UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**11 CIV 8757**

ECF CASE

-------------------------------------------------------------x

PIERRE LAGRANGE and
G&S TRUSTEES LIMITED,

                   Plaintiffs,

      -against-

KNOEDLER GALLERY, LLC, d/b/a
KNOEDLER & COMPANY, and
ANN FREEDMAN,

                 Defendants.

-------------------------------------------------------------x

:
:
:
:
:
:
:
:
:
:
:
:

Case No.

**COMPLAINT**

DEC 01 2011

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Pierre Lagrange ("Lagrange"), and G&S Trustees Limited ("G&S"), as trustee of a trust dated June 21, 2000, of which Mr. Lagrange is the principal beneficiary, by and through their undersigned attorneys, for their Complaint against defendants Knoedler Gallery, LLC, d/b/a Knoedler& Company ("Knoedler") and Ann Freedman ("Freedman") (collectively, the "Defendants"), state as follows on knowledge as to themselves and their own acts and on information and belief as to all other matters, which will likely have evidentiary support after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action for breach of express and other contractual warranties, fraud and unjust enrichment, arising out of Defendants' sale of a painting, purportedly by Jackson Pollock, titled *Untitled, 1950* (the "Work") to the Plaintiffs in November 2007 for $17 million (including commissions).

2.    Representing that the Work was owned privately by a collector who had inherited it, the Defendants warranted that the Work is an authentic painting by Pollock,

the famous American artist.  In reality, the Work is a forgery and the provenance is demonstrably false.  The work is neither authentic nor saleable.

3.      G&S purchased the Work in November 2007 from defendant Knoedler, a prominent art gallery based in New York.  Freedman was Knoedler's Director and President during the relevant period and was directly involved in selling the Work to G&S through Mr. Lagrange.

4.      At the time of the sale, the Work was *not* included in the Jackson Pollock *catalogue raisonné*, "a definitive catalogue of the works of a particular artist." *Thome v. Alexander & Louisa Calder Foundation*, 890 N.Y.S.2d 16, 20 (2009) (citing *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1113 (S.D.N.Y. 1992)).  As is well known in the art world, and as the courts in this State have recognized, "inclusion of a painting in a catalogue raisonne serves to authenticate the work, while non-inclusion suggests that the work is not genuine." *Id.*

5.      Because Defendants were well aware that the Work's omission from the *catalogue raisonné* effectively rendered the Work unsalable, they falsely represented to Mr. Lagrange, directly and indirectly, that the Pollock *catalogue raisonné* was in the process of being updated and that the revised version would include the Work.  These representations were false and Defendants knew it. Plaintiffs relied on these representations when they agreed to purchase the Work.

6.      In fact, there were no definitive plans to update the Pollock *catalogue raisonné* and there had been no discussion of including the Work.  On information and belief, Knoedler had the Work in its possession for over seven years and was unable to

sell the Work during that period for this very reason.

7.     Defendants also represented to Mr. Lagrange that the Work had been shown to twelve leading Pollock scholars, all of whom expressed "positive opinions" of the Work. This representation was false as well.  In fact, on information and belief, nearly all the scholars who viewed the Work did not express any opinion about it at all.  Again, Plaintiffs relied on these representations in agreeing to purchase the Work.

8.     Because the Work is not included in the Pollock *catalogue raisonné*, the Foundation has no plans to update the *catalogue,* and Knoedler refused to provide additional provenance information, Plaintiffs found it impossible to sell the Work.  On or about October 29, 2010, G&S, through Mr. Lagrange, offered the Work to the auction house Sotheby's, Inc. ("Sotheby's") for private sale.  Sotheby's, however, rejected the Work outright because it was not included in the Pollock *catalogue raisonné*.

9.     Christie's Inc. ("Christie's") also rejected the Work because of questions concerning its authenticity and provenance, principally due to its omission from the *catalogue raisonné*.  Christie's explained in a May 10, 2011 letter to Knoedler that "[i]t is our belief, and generally agreed in our industry, that Pollock paintings not listed in the *catalogue raisonné*, are rarely accepted in the marketplace."  Knoedler also refused to provide additional information to Christie's, without which Christie's would not even consider the Work for sale.

10.     After Sotheby's and Christie's refused to sell the Work, Plaintiffs demanded that Defendants come forward with at least some evidence supporting their warranties about the Work.  But Defendants have not produced a shred of paper or other

evidence supporting their false claims.  In fact, Knoedler has refused to provide Plaintiffs

with even the name of the collector who sold it the Work — information that Christie's

requested to better understand the Work's provenance.  Nevertheless, Plaintiffs recently

learned that the Work was co-owned by Knoedler and another investor at the time of the

sale, contrary to the representation that it was passed by descent.

11.    Because Defendants refused to provide additional information concerning

the Work, Plaintiffs commissioned a preeminent materials-analysis and consulting firm to

examine and analyze the Work.  Test results confirmed Plaintiffs' fears that the Work is a

fake: "Examination and analysis of materials used to create the [Work] revealed physical

evidence that certain materials are inconsistent and evidently irreconcilable with the

claimed attributes that Jackson Pollock painted the [W]ork in 1950 — or any other date."

12.    Remarkably, just one day after Plaintiffs provided Defendants with a copy

of the written report declaring the Work to be a forgery, Knoedler announced its

permanent closing after 165 years in business.  *See*

http://www.nytimes.com/2011/12/01/arts/design/knoedler-art-gallery-in-nyc-closes-after-

165-years.html.

13.    In sum, relying on Defendants' warranties and material misrepresentations,

Plaintiffs were induced to pay $17 million for a painting that they cannot sell, even

though the market value for Pollock paintings has substantially increased in the years

since the purchase.  Plaintiffs therefore are entitled to a judgment rescinding the

November 2007 sale of the Work, or awarding Plaintiffs compensatory damages, as well

as punitive damages.

## PARTIES, JURISDICTION AND VENUE

14.     Lagrange is a citizen of Belgium and resides permanently in London, England.

15.     G&S is a corporation organized under the laws of the Island of Jersey, with its registered office at 15 Esplanade, St Helier, JE1 1RB, Jersey, Channel Islands.

16.     Knoedler is a Delaware limited-liability company with its principal place of business located at 19 East 70th Street, New York, New York.  Knoedler's sole member is 8-31 Holdings, Inc., a Delaware corporation whose principal place of business is located at 19 East 70th Street, New York, New York.

17.     Freedman was the Director and President of Knoedler during the relevant period and resides permanently in New York, New York.

18.     This Court has personal jurisdiction over the Defendants under N.Y.C.P.L.R. § 301.  To the extent that any defendant is not located in New York, this Court also has personal jurisdiction under N.Y.C.P.L.R. § 302(a) because this action arises out of the transaction of business in New York.

19.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because (i) the action is between citizens of a State and citizens of a foreign state; and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because all Defendants reside in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the conduct complained of herein occurred in this District.

## STATEMENT OF FACTS

**Defendants Falsely Warrant That**
**The Work Has An Established Provenance**

21.     In or about October 2007, Mr. Lagrange learned from the art dealer Jaime Frankfurt, the principal of Frankfurt LLC, and Tim Taylor, another art dealer (collectively, the "Intermediaries"), that Knoedler was offering a Jackson Pollock painting for sale in New York. Mr. Lagrange expressed interest in the Work.

22.     The Intermediaries informed the Defendants that Mr. Lagrange was a potential buyer of the Work. To induce Plaintiffs to purchase the Work, Knoedler and Freedman assured the Intermediaries that: (1) the Work was authentic and had been viewed favorably by a number of leading Pollock experts; (2) the Work's provenance was sound and verifiable (*i.e.*, the Work was from the private collection of a collector who had obtained it directly from Jackson Pollock, through David Herbert, as agent for Pollock and an advisor to the private collector who purportedly purchased it); and (3) the Work was owned by an individual owner who had inherited it from the initial acquirer.

23.     Plaintiffs relied on similar assurances that Knoedler and Freedman made directly to them. In connection with the sale, for example, Knoedler and Freedman provided Mr. Lagrange with an undated Knoedler "Description of Work" stating in part:

> Provenance: The artist (via David Herbert).   Private collection. By descent to present owner. David Herbert often acted both as agent for the artist and as advisor to the collector.

24.     But Knoedler and Freedman had substantial reasons to question the Work's provenance and authenticity. On information and belief, Knoedler and Freedman had

purchased several purported works by various significant artists, including Jackson

Pollock, from a collection that David Herbert had purportedly assembled in or around

1955 for a Mexican collector.  On information and belief, in 2003 one of those purported

Pollock paintings was sent to the authentication service of the International Foundation

for Art Research, which judged it to be a counterfeit.

 25. On information and belief, E.V. Thaw, co-author of the Pollock *catalogue*

*raisonné*, saw two of the purported Pollock paintings from the Herbert collection and

questioned their authenticity and provenance.  Thaw shared his opinion with E.A.

Carmean, one of the experts whom Knoedler had consulted about the Work.

 26. On information and belief, David Herbert did not, as Knoedler and

Freedman represented, act individually as an agent for Pollock, who was from the late

1940's through 1950's represented by galleries (Betty Parsons and Sidney Janis) where

David Herbert was on staff as an employee.

 27. On information and belief, Knoedler's and Freedman's further

representation that the Work was in a "Private Collection" through which the "Present

Owner" represented by Knoedler and Freedman acquired it "by descent" was also false.

On information and belief, at the time of the sale to G&S, the Work was owned by

Knoedler and an investor, not by a "Private Collection."

 28. In sum, Knoedler and Freedman knew that there were grave concerns about

the Work's authenticity and provenance, but nonetheless willfully concealed these

concerns and the questions surrounding the Work's authenticity and provenance as part

of their scheme to induce Plaintiffs to buy the Work.

**The *Catalogue Raisonné* Misrepresentations**

29.    The omission of the Work from the Pollock *catalogue raisonné* caused Knoedler and Freedman to know that the Work was not salable.  In fact, even if the Work were an authentic Pollock with a reputable provenance, its omission from the *catalogue raisonné* by itself would impair or destroy the Work's marketability.

30.    To convince Plaintiffs to purchase the Work notwithstanding its omission from the Pollock *catalogue raisonné*, the Defendants concocted a story and assured Mr. Lagrange that the Work would be included in an upcoming supplement to the *catalogue*. Plaintiffs relied on those assurances when they agreed to purchase the Work.

31.    Specifically, Knoedler and Freedman communicated to Mr. Lagrange, through the Intermediaries, that the Pollock-Krasner[1] Foundation (the "Foundation"), a charitable foundation that issued a supplement to the Pollock *catalogue raisonné* in 1995, was aware of the Work and was in the process of issuing a "supplement" to the *catalogue raisonné* that included the Work.

32.    In fact, during an October 12, 2007 meeting at Mr. Taylor's Gallery in London to discuss Mr. Lagrange's interest in the Work, Freedman brought with her transparencies and papers relating to the Work, including a list of Pollock scholars who allegedly had viewed the Work.  She pointed out to Mr. Taylor, among other things, that two of the scholars on the list were officers of the Foundation, and then assured Mr. Taylor unequivocally that the Work would appear in a forthcoming addendum to the

---

[1]    "Krasner" refers to the Foundation's founder, Lee Krasner.  Ms. Krasner was Pollock's wife and, after his death in 1956, his widow.

8

Pollock *catalogue raisonné*. Shortly thereafter, Mr. Taylor conveyed Freedman's assurances to Mr. Lagrange.

33.     Ms. Freedman similarly represented to Mr. Frankfurt during a meeting with him at her offices in late summer/early fall 2007 that the Work would appear in a forthcoming addendum to the Pollock *catalogue raisonné*. Mr. Frankfurt, in turn, conveyed Freedman's assurances in this regard to Mr. Lagrange. Plaintiffs relied on those assurances when they agreed to purchase the Work.

34.     As with Defendants' other misrepresentations about the Work's authenticity and provenance, these representations too were false. The Foundation had — and has — *no* definitive plans to revise or supplement the *catalogue raisonné*, and no other person or entity is authorized to do so. In fact, the Foundation has disbanded its authentication committee and is unwilling to authenticate the Work (or any other work purportedly by Pollock).

35.     The Foundation's decision not to issue authenticity determinations (made in the face of litigation over earlier determinations) occurred over a decade ago, and was well known to Defendants. Accordingly, the Defendants knew that their representation that the Work would be in the next supplement of the *catalogue raisonné* was false.

36.     To further convince Plaintiffs to purchase the Work notwithstanding its omission from the Pollock *catalogue raisonné*, the Defendants assured Mr. Lagrange that twelve different Pollock scholars had viewed the Work and expressed "positive opinions" about it. Defendants made this assurance to convince Plaintiffs that there were no questions about the Work's authenticity and that the Work was fully marketable. In fact,

on information and belief, nearly all the identified scholars who viewed the Work did not express any opinions about it, let alone "positive" ones.

**The November 2007 Purchase**

37.    On or about November 6, 2007, relying on Defendants' assurances about the Work's authenticity and provenance, Plaintiffs agreed to purchase the Work for $17 million.

38.    While it was understood by all concerned that Knoedler was selling the Work for the benefit of Mr. Lagrange, the sale was structured to be executed in two closely connected stages (a practice common in the art industry).

39.    First, on November 6, 2007, Knoedler sent an invoice to Frankfurt LLC for a total purchase price of $15,300,000 (the "Knoedler Invoice").  The Knoedler Invoice included the following warranty about the Work and its provenance:

> Jackson Pollock (American 1912 – 1956)
> Untitled, 1950
> Oil, enamel and aluminum paint on masonite
> Mounted on wood
> 15 X 28 ½ inches (38.1x72.4 cm)
> signed lower right: "J. Pollock"
>
> Provenance:
> The artist (via David Herbert)
> Private collection
> By descent to present owner

40.    Second, on November 8, 2007, Frankfurt LLC sent an essentially replicate invoice to G&S for a total purchase price of $17,000,000 (*i.e.*, the amount due Knoedler plus a 10% commission split by Frankfurt LLC and Mr. Taylor).  This invoice bore the same warranty about the Work and its provenance as set forth on the Knoedler Invoice.

41.    Plaintiffs duly paid the purchase price and received the Work.

**Plaintiffs' Efforts To Sell The Work**
**And Defendants' Further Misrepresentations**

42.    On or about October 29, 2010, G&S, through Mr. Lagrange, offered the Work to Sotheby's for private sale.  G&S and Mr. Lagrange were shocked to learn a few days later that Sotheby's refused to sell the Work because of questions concerning its provenance and authenticity.

43.    In or about November 2010, Mr. Lagrange contacted Mr. Frankfurt and explained the difficulties in selling the Work, and Sotheby's concerns about the Work's provenance.

44.    Mr. Frankfurt, in turn, contacted Freedman (who by this time had left Knoedler and was establishing her own art gallery in New York, to be called FreedmanArt) and explained that Mr. Lagrange was seeking to sell the Work and that Sotheby's had rejected the Work because it was not in the *catalogue raisonné*.

45.    Freedman asked Mr. Frankfurt to assure Mr. Lagrange that both Knoedler and FreedmanArt were interested in selling the Work, that they thought the Work was readily salable, that they would take responsibility for selling the Work, and that it could be sold for more than $17 million.  In an effort to cover up her fraud, Freedman also repeated her previous false assurances that the Foundation was going to publish a revised or supplemental *catalogue raisonné* that would include the Work.

46.    On November 15, 2010, Mr. Frankfurt sent the following e-mail to Mr. Taylor:

Good to talk to you over the weekend.   As I said, Ann
[Freedman] is very excited and appreciative that I have talked
to her about handling the sale of the Pollock.   She has a
specific collector in mind for the [Work] and is ready to move
forward.   She will email this week with a proposal.   Knoedler
is also interested in selling the [Work] but I feel strongly that
Ann will get a better result.   The Pollock foundation has been
without a head and that is about to be resolved. *They are well
aware of the [Work] and it will be included in the supplement
to the catalogue raissone.*

*In present market conditions Pierre should at the very least
recoup his investment but I think there should be a profit.*  I
don't know how Pierre feels but the sooner we can get the
[Work] to New York the better.   I would like to get this
moving before everyone leaves for the holidays.

(Emphasis added).  This e-mail subsequently was conveyed to Mr. Lagrange.

47.     In a further effort to conceal Defendants' fraud and perpetrate the lie that

the Work would be included in a forthcoming supplement to the Pollock *catalogue*

*raisonné*, Freedman sent to Mr. Frankfurt an e-mail (which was subsequently forwarded

to Jasper Sharp, Mr. Lagrange's representative), asking him to "communicate" to Mr.

Lagrange:

That FreedmanArt would like to have this most significant
painting on consignment for resale.  I will be letting you
know more regarding the management transition taking place
at   The   PK   [Pollock/Krasner]   Foundation,   their   new
initiatives, *as they move forward with plans for a newly
revised CR [catalogue raisonné], to include the number of
discovered Pollocks since the time of its now outdated black
and white publication from the mid 70s.*  A major publication
of updated research and new scholarship on Pollock, will
serve as a very important contribution to both the institutional
and art collecting community, and will certainly be relevant
to the marketplace.  I look forward to speaking with you soon.

(Emphasis added).  Once again, Freedman's representations concerning the Foundation's alleged "plans" to publish a newly revised *catalogue raisonné* were false.

48.     After receiving Freedman's e-mail, Mr. Sharp contacted the Foundation and asked one of its representatives if the Foundation in fact intended to issue a new supplement to the Pollock *catalogue raisonné*.  Mr. Sharp was told: "absolutely not."

49.     Over the next several months, Defendants continued their efforts to perpetrate a fraud by repeating the knowingly false assertion that the Work would be included in a revised *catalogue raisonné* to be issued by the Foundation.

50.     Thus, on December 13, 2010, Mr. Frankfurt sent an e-mail to Mr. Lagrange's representative, reporting that he "[h]ad a long conversation with Ann Freedman who is going to get something in writing from the foundation" about the Work. The next day, Mr. Frankfurt followed up with another e-mail to Mr. Lagrange's representative, reporting that "Ann Freedman is actively working on getting something from the foundation."

**The December 18, 2010 Meeting With Ann Freedman**

51.     On December 18, 2010, Ms. Freedman and her associate, Per Jensen, met with Mr. Lagrange's representatives in New York to discuss the Work.

52.     During the meeting, Ms. Freedman confirmed that she had been personally involved in selling the Work to Plaintiffs in November 2007 and the Defendants knew at the time of the sale that the Work was not included in the Pollock *catalogue raisonné*.

53.     Moreover, she repeated the misrepresentations made previously to Mr. Lagrange about the Work's provenance and the plans to include the Work in a

13

forthcoming supplement to the Pollock *catalogue raisonné*. Freedman said that she had

spoken to a lawyer for the Foundation who told her that the Foundation was discussing

the possibility of issuing a statement that it planned to "go forward with a new update to

the catalogue."

54.   Incredibly, during the meeting, Ms. Freedman even claimed that the

Knoedler Invoice itself stated that the Work was "to be included" in a forthcoming

supplement to the Pollock *catalogue raisonné*. This was demonstrably false, as the

Knoedler Invoice does not refer to the *catalogue raisonné* in any way.

## Mr. Lagrange Meets With Frank Del Deo of Knoedler

55.   On February 4, 2011, Mr. Lagrange met with Frank Del Deo, Knoedler's

President and Director, to discuss the Work. During the meeting, Mr. Lagrange

demanded that Knoedler agree to rescind the sale.

56.   Following the meeting, Mr. Del Deo refused to rescind the sale, again

falsely representing to Mr. Lagrange that every leading scholar who had viewed the Work

had expressed "positive opinions" about it.

## Christie's Rejects The Work

57.   Now painfully aware that the Work was unsalable, in an effort to mitigate

damages, Plaintiffs relented to Defendants' urging to ship the Work to Freedman in New

York so that she could attempt to sell it on their behalf. She was unsuccessful.

58.   On March 2, 2011, Plaintiffs submitted the Work to Christie's to determine

whether it would be in a position to sell the work.

59.    In May 2011, Christie's sent to Knoedler a letter (that was subsequently forwarded to Mr. Lagrange) explaining that Christie's was "not able to consider [the Work's] sale" because it was not in the Pollock *catalogue raisonné*:

> Mr. Lagrange has now asked Christie's to endeavor to sell the painting on his behalf. As you know, the painting is not listed in the Jackson Pollock *catalogue raisonné*. *Though we understand the anecdotal provenance of the painting to be from David Herbert, it would be very helpful for you to provide the name of the consignor so we can better understand the painting's history. It is our belief, and generally accepted in our industry, that Pollock paintings not listed in the catalogue raisonné are rarely accepted in the marketplace. It is only those paintings with clear histories dating back to the artist which have found acceptance. Without further information about the provenance . . . we are not able to consider its sale.*
>
> Mr. Lagrange is concerned about the marketability of his painting as it stands now. It is my hope that you will be able to furnish additional provenance for the painting . . . .

(Emphasis added).

60.    On May 26, 2011, Mr. Del Deo of Knoedler wrote to Christie's, stating that Knoedler was "not able to provide you with any additional information with respect to this work other than what Mr. Lagrange already has in his possession."

**Forensic Analysis Confirms That
<u>The Work Is Not An Authentic Pollock</u>**

61.    Because Defendants refused to provide additional information concerning the Work, Plaintiffs commissioned a preeminent materials-analysis and consulting firm (the "Consulting Firm") to examine and analyze the Work.

62.     Using the same technologies that it had used previously to identify as fakes numerous other purported Jackson Pollock paintings, the Consulting Firm conclusively "rule[d] out Jackson Pollock as the source of both the [Work] and signature."

63.     As summarized in its report, dated November 29, 2011, the Consulting Firm determined that two of the paint samples "that were clearly and unambiguously integral to the original creation of the [Work] — not later addition or restoration," were "discovered in 1957," "first patented in 1962," and likely were not "commercially available" until 1970.  As Jackson Pollock died in 1956, the Consulting Firm concluded, the use of these "materials are inconsistent and evidently irreconcilable with the claimed attributes that Jackson Pollock painted the [W]ork in 1950 — or any other date."

**Knoedler Unexpectedly**
**Announces Its Permanent Closing**

64.     On November 30, 2011, just one day after Plaintiffs provided Defendants with a copy of the Consulting Firm's written report declaring the Work a forgery, Knoedler announced its permanent closing, ending its 165-year run as one of the country's oldest art galleries.

65.     According to a New York Times article, dated November 30, 2011, Knoedler announced its closing in the following brief statement:  "It is with profound regret that the owners of Knoedler Gallery announce its closing, effective today.  This was a business decision made after careful consideration over the course of an extended period of time.  Gallery staff will assist with an orderly winding down of Knoedler

16

Gallery." *See* http://www.nytimes.com/2011/12/01/arts/design/knoedler-art-gallery-in-nyc-closes-after-165-years.html.

## FIRST CAUSE OF ACTION
### Breach of Express Warranty
### (Against All Defendants)

66.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 65 as if fully set forth herein.

67.    Prior to and at the time of the sale, for the purpose of inducing Plaintiffs to consummate the transaction and as part of the basis of the bargain, Knoedler and Freedman represented to Mr. Lagrange expressly and unequivocally that: (1) the Work was created by Jackson Pollock in 1950; (2) the Work would be included in a forthcoming supplement to the Jackson Pollock *catalogue raisonné*; (3) several leading Pollock scholars had viewed the Work and all had expressed "positive opinions" about it; and (4) the Work's provenance was as stated in the sales invoices (*i.e.*. it was owned by the descendant of a collector who had acquired the Work directly from Jackson Pollock.

68.    These representations constitute express warranties under N.Y.U.C.C. § 2-313(1).

69.    In addition, the representations concerning authenticity and provenance in the invoices by the Defendants (who are art merchants) to Plaintiffs (who are not) constitute express warranties under § 13.01 of the New York Arts and Cultural Affairs Law.

70.    Plaintiffs, in agreeing to consummate the transaction, relied on Defendants' express warranties concerning the Work's authenticity, provenance and inclusion in an

updated addendum to the Pollock *catalogue raisonné*. Plaintiffs would not have

purchased the Work at any price had they been aware that Defendants' warranties were

false.

71.    Accordingly, Plaintiffs have been damaged as a result of Defendants'

breaches of their express warranties. Plaintiffs' damages consist of the amount paid for

the Work, $15.3 million, plus the difference between that amount and the current value of

the Work had it been as warranted.

**SECOND CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability**
**(Against Defendants)**

72.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1

through 71 as if fully set forth herein.

73.    Defendants are merchants with respect to goods of the kind that they sold to

Plaintiffs (namely, works of fine art), and hold themselves out as having knowledge and

skill particular to art, including modern American art such as the Work. Accordingly,

under N.Y.U.C.C. § 2-314, there was an implied warranty in the sale of the Work that it

was merchantable.

74.    Defendants breached the implied warranty of merchantability because the

Work cannot pass without objection in the trade as an authentic Pollock painting (verified

as such in the *catalogue raisonné*), and the warranted provenance — "the artist (via

David Herbert) / Private collection / By descent to present owner" — cannot be

substantiated.

75.    Plaintiffs notified Defendants of their breach of the implied warranty of

18

merchantability within a reasonable time after discovering the breach.

76.    Plaintiffs have sustained substantial damages as a result of Defendants' breaches.  Plaintiffs' damages consist of the amount paid for the Work, $15.3 million, plus the difference between that amount and the current value of the Work had it been as warranted.

### THIRD CAUSE OF ACTION
### Fraud
### (Against All Defendants)

77.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 76 as if fully set forth herein.

78.    Defendants fraudulently induced Plaintiffs to purchase the Work by misrepresenting that the Work would be included in a forthcoming supplement to the Jackson Pollock *catalogue raisonné* while knowing that such inclusion would not occur, and in fact was impossible.

79.    Defendants fraudulently induced Plaintiffs to purchase the Work by knowingly misrepresenting the Work's provenance, and by falsely representing that several leading Pollock scholars had viewed the Work and expressed positive opinions about it.

80.    Defendants' misrepresentations were material because Plaintiffs would not have purchased the Work had they known them to be false.

81.    Plaintiffs' reliance on these misrepresentations was reasonable given the Defendants' superior knowledge and position as allegedly reputable art merchants.

82.    In reliance on Defendants' misrepresentations and omissions, Plaintiffs

19

were damaged in the amount of $15.3 million, consisting of the purchase price they paid for the Work.

83.    Because Defendants engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage Plaintiffs, Plaintiffs are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**Unilateral Mistake**
**(Against All Defendants)**

84.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

85.    There existed a mistake by Plaintiffs by virtue of their belief that: (1) the Work was fully marketable; (2) the Work's provenance was from a private collector who obtained the work directly from Jackson Pollock; (3) there were no questions about the Work's authenticity; (4) the Work would be included in a revised Jackson Pollock *catalogue raisonné*; and (5) several leading Pollock scholars had viewed the Work and expressed positive opinions about it.

86.    Plaintiffs agreed to and did purchase the Work without any knowledge of these mistakes.

87.    Plaintiffs have fully performed all the obligations required of them under the purchase agreement.

88.    Plaintiffs have no adequate remedy at law.  As a result, Plaintiffs are entitled to a judgment rescinding the purchase.

20

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (Against All Defendants)

89.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 88 as if fully set forth herein.

90.    Defendants made numerous material misrepresentations and omissions regarding the authenticity of the Work.

91.    As a result of Defendants' conduct, Plaintiffs were induced to purchase the Work for $17 million (including commission).

92.    Accordingly, the Defendants have been unjustly enriched to Plaintiffs' direct detriment.

93.    It is against equity and good conscience to permit Defendants to keep the $15.3 million they received in connection with the sale of the Work.

94.    Rescission of the November 2007 sale is appropriate because failure to rescind the sale would result in unjust enrichment to the Defendants.

### JURY TRIAL DEMAND

Plaintiffs hereby request a trial by jury on all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a Judgment:

A.    Rescinding the November 2007 sale of the Work;

B.    Awarding Plaintiffs compensatory damages in an amount to be determined at trial, but no less than $15.3 million, plus the difference between that amount and the current value of the Work had it been as warranted, plus interest;

21

C.     Imposing punitive damages on Defendants by virtue of their willful and intentional misconduct;

D.     Awarding Plaintiffs their costs, expenses, disbursements and reasonable counsel fees in an amount to be determined at trial; and

E.     Awarding Plaintiffs such other relief as the Court deems just and proper.

Dated:     December 1, 2011
           New York, New York

THE DONTZIN LAW FIRM LLP

By: Matthew S. Dontzin
    David A. Fleissig
    Judd B. Grossman
    6 East 81st Street
    New York, NY 10028
    (212) 717-2900 phone
    (212) 717-8088 fax

    *Attorneys for Plaintiffs Pierre Lagrange and
    G&S Trustees Limited*

*OF COUNSEL*

John R. Cahill, Esq.
Ronald W. Adelman, Esq.
Lynn & Cahill LLP
50 West 40th Street
New York, NY 10018
(212) 719-4400