1CDFGIL1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ------------------------------x
3
    RONI GILADI,
4
                    Plaintiff,
5
             v.                          94 CV 3976 (JPO)
6
    BERISH STRAUCH, HARRIS
7   STERMAN, MONTIFIORE MEDICAL
    CENTER, "JOHN DOE," "RICHARD
8   ROE," last two names being
    fictitious, true names being
9   unknown,

10                  Defendants.

11  ------------------------------x
                                         New York, N.Y.
12                                       December 13, 2011
                                         9:30 a.m.
13
    Before:
14
                    HON.  J. PAUL OETKEN,
15
                                         District Judge
16
                         APPEARANCES
17
    PHILIP J. DINHOFER
18        Attorney for Plaintiff

19  WILSON ELSER MOSKOWITZ EDELMAN & DICKER
         Attorney for Defendants
20  GERARD JOSEPH HEUBEL

21

22

23

24

25

1CDFGIL1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everyone.  All set for the

4  jury?

5          MR. DINHOFER:  We have a few matters to discuss.

6          THE COURT:  Okay.

7          MR. DINHOFER:  First of all, as I said yesterday, I

8  have some cases for your Honor regarding fraudulent concealment

9  cause of action from the Court of Appeals of the State of New

10 York.  The first is Simcuski v. Saeli and I've highlighted in

11 yellow the relevant text, but the relevant part is that the

12 Court of Appeals says standing alone such non-disclosure or

13 concealment will not, however, serve as the basis for a

14 distinct cause of action in fraud.

15         THE COURT:  Okay.  I'll look at this later.  We need

16 to get the jury going.  Is there -- we'll look at this --

17         MR. DINHOFER:  The other case also, where they say if

18 he had, he only pled malpractice, but there was a statute of

19 limitations issue, and they said it would have been okay in

20 dictum more or less, if he had been timely he would have had

21 his fraudulent concealment, equitable estoppel.

22         THE COURT:  Anything else?

23         MR. HEUBEL:  Yes, I --

24         MR. DINHOFER:  I have something else.  I'm sorry.

25 Judge I'm going to be going ahead with my client today, and I

1CDFGIL1

```
1    want to be sure we have some understanding.  I was not allowed
2    to question Dr. Strauch with regard to his prior acts of
3    malpractice and I want to be sure counsel is not going to be
4    questioning my client about his prior lawsuit against Albert
5    Einstein College of Medicine for employment discrimination, I
6    think that the same rules that apply to why I couldn't go into
7    that with Dr. Strauch cover this case as well.
8              THE COURT:  Mr. Heubel, are you going to be going into
9    that?
10             MR. HEUBEL:  I'm not planning on going into it, except
11   to bring out that there was a prior lawsuit.
12             MR. DINHOFER:  That's the whole point.  The fact he
13   sued his employer has no relevance to this case.
14             THE COURT:  Has it come up yet?
15             MR. DINHOFER:  No.
16             MR. HEUBEL:  I don't think so.
17             THE COURT:  Wasn't there a motion in limine relating
18   to disability claim, and I think the ruling was that it was
19   excluded except if it's necessary to rebut something in
20   plaintiff's case.  I don't think there's relevance to it.
21             MR. HEUBEL:  Please note my exception.
22             THE COURT:  Okay.
23             MR. DINHOFER:  So we won't be hearing from that
24   transcript at all then.  He won't pull that out.  I couldn't do
25   it with the doctor with the malpractice transcript.
```

1CDFGIL1

1              MR. HEUBEL:  I don't intend to do that.

2              MR. DINHOFER:  Okay.

3              THE COURT:  Anything else?

4              MR. HEUBEL:  Just one thing.  Counsel and I had agreed

5      to admit in evidence the records of Dr. Morton Spinner.  I've

6      made copies of those and I'd like to have them marked and

7      admitted by stipulation.

8              THE COURT:  Okay.  Is that agreed upon?

9              MR. DINHOFER:  Well, I did stipulate, your Honor, the

10     only thing, I wish counsel had done this sooner, I might have

11     used it when I was in that dark phase of my cross-examination

12     of Dr. Strauch.  I was deprived of that opportunity because he

13     didn't bring it in any sooner, but I did agree to it.

14             MR. HEUBEL:  We both had copies of it, Judge, and both

15     had an equal opportunity to do it.

16             MR. DINHOFER:  That was your exhibit, not mine.  You

17     said you were going to bring it in.

18             MR. HEUBEL:  We stipulated --

19             MR. DINHOFER:  You said you were going to bring it in.

20     I'm not disagreeing.  It was stipulated.

21             THE COURT:  You can bring it in.

22             MR. DINHOFER:  I just wish you had done it sooner.

23             THE COURT:  Anything else?

24             MR. HEUBEL:  Can I pass this up?

25             THE COURT:  Sure.  Just leave it for Mr. Skolnik.

1CDFGIL1

1           MR. DINHOFER:  Do you have a tag?

2           MR. HEUBEL:  Are we up to 15?

3           MR. DINHOFER:  You're marking it Defendant's B?

4           MR. HEUBEL:  Defendant's B.

5           MR. DINHOFER:  Then you can offer it in front of the

6   jury I guess at some point.

7           THE COURT:  Okay.  Anything else for now?

8           MR. HEUBEL:  No, Judge.

9           THE COURT:  Okay, you can bring the jury in.

10           (Pause)

11           THE COURT:  A note from the jury.

12           MR. DINHOFER:  I guess if the jury asks for the

13   exhibits we're not going to give them the redactions because

14   they could read what they couldn't read, right?

15           THE COURT:  Well, we'll address that -- okay.  I have

16   a note from the jury dated today, 12/13/11, 9:45 a.m.  "Your

17   Honor" -- there are four points.  Number one, Juror No. 5 will

18   not be able to attend on Monday, 12/19 and would prefer not to

19   be here on Friday 12/16 also.  Two:  Juror No. 2 would prefer

20   not to be here on Thursday after 3:30 p.m.  Three:  Juror No. 1

21   would prefer not to be here on Thursday after 2:00 p.m.  Four:

22   Juror No. 8 would like to keep a firm 4:30 p.m. on Wednesday.

23   I assume that means a firm 4:30 p.m. appointment on Wednesday.

24           MR. HEUBEL:  Appointment or --

25           MR. DINHOFER:  End time.  The end time we meet.

1CDFGIL1

```
 1            MR. HEUBEL:  It could be the end time, we're not sure.

 2            THE COURT:  Maybe it means a firm end time on

 3    Wednesday.

 4            I think what this means is we're at serious risk of

 5    losing the jury.  We told them five to seven days, I told them

 6    five to seven days and they're getting antsy.  I think we've

 7    got to finish the evidence in this case tomorrow and get the

 8    case to go to the jury on Thursday or tomorrow.

 9            MR. HEUBEL:  Judge, I've instructed my expert to be

10    here 9:30 sharp tomorrow and I don't see any reason why we

11    can't continue with him, and I may put Dr. Strauch on if my

12    case begins this afternoon, and that should not take up a lot

13    of time, but will take up some.

14            I think, though, your Honor was fairly accurate,

15    though.  We've had I guess five days worth of testimony, so

16    you're still pretty much on the mark, I think.

17            MR. DINHOFER:  We didn't work Friday.

18            THE COURT:  No, that's true.  Okay.  So some of these

19    may be moot if we do finish Wednesday or early Thursday.  I'm

20    hoping we finish Wednesday.

21            MR. DINHOFER:  You could tell the jury just that fact,

22    we hope to get the case to them by late Wednesday afternoon or

23    early Thursday morning, depending on how it plays out.

24            THE COURT:  Okay, you can bring them in.

25            (Continued on next page)
```

1CDFGIL1

1           (In open court; jury present)

2           THE COURT:  Good morning, ladies and gentlemen.

3    Please be seated.  I've received the note from your foreperson,

4    and I appreciate your continued patience and work on the case.

5    I understand that there are some scheduling issues that come up

6    and I will bear those in mind, and I've informed the parties to

7    bear those in mind.  I do think, I do hope to get the evidence

8    completed by tomorrow so that the case, we're hopeful the case

9    will go to you, the jury, by the end of tomorrow or first thing

10   Wednesday or Thursday morning.  Hopefully by the end of

11   tomorrow.  We'll do our best to get the case to you and also

12   accommodate your scheduling issues.  Okay?

13           So we're going to continue now with testimony still in

14   plaintiff's case, and this is, there was earlier testimony that

15   we began for scheduling reasons when Mr. Dinhofer was

16   questioning Mr. Giladi, the plaintiff in the case, and he's

17   going to be, I believe, continuing with that testimony now.

18           MR. DINHOFER:  Before we do that, your Honor, there

19   was just one brief thing.  I was going to request that the

20   Court take judicial notice of the following statutes.  18,

21   United States Code, Section 24, which is definition --

22           MR. HEUBEL:  Judge --

23           THE COURT:  You object to this?

24           MR. HEUBEL:  Yes.  I don't think that it's appropriate

25   that we do this at this point.

1CDFGIL1

```
 1              THE COURT:  We'll talk about this --
 2              MR. DINHOFER:  It's part of my case in chief, your
 3   Honor.  It has to be in evidence.
 4              THE COURT:  Well, I have to decide whether I'm going
 5   to take notice of it.
 6              MR. DINHOFER:  Can we have a sidebar?
 7              THE COURT:  Not now.
 8              MR. DINHOFER:  Okay.  Then we'll resume with
 9   Mr. Giladi.
10    RONI GILADI,
11        called as a witness by the Plaintiff,
12        having been previously duly sworn, testified as follows:
13              THE COURT:  Mr. Giladi, I remind you you're still
14   under oath from your previous testimony.  You may be seated.
15   DIRECT EXAMINATION
16   BY MR. DINHOFER:  (Continued)
17   Q.  Good morning, Mr. Giladi.
18   A.  Good morning.
19   Q.  If I recall correctly when we left off you told us about
20   how you had awoken from surgery from the pain that you had.
21   The subsequent office visits, I believe we went through the two
22   or three office visits that you had with Dr. Strauch and my
23   notes indicate we were somewhere around the March 13 '92 office
24   visit?
25   A.  Could be.  I believe so.
```

1  Q.  Okay.  Do you recall what occurred on that date?  I'm sorry

2  if I'm repeating a little bit, but just to pick up from where

3  we left off, but do you recall what occurred on that date?

4  A.  One second, please.

5        (Pause)

6  A.  Yes.

7  Q.  Could you tell us what occurred on that date?

8  A.  I went to visit Dr. Strauch for followup.  When I came to

9  his office I informed him that I -- this is a week or so after

10  my returning to work, like the first two weeks after returning

11  to work.  I explained to him that I'm having a very difficult

12  time to perform my duties at work, and I'm barely able to use

13  my left hand and I am putting all the pressure of my duty on my

14  right hand and using my body as a -- I'm sorry.

15        (Pause)

16  A.  Sorry.

17  Q.  Take a second, please.

18  A.  I told him that I -- it's very important for me to continue

19  with my job because I have kids to take care of, and I need his

20  help.  I told him that I, during the physical therapy that I

21  was been instructed or being told by Mrs. Lang to do at home,

22  the home exercises she gave me.  I'm doing the warm bath, but

23  the pain is not going away.  I'm still having swollen, my hand

24  is still swollen a little bit.  The sharp pain is still there.

25  The emission sensation is there, and I'm totally abusing my

1    body because I have a lot of work with heavy equipment which I

2    cannot do with two hands and I have to use my right hand and my

3    body to be able to carry it.

4             He told me that I had to be patient because in the

5    type of surgery that I had it would take about nine to ten

6    months for recovery.  At this moment I turned to him and I said

7    this is contradicted to what you told me before the surgery.

8    You never told me that.  You told me that within three to four

9    weeks, tops, four weeks, I will be at work in full steam and I

10   would be like I was the day I was born.  I don't feel so.  He

11   told me be patient, you're doing very well, you're improving

12   fine, and I will see you the next visit.

13   Q.  There were two things that you mentioned in there that I

14   just want to come back to for a second.  One is that you

15   mentioned at this point of this visit you had returned to work.

16   Do you remember when it is that you actually returned to work?

17   A.  I believe maybe the 9th or the 8th of March.  I cannot tell

18   you exactly the dates, but I think around the neighborhood

19   between the 5th to the 9th.

20   Q.  Was that more or less the date that was on the third form,

21   the third disability form, whatever that date was?

22   A.  Could be.

23   Q.  And the other thing you mentioned was a physical therapist,

24   Ann Lang?

25   A.  Yes, Ann Lang, when I was at his office in January, when

1   Dr. Strauch took the cast off, and he looked at my hand, I was

2   asking him or he refer, I do not recall exactly what happened,

3   but I went to the physical therapy and he told me that he would

4   like to go to his physical therapist which I went to her and I

5   was in her office and I was only once in with her in her

6   office.  It was never a second visit was scheduled and she gave

7   me what's called home exercise to do, which I followed up

8   religiously.

9   Q.  Now, over the next few months, did you continue to see

10  Dr. Strauch?

11  A.  Religiously, the way he told me to do.

12  Q.  And do you have any notes showing when you next saw

13  Dr. Strauch?

14  A.  As I said before, I don't have all the notes that I -- I

15  did not find all the notes, but my next notes go into July 30,

16  1992.

17  Q.  Okay.  Well, let's go back, because Dr. Strauch, if I

18  recall correctly, we saw in his notes that you were there on

19  April 3rd of 1992.  Did anything different occur, to your

20  recollection, on April 3rd of '92 than on any of the prior

21  visits?

22  A.  The next time, each time, each and every time I went to

23  Dr. Strauch I complained about the same things about burning

24  feeling, diminished sensations, difficulty to use the hands,

25  pain, sharp pain at the elbow.  I cannot be around people

1    because every touch to the elbow I will jump and I will have, I

2    will be have a lot of pain and discomfort for a long period of

3    time, and his response was on a regular basis, you're doing

4    well, be patient.

5    Q.  And would the same be true in May of '92 when you saw

6    Dr. Strauch?

7    A.  Yes.

8    Q.  And would the same be true in July of '92 when you saw

9    Dr. Strauch?

10   A.  Yes.

11   Q.  And during this next four-month period of time, are you

12   back at work?

13   A.  I was working and I was struggling and the people I'm

14   working with are mostly from the neurology department at

15   Montefiore on a regular basis do not understand what happened

16   to me that I'm not the same person I used to be before

17   December.  They know me as a very eager --

18              MR. HEUBEL:  Objection as to what other people thought

19   or said.  Hearsay.

20              THE COURT:  That's sustained.  Please just testify to

21   what you know and not what you surmise other people were

22   thinking or feeling.

23   A.  Since I came back to work, I was not doing my work the way

24   I used to.  Things taking me longer.  And in many cases I had

25   to even -- if I had a case supposed to start at 8:00 in the

1CDFGIL1                         Giladi - direct

1    morning I had to come three hours prior to the case to be able

2    to get things ready if I want the surgery to start on time.

3    Q.  And before Dr. Strauch's surgery, what time would you have

4    arrived and have started on time?

5    A.  A half hour, 45 minutes tops before surgery.

6    Q.  Did there come a time in July of 1992 -- withdrawn.  Did

7    there come a time in May of '92, I'm sorry, or during this

8    period of time between April and July of '92 where you sought

9    out other medical opinions?

10   A.  Yes.

11   Q.  Why is that?

12   A.  Because I felt there's something wrong with me and I want

13   to know what's going on and I find out that the doctors who did

14   the surgery on me --

15            MR. HEUBEL:  Objection.

16            THE COURT:  Wait for the next question.

17            MR. DINHOFER:  He was answering the question.  I don't

18   know what the objection was.  I asked him why --

19            MR. HEUBEL:  I thought he started to say, Judge, and I

20   found out -- I may have misheard that.

21            THE COURT:  Hold on a second.  Yes, the question was

22   did there come a time between April and July of '92 when you

23   sought out other medical opinion.

24            MR. DINHOFER:  And then why is that, and he was

25   telling us why.

1CDFGIL1                    Giladi - direct

1          THE COURT:  Why did you seek out other medical

2    opinions?

3          THE WITNESS:  Because I was not -- because my

4    complaint was not being addressed by the physician I'm going

5    to.

6    Q.  The physician you're going to, meaning Dr. Strauch?

7    A.  My surgeon.

8    Q.  Meaning Dr. Strauch?

9    A.  Yes.

10   Q.  Who did you see?

11   A.  I saw Dr. Goodrich.

12   Q.  And when did you go see Dr. Goodrich?

13   A.  I think a week or two or in this neighborhood.  After I saw

14   Dr. Strauch, I think after the July visit with Dr. Strauch.

15         MR. DINHOFER:  If I may, one second here.

16         (Pause)

17   Q.  Prior to seeing Dr. Goodrich, do you remember going for an

18   EMG test?

19   A.  I saw Goodrich in '92.  Yes, I went to see Dr.  -- I saw

20   Dr. Sadeh in Israel in November of 1992 -- '91.

21   Q.  That's December of '92.  In May of 1992 do you remember

22   seeing a Dr. Jerry Kaplan?

23   A.  Yes.

24   Q.  Who is Dr. Jerry Kaplan?

25   A.  He's a neurologist at Albert Einstein College of Medicine.

1          MR. DINHOFER:  All right, and for the record we have

2     Dr. Kaplan's records in evidence as Exhibit 4.

3     Q.  And how is it that you came to see Dr. Kaplan in 1992?

4     A.  I know Dr. Kaplan for many years and I had a job at

5     Einstein and when I was there I saw Dr. Kaplan and through our

6     conversation he told me --

7          MR. HEUBEL:  Objection.

8          THE WITNESS:  I stopped.

9          THE COURT:  Sustained.

10    Q.  Well, did you see Dr. Kaplan back in '87 when you had the

11    median nerve injury?

12    A.  I did.

13    Q.  And did you see him prior to that when you had a car

14    accident?

15    A.  I know him since '83.

16    Q.  Okay.  And could you tell us how many different EMG's has

17    Dr. Kaplan taken of you over the years?

18    A.  I believe a total of no more than four or five.

19    Q.  Okay.  And do you know what the results were of the EMG

20    that Dr. Kaplan performed on you?

21    A.  Dr. Kaplan, which I learned about the results, that he --

22          MR. HEUBEL:  Objection.

23          THE COURT:  Sustained.

24          MR. DINHOFER:  Okay.

25    Q.  When you saw Dr. Kaplan, was there any recommendation for

1CDFGIL1                         Giladi - direct

```
 1   treatment?

 2              MR. HEUBEL:  Objection.

 3              THE COURT:  I think it's hearsay.  Sustained.

 4              MR. DINHOFER:  Okay.

 5   Q.  Did Dr. Kaplan perform any treatment?

 6   A.  He did an EMG.

 7   Q.  Okay.  What was your next course of action following seeing

 8   Dr. Kaplan?

 9   A.  I saw Dr. Goodrich.

10   Q.  And what did Dr. Goodrich do for you?

11   A.  He took a history.  He did a physical examination and

12   during the physical examination he determined that I have

13   injury to the nerve.

14              MR. HEUBEL:  Objection.

15              THE COURT:  Sustained.

16              MR. HEUBEL:  As to what Dr. Goodrich determined.

17              MR. DINHOFER:  His records and reports are in

18   evidence, your Honor.

19              MR. HEUBEL:  And that's all that's in evidence, Judge.

20              THE COURT:  Yes.  I don't think he could testify to

21   what Dr. Goodrich told him because that would be hearsay.

22              MR. DINHOFER:  I don't think he was telling what he

23   told him.

24              THE COURT:  If it's in evidence, he can read from the

25   document.
```

1CDFGIL1                        Giladi - direct

1   Q.  Are you able to see on the monitor the July 27, 1992 report

2   of Dr. Goodrich?

3   A.  Yes.  He's writing exactly what I told him, that I gave him

4   a history, dated back to 1987, then he said that he underwent

5   surgery after EMG documented ulnar neuropathy by Dr. Strauch in

6   December of 1991 --

7           MR. HEUBEL:  Objection.  Judge, the witness was asked

8   a question and now he's reading from a document.  It's either

9   his testimony if it's permissible or we have the document.

10          THE COURT:  What was the question, counsel?

11          MR. DINHOFER:  I'll move on, your Honor.

12          THE COURT:  Okay.

13  Q.  Well, in the second paragraph of this report, Dr. Goodrich

14  states:  So in summary, what we have is a man status post ulnar

15  nerve transposition with neuroma or injury to the ulnar nerve

16  itself.  Did Dr. Goodrich communicate that information to you?

17  A.  Yes.

18  Q.  And then he says I have recommended to Roni that he have it

19  reexplored to find out what has happened to the nerve and to

20  rule out a neuroma.  Did Dr. Goodrich communicate that

21  information to you?

22  A.  Yes.

23  Q.  Based on that information that was communicated to you by

24  Dr. Goodrich, what did you next do?

25  A.  I did what Dr. Goodrich told me to do and I went back to

1CDFGIL1                    Giladi - direct

1    Dr. Strauch.

2    Q.  To this point in all the conversations you had with

3    Dr. Strauch, has he ever told you that you did not have an

4    ulnar nerve transposition on December 11 of 1991?

5    A.  December 12.

6    Q.  December 12, I'm sorry, December 12 of 1991.

7    A.  No.

8    Q.  So when do you next see Dr. Strauch after Goodrich?

9    A.  I believe in August.

10   Q.  Okay.  And did you communicate to him at that time that you

11   had been seen by Dr. Goodrich?

12   A.  I believe I told him, I do not know if I said clear

13   Dr. Goodrich, because Dr. Goodrich was not comfortable with the

14   issue because Dr. Strauch is boss.

15          MR. HEUBEL:  Objection.  Objection and move to strike.

16   Unresponsive and hearsay.

17          THE COURT:  It's statements in the form of treating,

18   so I think that that's a hearsay exception, so I'll allow it.

19   Q.  Okay.  Can you repeat that answer, because I'm not sure we

20   heard it over the objection.

21   A.  Dr. Goodrich was uncomfortable with situation --

22          MR. HEUBEL:  Objection.

23   A.  Because Dr. Strauch is boss in one area of his profession.

24          THE COURT:  The objection is sustained as to

25   statements about what Dr. Goodrich told the plaintiff.  He can

 1   testify to what he said to Dr. Goodrich, but not to what

 2   Dr. Goodrich said to him or what he was thinking.

 3          MR. HEUBEL:  And I ask, Judge, also that it be

 4   stricken.

 5          MR. DINHOFER:  I'm asking why he didn't mention it,

 6   and all he's saying is because Strauch was the boss he's

 7   uncomfortable about getting involved in that.  That's not

 8   communicating any statements.  It's the fact of why he didn't

 9   do what he said to do.

10          THE COURT:  It's testifying to a statement of Dr.

11   Goodrich or what Dr. Goodrich was thinking or feeling.

12          MR. DINHOFER:  He could have knowledge of that

13   personal relationship as well, your Honor.

14          THE COURT:  But he can't testify to what Dr. Goodrich

15   is comfortable or not comfortable with, so the jury is

16   instructed to disregard insofar as it states anything about

17   what Dr. Goodrich was thinking or was comfortable with or not

18   comfortable with.

19   Q.  What occurred on the occasion of the visit with

20   Dr. Strauch, if anything, different from any of the prior

21   visits?

22   A.  No, nothing different.

23          MR. DINHOFER:  Did you say something, Gerry?

24          MR. HEUBEL:  You know I didn't say anything.

25          MR. DINHOFER:  I'm sorry, I thought I heard something.

1   It must have been outside.  I thought it was you.

2   A.  I may ask Dr. Strauch, I do not remember exactly when, for

3   a letter to the military in Israel.

4   Q.  I'm sorry?

5   A.  I asked him, I may asked him for some document that I would

6   be excused from military service in Israel.

7   Q.  Okay, and why is that?

8   A.  Because my condition was not -- I was not in a position

9   where I could serve in military duties and in order for me to

10  be excused if I'm in the country and an emergency occurred and

11  I would need to be in service, that I don't want to be at all

12  in the military, so I have to have something in my hand to tell

13  them why I cannot serve in the Army.

14  Q.  And did Dr. Strauch give you such a note?

15  A.  Yes, he did.

16  Q.  And is that the note we saw in the file, I believe that was

17  in October or November?

18  A.  Something like that.

19  Q.  Of '92?

20  A.  Yes.

21  Q.  If I recall correctly, if I can find it --

22          (Pause)

23  Q.  I'm sorry, September 1, '92.  Is this the note that

24  Dr. Strauch gave you?

25  A.  I believe so, yes.

1 Q.  And again, does this note indicate that Dr. Strauch is

2 telling you that, in the third paragraph, that you underwent a

3 transposition --

4 A.  He made that clear that on December 12, 1991 I underwent a

5 transposition of the ulnar nerve at the elbow.

6 Q.  And again to the point of this note, can we agree as of

7 this time still no one has told you that you did not in fact

8 have an ulnar nerve transposition?

9 A.  No.  The letter itself states very clear I did a

10 transposition and this letter I'm going to provide it to an

11 authority overseas, so it is clear to me at that time, even if

12 he implied in any way, it's clear to me that a transposition

13 was never being done.

14 Q.  The transposition was done?

15 A.  Never done.  Sorry, the transposition was done.

16 Q.  Okay.  Now, going through September, October, November, and

17 you continued during those months to see Dr. Strauch?

18 A.  I saw him in October, and in October I clearly indicated to

19 him that I was, during my work I'm talking with other

20 neurologists that I'm working with.  I told him that all of

21 them --

22     MR. HEUBEL:  Objection.

23     MR. DINHOFER:  I told him?

24     MR. HEUBEL:  All of them.

25     MR. DINHOFER:  He told him.

1          THE WITNESS:  I'm talking what I said to Dr. Strauch.

2          THE COURT:  Are you saying I told him, Dr. Strauch?

3          THE WITNESS:  I'm talking with regard to Dr. Strauch,

4     I'm now in the office with Dr. Strauch and I'm explaining what

5     I said to Dr. Strauch.

6          THE COURT:  Okay.

7     A.  I told Dr. Strauch that all the neurologists I'm working

8     with indicating that I have some problem with my hand, and

9     should be --

10         MR. HEUBEL:  Objection.

11         THE COURT:  Overruled.  You may continue.

12    A.  Should be a little bit explored.  Dr. Strauch told me that

13    I am talking with too many peoples, I should stop consulting

14    with everybody that I see.  I'm doing very well.  He said to me

15    you don't have any problem.  If you have any problem, you have

16    it in your head because you're a hypochondriac.  I stopped for

17    a second and I said, "What did you say?"

18         He said, "You're a hypochondriac, you have no

19    problem."

20         I said, "I'm not a hypochondriac.  I have problem.  I

21    have pain.  I cannot see my kids.  Because they're not allowed

22    to come to my left side.  They like to play with me, I cannot

23    play with them.  Don't tell me I am a hypochondriac."

24         I felt like lost.  I did not know what to do any more.

25    After leaving his office, I took five weeks vacation to search

1CDFGIL1                    Giladi - direct

1    to see what is going on with me.

2    Q.  And when you took this vacation, where did you go?

3    A.  I went to Israel.

4    Q.  And when you were in Israel on this vacation, this would be

5    roughly, I guess December of '92?

6    A.  I went, yes, I think December, January.  I think the last

7    week of November, maybe part of all December and part of

8    January, beginning of January, a few weeks in January.

9    Q.  And did you see any doctors while you were in Israel?

10   A.  Yes.  I saw a neurologist.

11   Q.  Who is that?

12   A.  Dr. Sadeh.

13   Q.  We have Dr. Sadeh's records in evidence as Plaintiff's

14   Exhibit 6.  And can you tell us what did Dr. Sadeh do for you

15   when you saw him?

16   A.  He took a history.  He did a physical examination and he

17   did an EMG.

18   Q.  And where it says diagnosis in Dr. Sadeh's report of

19   December 31, 1992, that's in evidence, where it says diagnosis

20   bilateral carpal tunnel syndrome, ulnar neuropathy most

21   probably due to injury at elbow, did Dr. Sadeh communicate that

22   information to you?

23   A.  Yes.

24   Q.  Following that visit with Dr. Sadeh, what did you next do?

25   A.  I came back to Dr. Strauch.

1CDFGIL1                          Giladi - direct

1    Q.  For what purpose?

2    A.  To report to him what happened in Israel.  He is my

3    physician.

4    Q.  When you went to see Dr. Strauch, did you bring with you a

5    copy of Dr. Sadeh's report and EMG?

6    A.  I had it with me.

7    Q.  Did you attempt to show that report to Dr. Strauch?

8    A.  Yes, but he refused.

9    Q.  Refused what?

10   A.  He said to me that this EMG was done on different machines

11   than the one prior to surgery and this is not going to reflect

12   anything for him or give him any information, but he asked me

13   to take Dr. Berg's report --

14   Q.  Berger?

15   A.  Berger's report and send it to the doctors in Israel for

16   comparison.  He also told me that he would like me to have the

17   EMG repeated with the same doctors I did preop.  I asked him if

18   you claiming that the doctors, that you cannot see -- this

19   report is not going to help you in any way because it's done on

20   different machine and different operator, how this report is

21   going to be any value to Dr. Sadeh for comparison.  And I told

22   him that there's no point for me to have EMG within few weeks

23   one from each other, especially when the information it's

24   giving me isn't contradicted, because on the one hand he cannot

25   compare, but Dr. Sadeh can compare.

1          So he told me that I cannot -- he is not going to see

2     me for my hand until I do the EMG with Dr. Berg.  So I feel at

3     this time that I lost my physician.

4     Q.  What do you mean by I lost my physician?

5     A.  I can't -- I'm not going to do the EMG.  There's no point

6     for me to do another EMG with him.  It's not an easy test.

7     Q.  What does EMG entail?

8     A.  Sorry, in this, in this meeting I had also another thing

9     from Dr. Strauch that I would like to go over it.

10    Q.  All right, we'll go back to that, then.  Tell us what

11    happened in the meeting with Dr. Strauch.

12    A.  You have needles being sticked to your hand, electroshock

13    was being given.  It's not comfortable test.

14    Q.  When they administer the electric shock at the elbow, how

15    did they go about doing that?

16    A.  They go to the area of the nerve and they stimulate the

17    nerve and measure the speed or whichever, I'm not a

18    neurologist, and they take that measure and measuring and then

19    write.  Dr. Sadeh it was computerized, he did not do anything,

20    everything was in the computer.

21    Q.  How do they stimulate the nerve?

22    A.  With the electric shock.

23    Q.  And can you show us on your good arm where they actually

24    put the probe that they touch to your nerve in order to

25    stimulate it?

1CDFGIL1                    Giladi - direct

1    A.   Here for the ulnar nerve and here for the median nerve.

2    Q.   Do they ever go behind the --

3    A.   They went the other --

4    Q.   The elbow.

5    A.   Anatomic where the nerve is supposed to be the day you're

6    born.

7    Q.   By the groove?

8    A.   By the groove, yeah.

9    Q.   They don't go any higher than the groove?

10   A.   I cannot tell you exactly the site, I think it's near the

11   groove, this area from there.

12   Q.   Well, let me ask you this way, maybe we can do it just to

13   jump ahead for a quick second.  From the site where you now

14   know you had the neuroma --

15   A.   I think it was below it.

16   Q.   It's below the neuroma where they're putting the

17   electrodes?

18   A.   I believe.

19   Q.   Okay.

20   A.   I wanted to say one thing about the meeting that I had with

21   Dr.  --

22   Q.   Yes, I was going to come back to that now.  Could you tell

23   us what you wanted us to know about the January 1993 meeting

24   that you had with Dr. Strauch?

25   A.   During this meeting I told Dr. Strauch, I questioned

1CDFGIL1                      Giladi - direct

1    Dr. Strauch if the nerve was being transposed how the

2    neurologist can do the EMG the way it was being done to me for

3    the last, for the prior EMG's, because if the nerve was being

4    transposed and you put an electrode there, you're not going to

5    get any result because the nerve is not supposed to be there.

6         At this moment Dr. Strauch took his office notes or

7    book, my chart, he look at the chart and he said to me, I do

8    not know.  Based on my chart, you did not have a transposition.

9    But based on the surgical report you did have a transposition.

10        I said to him, "So what really happened?"

11        He said, if I'm -- I do not remember word by word

12   exactly, but my understanding from all the conversations that I

13   had with him that something happened in the OR and he start to

14   stumble with the conversation and then he told me, he start to

15   do, took my hand, start to do examination, changed the subject

16   totally and he told me what he told me about next time I should

17   come to him only if I do the EMG.

18        But I still at this point, I do not know if done, not

19   done or what happened in the OR during my surgery.

20             (Continued next page)

21

22

23

24

25

1   BY MR. DINHOFER:

2   Q.  From January of '93 to the present date, have you ever

3   returned to Dr. Strauch for your left arm?

4   A.  For my left, no.  I went to him when I have problem with my

5   right hand, carpal tunnel syndrome because of the stress I put

6   on my hand as a result that over use it because of my

7   condition.

8   Q.  And why at this point in time did you go see Dr. Strauch,

9   having had all the experiences that you had with him?

10  A.  I didn't hear the question, sorry.

11  Q.  I'm sorry.  You knew there was something wrong with your

12  left side and Dr. Strauch wasn't being straight forward with

13  you.  Is there a reason why you went to see him for the right?

14  A.  Why?

15  Q.  Yeah.

16  A.  Because what my thought at that time, I do not -- not

17  exact.  But I know that I went to him to give him another

18  chance, maybe during this examination he will do something, he

19  will tell me the truth what happened in the OR, because I

20  really wanted to know what going on in OR.  I had Doctor that I

21  saw that told me that I have injury --

22          MR. HEUBEL:  Objection.

23          THE COURT:  The objection is to form or --

24          MR. HEUBEL:  The Doctor that told me.

25          THE COURT:  Okay.

1           MR. HEUBEL:  Sounded like another Doctor told me,

2     Judge.

3           THE COURT:  Yeah, if you're going to -- please don't

4     testify as to what another doctor might have said, but if you

5     testify to your own.

6           MR. DINHOFER:  I think he's talking about what he said

7     he's communicating to the doctor in the course of treatment.

8           THE COURT:  If you're communicating to your doctor,

9     you can testify to that.

10    A.  The question is why I went back to him.

11    Q.  Yeah.  When was that that you went back to him, first of

12    all?

13    A.  I went back to him in October, and last visit with Dr.

14    Strauch.

15    Q.  October of '93?

16    A.  Yes.

17    Q.  And between October of '93 and January of '93, about how

18    many different doctors did you see with regard to your left

19    arm?

20    A.  I saw one, two, three -- I think three doctors.

21    Q.  Okay.

22    A.  Or so.

23    Q.  Do you know who they were?

24    A.  The first one was Dr. Spinner.

25    Q.  Okay.  Who is the next doctor?

1CDZGIL2                          Giladi - direct

1   A.  The next doctor was Dr. Beasley.

2   Q.  Okay.  Who is the next doctor?

3   A.  I think I went back to doctor -- I think I saw somebody in

4   Israel, Doctor Ester Lipsker or something like that?

5   Q.  Okay.

6   A.  I think so.  I saw doctor -- also I did not see him, but we

7   were discussing things at the office, Doctor Goodrich -- Doctor

8   Kantowitz, he's a neurologist that I'm working with, I work

9   with him very heavily.

10  Q.  So we got Kantowitz.  Did you see Dr. Goodrich during this

11  time?

12  A.  I saw him in May, I believe so.

13  Q.  Okay.  And does the name Dr. Beasley refresh your

14  recollection?

15  A.  I say say him in, I saw Beasley in, I believe in April.

16  Q.  Okay.  So in the span of roughly ten months from January of

17  '93 to October of '93, when you went back to Dr. Strauch?

18  A.  Sorry.  I saw Dr. Rousso also.

19  Q.  Dr. Rousso too, okay.  You saw about six different doctors,

20  seven different doctors that you mentioned?

21  A.  Something like five, six.

22  Q.  Okay.  Let's go through some of these doctors then that you

23  saw.  One that you saw was a Dr. Spinner?

24  A.  Yes.

25          MR. DINHOFER:  Okay.  And I didn't know if we formally

1CDZGIL2                    Giladi - direct

1   moved it, but we had it marked for identification and agree

2   it's in evidence as Exhibit B, defendant's B.?  It's Dr.

3   Spinner's records?

4              MR. HEUBEL:  So stipulated.

5              MR. DINHOFER:  In evidence.

6   Q.  Had you seen Dr. Spinner prior to seeing him in 1993?

7   A.  Yes, I saw him after my '87 surgery.

8   Q.  Okay.  And what part, if any, did Dr. Spinner play in your

9   recovery from the 1987 surgery?

10  A.  He was dealing with the bicep hematoma that I had and the

11  effects from it and from the median nerve.

12  Q.  Okay.  And what kind of treatment did he give you back in

13  '87?

14  A.  Physical therapy.

15  Q.  And was the physical therapy that Dr. Spinner sent you for

16  back in '87 for the injury that you had to the branch of the

17  median nerve, was that successful?

18  A.  Yes.

19  Q.  And you saw him in 1993?

20  A.  Only for one visit.

21  Q.  Okay.  I show you on the screen now the report of Dr.

22  Spinner.  When you saw Dr. Spinner, did he test your grip

23  strength?

24  A.  Yes.

25  Q.  And the report indicates he used a dynamometer, is that

1    correct; he tested your grip strength with a dynamometer?

2    A.  Yes.  He use it like five or six times, not only once.  He

3    did back and forth, back and forth back, and for the long time.

4    Q.  Okay.  And did he do it for grip and for pinch for the

5    different muscles that he was testing?

6    A.  Yes.

7              THE COURT:  Mr. Dinhofer, is this in evidence?

8              MR. DINHOFER:  Yes, it is.

9              THE COURT:  And what is this?

10             MR. DINHOFER:  This is from -- we just moved it into

11   evidence, this is defendant's B.

12             THE COURT:  Defendant's exhibit B?

13             MR. DINHOFER:  Yeah.

14             THE COURT:  And this is -- there is no objection to

15   this?

16             MR. HEUBEL:  Stipulated.

17             MR. DINHOFER:  By stipulation, your Honor.

18             THE COURT:  Okay, it's received in evidence.

19             (Defendant's Exhibit B received in evidence)

20             THE DEPUTY CLERK:  Thank you.

21             MR. DINHOFER:  Okay, officially do that.  I'm sorry.

22   Q.  Okay.  And where Dr. Spinner tells you -- states, rather --

23   where is it -- that there was a neuroma -- where did I see it?

24   Oh, there it is.  Neuroma of the medial cutaneous nerve of the

25   forearm, did he communicate that information to you?

1CDZGIL2                        Giladi - direct

1   A.  The thing that I -- that what he say -- I'm sorry.  The

2   only thing what been told neuroma, I did not -- when he was

3   touching here, my understanding is he feeling a neuroma.

4   Q.  Okay.  And then he said, towards the end -- did he

5   communicate this to you -- that you would need a sub-muscular

6   transposition of the ulnar nerve?

7   A.  Yes, he did.

8   Q.  And did you have any response to that?

9   A.  If I have any response?

10  Q.  To Dr. Spinner when he told you that you would need a

11  transposition?

12  A.  I ask him why I need to have a transposition if I had one

13  already.

14  Q.  Okay.  And were you satisfied with the response that Dr.

15  Spinner gave you to that question?

16  A.  I was confused by it.

17  Q.  Did Dr. Spinner make any plans to do surgery on you?

18  A.  He per se, no.

19          THE COURT:  He what?

20  Q.  He didn't make plans on you?

21  A.  No.

22  Q.  Okay.

23  A.  I was best on the information I should go to have surgery

24  to seek for surgery, but he, himself, did not want to do the

25  surgery.

1            MR. HEUBEL:  Objection, ask that be stricken; again

2     testifying as to what was going on in the mind of Dr. Spinner.

3            MR. DINHOFER:  I don't believe that's at all what he

4     said about his state of mind, your Honor.  He's just stating as

5     a matter of fact he didn't want to do the surgery.

6            MR. HEUBEL:  I don't understand the difference, Judge.

7            MR. DINHOFER:  I asked him if he had plans, and this

8     is what the plan was.  This is not a statement of the doctor.

9            THE COURT:  Well, I'll allow it.

10           MR. HEUBEL:  Judge --

11           MR. DINHOFER:  Thank you, your Honor.

12    Q.  Okay.  I think the next doctor you mentioned in sequence

13    would be Dr. Kantowitz?

14    A.  Yes.

15    Q.  And can you tell us who is Dr. Kantowitz?

16    A.  Dr. Kantowitz is a neurologist, neurosurgeon who I know for

17    many many years during my affiliation with the Albert Einstein

18    College of Medicine and Montefiore Medical Center.

19    Q.  Okay.  And what did Dr. Kantowitz do for you?

20    A.  I told Dr. Kantowitz that I'm totally confused, I do not

21    know any more if transposition was being done or not done.  I

22    believe my surgeon, the transposition was being done.  But my

23    physician also -- my surgeon also told me that the possibility

24    was not done.  I see other doctors who told me the

25    transposition was not done.  I said to him, do you mind to

1CDZGIL2                    Giladi - direct

1   confirm it for me with an MRI, so once for all I will get an

2   answer where my nerve is.  He say no problem.  I will have

3   answer.  I told him that they, there is a suspicion that I have

4   a neuroma in the area.  He say, if this is the case, we need to

5   do an MRI with contrast.  So he scheduled for me an MRI with

6   contrast.

7           And when I went to do the MRI, somehow after

8   discussing between the radiologist and Dr. Kantowitz, the

9   contrast was being removed from the prescriptions.

10  Q.  Okay.  We have in evidence as plaintiff's exhibit number

11  seven, MRI films.  Is this the MRI that Dr. Kantowitz sent you

12  to have?

13  A.  Yes.

14  Q.  And as part of plaintiff's Exhibit one, the hospital

15  record, we have the report of the radiologist?

16  A.  Yes, yeah.

17  Q.  Is that the report that you were familiar with from the

18  radiologist regarding the MRI that you had back in --

19  A.  March 3rd, '93.

20  Q.  Yes.  Thank you for finding the date.

21  A.  Yes.

22  Q.  Okay.

23  A.  I also -- Dr. Kantowitz show me the -- after he received

24  the MRI, showed me the MRI, and he point to two pictures.

25          MR. HEUBEL:  Judge -- withdrawn.

1CDZGIL2                     Giladi - direct

1   A.  Which is CAT number I think 8 13 and 1313.

2   Q.  8 of 13 and 13 of 13?

3   A.  Yes.

4   Q.  Yeah.

5   A.  And when I was looking at that, it was some fat around the

6   nerves, which was unclear why, some thickness -- I'm not a

7   neurologist, I can not, but just two picture was important for

8   him to show me.

9   Q.  Okay.

10          THE COURT:  Would this be a good time for a quick

11  break.

12          MR. DINHOFER:  Sure.

13          THE COURT:  Okay, let's do a five minute break.

14          (Recess)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1CDZGIL2                        Giladi - direct

 1              (In open court; jury not present)

 2              THE DEPUTY CLERK:  Judge entering.

 3              THE COURT:  Bring back the jury.

 4              MR. HEUBEL:  Judge, can I ask, before the jury comes

 5    in, that when documents are up in his testimony, that's fine,

 6    but that they not be --no testimony about that particular

 7    document going on, we're going to overly emphasize something,

 8    that shouldn't remain up on the screen.

 9              So I'm asking that when counsel is finished with the

10    document --

11              THE COURT:  Yes, that's true.  When you're finished --

12              MR. DINHOFER:  I'm trying to do that.

13              THE COURT:  When you're finished talking about a

14    document, remove it from the screen, that's right.

15              MR. DINHOFER:  I cover them, uncover.  I move them

16    back and forth.  It's just --

17              THE COURT:  Yes.

18              MR. DINHOFER:  In the moment you don't pay particular

19    detail.

20              THE COURT:  Okay.

21              THE DEPUTY CLERK:  Jury entering.

22              THE COURT:  You may be seated.

23              (Continued on next page)

24

25


                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

1CDZGIL2                         Giladi - direct

 1                    THE COURT:  You may continue, Mr. Dinhofer.

 2                    MR. DINHOFER:  Thank you, your Honor.

 3     Q.  Okay.  So after the MRI's with Dr. Kantowitz, I believe the

 4     next in your sequence is a Dr. Beasley?

 5     A.  Yes.

 6     Q.  Can you tell us who Dr. Beasley is?

 7     A.  He's a surgeon from NYU, if I'm not mistaken.

 8     Q.  Okay.  What kind of surgeon?

 9     A.  Upper extremity.

10     Q.  Okay.  And do you recall when it was that you presented to

11     Dr. Beasley?

12     A.  Sometime in April.

13     Q.  Okay, April of '93?

14     A.  Yes.

15     Q.  Okay.

16                    MR. DINHOFER:  At this time, your Honor, I'd like to

17     offer in evidence the records of Dr. Beasley.  I believe it's

18     two pages?

19                    THE COURT:  Any objection?

20                    MR. HEUBEL:  Let me just see them, Judge.  Can we

21     approach, Judge.

22                    THE COURT:  Yes.

23                    (Continued on next page)

24

25

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

1          (At the side bar)

2          MR. HEUBEL:  I do have an objection to the admission

3   of these documents, just copies of could have been subpoenaed.

4   Apparently they weren't subpoenaed.

5          THE COURT:  They were?

6          MR. HEUBEL:  Not subpoenaed, as far as I know.

7          THE COURT:  Were they produced to you, to defendants?

8          MR. HEUBEL:  Yeah.  We've had them during discovery.

9          THE COURT:  So what's the nature of the objection?

10          MR. HEUBEL:  Objection is they're not authenticated.

11          MR. DINHOFER:  They're no different than any of the

12   other records, none of them authentication that we've taken so

13   far, we've been doing it by stipulation.

14          MR. HEUBEL:  Right.

15          THE COURT:  And why didn't you stipulate to this?

16          MR. HEUBEL:  Because I don't want to stipulate to it.

17          MR. DINHOFER:  Because it's good for me, obviously.

18          MR. HEUBEL:  I don't know that's terribly, but --

19          MR. DINHOFER:  Well, never give the other guy what he

20   wants I guess.

21          THE COURT:  Well, is it, is there a question about the

22   authentication?

23          MR. HEUBEL:  I don't know.  How would we know?

24          MR. DINHOFER:  The interesting thing, Judge, is this

25   Dr. Beasley is the partner of Dr. Grad, their former expert,

1CDZGIL2                          Giladi – direct

 1    and I don't think there would be any authentication issue,

 2    because that would be challenging their own expert on that

 3    basis.

 4                MR. HEUBEL:  That's absurd.

 5                MR. DINHOFER:  There is no authentication here.  It

 6    was one page of notes that he did an examination, and he

 7    referred him to, according to his letter, back to Benise

 8    Lester.  He thought the case was too complicated.

 9                MR. HEUBEL:  Maybe there are other pages.

10                MR. DINHOFER:  It's really not a complex record, I

11    don't plan on spending too much time with it.

12                MR. HEUBEL:  The amount of time is irrelevant.  It's

13    not a certified copy.

14                MR. DINHOFER:  There's never been a challenge to the

15    authenticity in any of the pretrial orders.

16                MR. HEUBEL:  We didn't agree to the authenticity of

17    any documents in the pretrial order.

18                MR. DINHOFER:  Challenge --

19                THE COURT:  Well, without authentication, I'm afraid I

20    can't admit it.

21                MR. DINHOFER:  Thank you.

22                (Continued on next page)

23

24

25

1          (In open court)

2    Q.  When you saw Dr. Beasley, can you tell us what he did for

3    you?

4    A.  Like with the other doctors, he took a history and he did a

5    physical examinations.

6          During the physical examinations, after almost the end

7    of physical examination, he was -- for some reason he stopped

8    and went to call one of his colleague, his partners, to consult

9    with him about my condition.

10   Q.  Were you seen by this colleague?

11         MR. HEUBEL:  Objection, Judge.  May we approach?

12         THE COURT:  Yes.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. HEUBEL:  Judge, I have -- my objection is based

3     upon discussion with prior counsel where he told me that --

4     this is during the course of this trial -- that what I

5     anticipate him saying is that Dr. Grad, who was the defense

6     prior expert, now unavailable, was the person who walked into

7     the room while they were there.  And I see no relevance to

8     that, and extreme prejudice in that.

9          MR. DINHOFER:  It's a fact of what occurred, and he's

10    entitled to say the facts of what occurred.  The fact that that

11    fact may prove embarrassing to you in some way is not an

12    objection.

13         THE COURT:  Was Dr. Grad part of the examination?

14         MR. DINHOFER:  Yes.

15         THE COURT:  And treatment?

16         MR. DINHOFER:  Yes.  He's going to say just that, Dr.

17    Grad --

18         THE COURT:  We did have reading testimony from Dr.

19    Grad.

20         MR. HEUBEL:  This is what he's going to say.  He

21    didn't know who he was in the room with him, but apparently at

22    Dr. Grad's deposition he was there and he said, now I recognize

23    the guy who came in.  And what is the relevance of Dr. Grad

24    walking into the room, except Dr. Grad is unavailable to

25    respond or for me to have him respond to anything that's said?

 1              MR. DINHOFER:  That's just a fact that would have

 2     occurred no matter what, and that's a fact of what occurred.

 3     And he's just describing the facts of what occurred.  Dr.

 4     Beasley called another doctor into for consultation, and he's

 5     going to testify to what happened.

 6              MR. HEUBEL:  Yeah, what's he going to say?

 7              MR. DINHOFER:  You'll hear it when he says it.

 8              THE COURT:  Is he going to talk about Dr. Grad?

 9              MR. DINHOFER:  He's not going to say anything that Dr.

10     Grad said to him or anything.  He's just going to say that this

11     man came in, he examined, they consulted, and he subsequently

12     learned at the deposition, he saw him, he put it together.

13     Just as he said.  Because this is not a surprise.  He testified

14     to this at his deposition, that he tied it together, that this

15     was the same Dr. Grad who examined him years later, and that's

16     it, and that's as far as it goes.

17              MR. HEUBEL:  Well, Dr. Grad didn't examine him till

18     years later -- Dr. Grad was an expert.

19              MR. DINHOFER:  At the deposition, I'm sorry, saw him

20     at the deposition.  I'm sorry, you're correct, he learned about

21     him years later is what I meant to say.

22              MR. HEUBEL:  There's nothing relevant probative in

23     that exchange, but it does cast a cloud that I cannot dispel,

24     because I don't have that witness, he's not unavailable because

25     of anything that the defense did.

1            THE COURT:  We don't know why he's unavailable.

2            MR. DINHOFER:  But it's a fact of what occurred.  He's

3    entitled to --

4            MR. HEUBEL:  It adds nothing except prejudice.

5            MR. DINHOFER:  No, it's a fact that there was a

6    consultation and who it was who did that consultation at that

7    time, and that's all its stands for.

8            THE COURT:  I don't think it's so prejudicial that it

9    substantially outweighs any affect.  We did have reading, read

10   testimony from Dr. Grad, so I am going to overrule the

11   objection.

12           MR. DINHOFER:  Thank you, your Honor.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1CDZGIL2                         Giladi – direct

1              (In open court)

2     Q.  So you told us that Dr. Beasley consulted with someone

3     else?

4     A.  Yes, I believe.

5     Q.  Did that person come into the examination room?

6     A.  Yes, he did.

7     Q.  And did that person conduct an examination of you?

8     A.  Yes.

9     Q.  At the time when you saw that person, did you know who that

10    person was?

11    A.  No.

12    Q.  Did there come a time when you later learned who that

13    person was?

14    A.  Yes.

15    Q.  Okay.  When was it that you learned who this person was?

16    A.  When he underwent depositions, you did a deposition of him.

17    Q.  Who was the person?

18    A.  Dr. Grad.

19    Q.  Can you tell us about the physical examination that Dr.

20    Beasley performed?

21    A.  He did strength by equipment, if I'm not mistaken.

22    Q.  When you say "strength by equipment," do you mean he used

23    the dynamometer?

24    A.  Yes, he use it, and then his partner repeat it again.

25    Q.  Dr. Grad also used the dynamometer?

1   A.  I believe both of them did it, confirm it.

2   Q.  Okay.  What else did their physical exam consist of?

3   A.  They did also, I think he did some sensation test and.

4   Q.  Did he use any equipment for the sensation test?

5   A.  Think he used needles.

6   Q.  Needles, okay.  Did he actually pierce your skin with the

7   needles?

8   A.  He went and he, he put needles, told me when I -- to tell

9   him -- to close my eyes and to tell me when I feel it, when I

10  don't feel it, something like that.

11  Q.  It wasn't breaking skin with them, he was just using it for

12  sensory testing?

13  A.  That's correct.

14  Q.  Okay.  Anything else that he did?

15  A.  This is the major thing that I recall.

16  Q.  Okay.

17  A.  He did a full examination of the hand.

18  Q.  Did you bring any EMG's with you to Dr. Beasley?

19  A.  I may -- I believe so I did, but I can not testify to that

20  at the moment.

21  Q.  Okay.  Did Dr. Beasley treat you?

22  A.  No.  He refer me to, refer me to different doctor.

23  Q.  Okay, what doctor was that?

24  A.  Doctor Lipsker, somebody at the New York, New York near my

25  office.

1   Q.  Would the name Benise Lester refresh your recollection?

2   A.  Yes, yes.

3   Q.  Is that who Dr. Beasley referred you to?

4   A.  Yes.

5   Q.  Okay.  Now, I think you said next in line in May of '93 you

6   returned to Dr. Goodrich?

7   A.  No.  I believe -- I'm not sure, but I think when I was in

8   Israel in the April for short period of time, I saw -- she's a

9   friend of mine, but she's also hand surgeon, upper extremity

10  surgeon, she's a head of the upper extremity department at

11  Kaplan.

12  Q.  Okay.  Let's go back one second, though, before we get

13  there.

14          Did you see Dr. Goodrich in August of '92?

15  A.  August of 1992?  I do not recall.

16  Q.  Okay.  If I show you the following letter from Dr.

17  Goodrich, part of exhibit 12, dated August 10th of 1992 by Dr.

18  Goodrich, would that refresh your recollection as to whether or

19  not you saw him back then?

20  A.  I could saw him, I could give -- I called him to tell him I

21  need something to confirm for what I need, something like that.

22  Q.  This might have been a note without a visit?

23  A.  I cannot, I cannot testify to that.  I don't have any

24  recollection at the moment.

25  Q.  Okay.  Well, how about this note of May of '93, does that

1CDZGIL2                      Giladi - direct

1   refresh your recollection that you saw him in May of '93?

2   A.  It's clear from the note that he saw me on May 11, 1993.

3   Q.  Okay.  And where Dr. Goodrich says in -- and this is again

4   part of exhibit 12, your Honor -- he continues to have

5   progressive loss of neurological function following the ulnar

6   nerve involved motor and sensory distribution, did Dr. Goodrich

7   communicate that information to you?

8   A.  Yes.

9   Q.  Okay.  And did you complain to him about pain in the nerve

10  upon being touched in the elbow?

11  A.  I complained to him the same complaint I had with him the

12  first visit, about sharp pain in my elbow, unable to be around

13  people.  Because if anybody would touch my elbow, I will jump,

14  and have a lot of discomfort, difficulty on my job, my ability,

15  my inability to perform my job I used to before my surgery, and

16  the concern was that I'm, that I'm deteriorating slowly.

17  Q.  Okay.  Where it says, that considering his EMG findings,

18  which have shown a loss of conduction velocity and amplitude,

19  along with clinical findings which show a progression and

20  neurological deterioration, did Dr. Goodrich communicate that

21  information to you?

22  A.  Yes.

23  Q.  Which EMG's was he referring to?

24  A.  Dr. Sadeh, if I'm not mistaken.

25  Q.  Dr. Sadeh?

1          MR. HEUBEL:  Objection.

2          THE COURT:  Sustained.

3   Q.  Did you present any EMG's to Dr. Goodrich for review?

4   A.  Yes.

5   Q.  Which EMGs did you present to Dr. Goodrich for review?

6   A.  Dr. Sadeh.

7   Q.  Okay, the one of December '92?

8   A.  Yes.

9   Q.  Where Dr. Goodrich says that he very definitely needs an

10  ulnar nerve exploration to rule out whether or not this is an

11  injury to the nerve or whether or not he has developed some

12  type of scar or neuroma, did Dr. Goodrich convey this

13  information to you?

14  A.  Yes.

15  Q.  And where it says, all of these should be done in the very

16  near future, did he convey that to you?

17  A.  Yes.  He told me that I should do it as soon as possible.

18  But when I asked him about the result of the surgery if should

19  be, if I will have any relief or it will be the way used to be

20  before the surgery the possibility was very -- was not, was no

21  guarantee that I will be the way, because it was too long, too

22  long before, after the surgery.

23          MR. HEUBEL:  Objection.

24          THE COURT:  Is it a hearsay objection?

25          MR. HEUBEL:  Yeah, what Dr. Goodrich said to him.

1CDZGIL2                        Giladi - direct

1          THE COURT:  Sustained.

2          MR. HEUBEL:  And I ask be stricken.

3          THE COURT:  Yeah, the witness should disregard

4    statements by Dr. Goodrich as reported by the witness.

5    Q.  Okay.  In May of '93, did you have occasion to go back to

6    Israel?

7    A.  Yes, I did.

8    Q.  And when you were in Israel in May of '93, did you consult

9    with any doctors?

10   A.  Dr. Rousso.

11   Q.  And who is Dr. Rousso?

12   A.  Dr. Rousso.

13   Q.  Not that we haven't seen him already, but I'm asking you

14   for your knowledge?

15   A.  Dr. Rousso is a well known doctor in Israel, he's a plastic

16   surgeon.  He's a reconstruction and upper extremity physician

17   who held a lot of academic positions in Israel, and he's very

18   acceptable in the medical, in the medical community in Israel.

19   Q.  And did you consult with Dr. Rousso in May of '93?

20   A.  Yes.

21   Q.  Can you tell me what occurred on the occasion of your first

22   visit with Dr. Rousso in May of '93?

23   A.  The procedure between Israel to United States, he did not

24   have forms that I need to list everything I had prior to my

25   visit with him, or what is my complaint or other stuff when you

1   walked into the room.  He just ask me questions, he take notes.

2   And when I went to the room, he asked me what he can do for me,

3   why I'm here.

4   Q.  Okay.  When you saw Dr. Rousso in May of '93, did you give

5   him a history?

6   A.  I told him why he asked me why I'm here, and I told him I'm

7   here for my elbow.

8   Q.  Did you tell him about the history of surgery that you had

9   to your left arm?

10  A.  I may did, I may didn't.

11          The issue was not relevant at the time.  We were more

12  concerned about what happened in the elbow and why I have pain

13  in my elbow, and what is the cause for the pain of my elbow,

14  when the pain started, if ever I had any injury to my elbow.

15  He went back to since I was a kid, if I ever had crush, if I

16  had any problem with my elbow.  He's concerned because I came

17  to him for my elbow and he want to make sure that I'm giving

18  him everything and whatever happened to me to my elbow.

19  Q.  Just so I'm clear for a second, from the 1987 surgery that

20  you had on the sensory branch of the median nerve at the

21  wrist --

22  A.  Yes.

23  Q.  -- is there a scar on your wrist from that surgery?

24  A.  It's big scar, big scar in the area.

25  Q.  Is that a different scar from the scars from the surgery

1CDZGIL2                    Giladi - direct

 1  that you had on your wrist for the surgery that was performed

 2  by Dr. Strauch and Sterman?

 3  A.  Totally different location.

 4  Q.  Okay.

 5  A.  I believe.

 6  Q.  So you were complaining to Dr. Rousso about your elbow?

 7  A.  That's correct.

 8  Q.  And can you tell us what occurred?

 9  A.  I told Dr. Rousso that I underwent surgery on

10  December 12th, 1991 by Dr. Strauch.  I explained to him that

11  prior to surgery I never complained about any problem with my

12  elbow, that I never had any injury to my elbow, and my elbow

13  was a virgin area for any disease, except to the entrapment or

14  any crush or any injury.

15  Q.  Okay.  Did you present with complaints of pain?

16  A.  Yes, this what I'm going to next.

17  Q.  Okay.

18  A.  And I told him that upon waking from surgery, I had a sharp

19  pain at the area of the elbow, at the -- near the bones there.

20  Q.  He's indicating the back side of his left elbow.

21  A.  Yes.

22          And since this moment from waking up from surgery, I

23  am, I'm having difficulty function with my hands, I have pain,

24  I have sensations.  And I also explain to him that I had an

25  ulnar transposition, that's the information I received from my

1CDZGIL2                         Giladi - direct

1    physician, my surgeon, and I would like him to evaluate me and

2    tell me if he can help me to let me know what is the cause for

3    the pain.

4    Q.  Did Dr. Rousso perform an examination on the occasion of

5    the first visit?

6    A.  Yes, he did.

7    Q.  And can you tell us what his examination consisted of?

8    A.  If I'm not mistaken, he did -- I don't know the first time

9    or the second time he did strength, he did sensation and

10   confirmation of the location of the nerve.

11   Q.  Okay.  Did Dr. Rousso touch you?

12   A.  Yes, he touch me.

13   Q.  Where did he touch you?

14   A.  At the elbow.

15   Q.  Did you return to Dr. Rousso after the first visit?

16   A.  Yes, because he told me that my story doesn't make sense.

17   He said to me -- that's all right.  And I had to confirm to him

18   that the transposition was being made, so I had to go back home

19   to bring the surgical report to him.

20   Q.  And did you provide Dr. Rousso with your surgical report

21   from Montefiore Medical Center?

22   A.  I provide him with, if I'm not mistaken, I provided him

23   with two EMG's and surgical report.

24   Q.  Okay.  And the surgical report would be the same one that

25   we have here in Exhibit one, the three pages of the operative

1CDZGIL2                          Giladi – direct

1   report?

2   A.  Yeah, one, one preop and one postop.

3   Q.  No, no, the surgical report itself, not the EMG's.

4   A.  Yeah, the one from --

5   Q.  The one from the Montefiore Medical Center that's in

6   evidence?

7   A.  Yes.

8   Q.  Okay.  And then you brought him a preop EMG.  Would that

9   have been Dr. Berger's EMG?

10  A.  Yes.

11  Q.  And you brought him a postop EMG, would that have been Dr.

12  Sadeh's EMG?

13  A.  Yes.

14  Q.  Did you treat with Dr. Rousso at that point in time?

15  A.  I went to him for --

16          MR. HEUBEL:  Objection to the form, Judge.

17          MR. DINHOFER:  Treatment at that time.

18          THE COURT:  Is it just clarification?

19          MR. HEUBEL:  Yeah, I'm not sure what that means.

20          THE COURT:  Yeah, if you could rephrase it to make it

21  exactly clearer what the question is.

22  Q.  Okay.  Did Dr. Rousso give you any specific treatment at

23  that time?

24  A.  Besides the examination, evaluation and the diagnosis

25  potential what he think is the problem and what I should do,

1  nothing.

2  Q.  Did he provide you with a written report at that time?

3  A.  Yes.

4  Q.  What did you do with that written report?

5  A.  I believe I fax, I fax it to you.

6  Q.  Faxed it to me.  Had you spoken to me prior to seeing Dr.

7  Rousso?

8  A.  I believe after Dr. Spinner, I realized that I need to

9  consult with some, somebody about my right, and this how I came

10 to you.

11             MR. HEUBEL:  I'm sorry, I didn't hear the last part of

12 that.

13 A.  I came, I was --

14             MR. HEUBEL:  Could you read it back, please?

15             THE COURT:  I believe Dr. Spinner, I realize that I

16 need to consult with somebody about my right, and this how I

17 came to you.

18 Q.  And did I request that you obtain a report from Dr. Rousso?

19 A.  You told me that in order for you to know if anything wrong

20 happened to me, I need to provide you with a written

21 documentation that something like that happened to me.

22 Q.  For legal requirements, did I explain to you for legal

23 requirements for the purposes of commencing a medical

24 malpractice report, or lawsuit, the law of the State of New

25 York required that you have a report from a physician attesting

1   to the fact that there was some kind of malpractice?

2   A.  Yes.

3   Q.  And is that the purpose why you went to Dr. Rousso at that

4   time, to get that report?

5   A.  As I said before, it was combination of two.  I was looking

6   for somebody who was willing to treat me, because up to that

7   moment the two doctors I saw, Dr. Spinner and Dr. Beasley, was

8   not going to.  And based on my assumption from my condition, I

9   cannot go to any doctors to take care of the problem, I need to

10  go to somebody who very expert in the field, and this what I

11  was doing.  And Dr. Rousso is internationally known as an upper

12  extremity surgeon, and I thought he's one the people who may be

13  able to help me to my condition.

14  Q.  Now, after you saw Dr. Rousso, did you return back to the

15  United States?

16  A.  Yes, I did.

17  Q.  Okay.  And did you return back to work in May of '93?

18  A.  Yes, I did.

19  Q.  And did something occur at work in June of '93?

20  A.  Yes.  I was June 30th, 1993, I was being –– my job at that

21  day was to videotape something.  For that purpose, I had to

22  rent a camera, professional camera.

23  Q.  You had to rent the camera, is that what you said?

24  A.  Yes.

25  Q.  Okay, continue.

1CDZGIL2                      Giladi - direct

```
 1   A.  And to bring the camera to the office, I got help from a
 2   colleague at work.
 3            When I was going to return the camera, for some reason
 4   my boss did not want to give me help.  And he told me, this my
 5   responsibility and I should be able to handle the job on my
 6   own.
 7            I explained that my medical condition is not so that I
 8   can do it by myself.  And he informed me that he cannot provide
 9   me with any help, because other people busy at the moment and
10   they have their own job and I should do my job.
11   Q.  And did you try and do the job?
12   A.  Yes, I did.
13   Q.  Is that something that we can say that you do to this day,
14   you try and do things with your left arm?
15   A.  I, since the moment I returned to work, even though my
16   condition was not permit me to work with my hand the way I used
17   to, I really pushed myself very hard, to act like I don't have
18   any problem.  It's even up to today I'm trying to use my hand
19   to do a lot of things that it's hard for me to do.  I'm trying
20   not to feel disabled.  I'm trying to feel like everybody.  I'm
21   trying to feel like I felt before the surgery.  It's hard.
22   Q.  Okay.  So what occurred at work back on June 30th of '93?
23   A.  I put the camera in a protecting box, which has wheels on
24   the bottom.  I rolled the box from my office to the loading
25   dock at the place where I work.  I opened the trunk and I tried
```

1CDZGIL2                    Giladi - direct

1   to put the camera into the trunk.  While I'm struggling to put

2   the camera, the box into the trunk, I felt like the hood of the

3   trunk touched my elbow, give me electric shock to my hand.  I

4   got like shock.  I jumped, and this one point I was trying to

5   protect the box from falling, I tried to balance, and with all

6   that, I hurt my back.

7   Q.  And did you make a -- did you later come to make a workers

8   compensation claim with regard to your back?

9   A.  Not immediately.

10  Q.  Well, later you did?

11  A.  When I stopped working, and I realize that I'm not going to

12  be able to get any income from my work, I was being told that

13  the only way I can be compensated is by filing a claim through

14  workmen comp.

15  Q.  And at the time when you made that workers compensation

16  claim for your back, did you also make workers compensation

17  claims for the carpal tunnel pain that you were having in your

18  hands?

19  A.  No, I did -- I filed -- I filed one by myself.  And in this

20  form I put regular that I hurt my back, and I hurt my hand.

21  And for me, hands -- and also if you heard Dr. Rousso yesterday

22  was talking about when he said from the elbow to the hands in

23  Israel, I did not know, but in Israel we talk hands this

24  section of the hand, we don't -- we don't say from here to

25  here -- from shoulder to fingers hand.  We, we divide the hand

1CDZGIL2                    Giladi – direct

1    to like six or seven parts.  We have the hand, the wrist, the

2    front hands, elbow, upper arm, and shoulder.

3    Q.  Okay.  Now, did you ever see the Dr. Benise Lester that you

4    were referred to by Dr. Beasley?

5    A.  Yes, I saw her in August after my injury, my back injury.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1CDFGIL3                    Giladi – direct

1   Q.  Do you recall when it is that you saw Benise Lester?

2   A.  Sometime in August of '93.

3   Q.  And just so we're clear, Benise Lester, is that a man or a

4   woman?

5   A.  She's a female.

6   Q.  Female, okay.  And can you tell us what occurred with

7   regard to the visit with Benise Lester?

8   A.  Gave her the history, she did examination, and I got pain

9   medication, I believe, from her.  And she did some diagnosis.

10  Q.  Did you continue to treat with Dr. Lester?

11  A.  No.

12  Q.  Is there a reason you didn't treat with Dr. Lester?

13  A.  Because the direction she's going, she's going in the

14  direction of RSD which I did not have, I had no symptom of RSD.

15  Q.  What is RSD?

16  A.  Reflex sympathetic syndrome.

17  Q.  By the way, had any doctor ever prescribed any appliances

18  for you to wear on your arm?

19  A.  I had two doctors, one in '92, Spinner, and when this was

20  damaged, Dr. Goodrich provide me with another one.

21  Q.  Did you bring that appliance here with you today?

22  A.  Yes, I did.

23       MR. DINHOFER:  I believe we're up to Exhibit 16 on

24  plaintiff's part.

25  Q.  I'll show you what's been marked for identification as

1CDFGIL3                     Giladi - direct

1    Plaintiff's Exhibit 16.  Can you tell us what that is?

2    A.  This is what's called a Cook splint that I had to wear.

3    Q.  And who gave you the splint?

4    A.  As I said, the first one was given to me if I'm not

5    mistaken, by Dr. Spinner and the second one by Dr. Goodrich.

6    Q.  Did you wear this splint during the course of your

7    rehabilitation that you underwent after the surgery in December

8    of 1991?

9    A.  This one I used when I was going around people or when I

10   was asleep.

11          MR. DINHOFER:  I offer this in evidence, your Honor.

12          THE COURT:  Counsel?

13          MR. HEUBEL:  No objection.

14          THE COURT:  It's admitted.  Plaintiff's Exhibit 16 is

15   admitted.

16          (Plaintiff's Exhibit 16 received in evidence)

17   Q.  Were there any other types of appliances, splints or

18   braces --

19   A.  Yes.

20   Q.  -- and such that you were prescribed to you by the various

21   doctors that you had seen?

22   A.  Yes.  I had one that was foam from Dr. Rousso.  This one

23   was for a daily basis.

24   Q.  Okay, that comes later on.  Up to this point I'm talking

25   about.

1CDFGIL3                       Giladi - direct

1   A.  No, it was in May.  Dr. Rousso was in May '93.

2   Q.  In May he told you to wear a foam splint?

3   A.  I believe so.

4   Q.  Do you have that splint?

5   A.  No, this one is -- deteriorate from sweating and all this

6   stuff and every time I had to get a new one.

7   Q.  How many different foam braces did you have to use due to

8   deterioration from sweat?

9   A.  I couldn't count, but it was many.

10  Q.  It was several?

11  A.  Yes.

12  Q.  And what portion of your arm did these foam braces cover?

13  A.  I had for the injury to my elbow, I did, at the area of the

14  elbow.  For the carpal tunnel I had in my wrist one hand wrist.

15  Q.  The brace that you used for your wrist for carpal tunnel

16  were those preformed Ace bandage type splints?

17  A.  No.  This was you buy from the pharmacy, you have a metal

18  bar in the middle, under, on the lower part.

19  Q.  On the side of the palm?

20  A.  On the side of the palm, to have your hand in a position,

21  one position, and then the rest is the material.

22  Q.  Is that what was called a cockup splint?

23  A.  Could be.

24  Q.  And that was for the carpal tunnel?

25  A.  It's correct.

1CDFGIL3                    Giladi - direct

1   Q.  Did there come a time when you planned on having surgery

2   with Dr. Goodrich?

3   A.  Yes, was in I think in October we spoke about surgery, with

4   Dr. Goodrich about surgery.

5   Q.  And if I show you Dr. Goodrich's report from Exhibit 12 in

6   evidence of October 26, 1993, does that refresh your

7   recollection as to when you spoke with Dr. Goodrich more or

8   less about surgery?

9   A.  Look like the end of October.

10  Q.  And did you have a plan to undergo surgery with

11  Dr. Goodrich?

12  A.  At the time, yes.

13  Q.  And for what purpose were you planning on having that

14  surgery?

15  A.  I want to have relief from the pain.

16  Q.  Did you in fact have surgery with Dr. Goodrich?

17  A.  I couldn't.

18  Q.  Is there a reason why you couldn't?

19          MR. HEUBEL:  Objection.  To the extent it calls for

20  something Dr. Goodrich told him.

21          THE COURT:  You may answer if it's not reflecting what

22  Dr. Goodrich told you.

23  Q.  Can you tell us the reason why you didn't have surgery with

24  Dr. Goodrich?

25  A.  If I did have surgery with Dr. Goodrich, I have to pay for

1CDFGIL3                          Giladi – direct

1    the surgery from my own pocket.

2    Q.   Why is that?

3    A.   Because I was considered, my employment was ended on

4    August 12, I believe in this area and I find out by

5    mid-September I lost my medical benefits.

6    Q.   Do I understand you to say that after you hurt your back in

7    June 30th of 1993 you never returned to work?

8    A.   No, I worked between June 30th, 1993, the next day and

9    July 1 I saw the doctors.  I was in and out.  I was really

10   attempting to continue with my work.  On August 12 the doctor

11   put me on total disability, so I had to stop working.

12   Q.   That was because of your back?

13   A.   Because of my back and also I had swelling in my hand here.

14   Q.   Is that related to your --

15            MR. HEUBEL:  I'm sorry, Judge, is that referring to

16   the right hand?

17   Q.   You were indicating your right hand, correct?

18   A.   Indicating right hands and also -- I had right hand and

19   swelling on both hands because when I tried to protect

20   equipment it hurt both my hands.

21   Q.   But the primary reason you were out is because of your

22   back?

23   A.   My back, yes.

24   Q.   You understand in this lawsuit we're not claiming that you

25   were out of work on account of your left upper extremity,

1CDFGIL3                    Giladi - direct

1    correct?

2    A.   My understanding that this lawsuit regarding my left hand,

3    nothing else.

4              MR. DINHOFER:   One second, your Honor.

5              THE COURT:   Counsel, would this be a good time to take

6    a brief break?  I have to do another matter very briefly for

7    five or ten minutes.  So we'll take one more break before our

8    lunch break.  Please leave your pads on your chairs and we'll

9    meet back in ten minutes.

10             (Jury excused)

11             (Continued next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury not present)

2            (At 11:55 a note was received from the jury)

3            THE COURT:  We have a note from the jury.  The prior

4    note that I read at 9:45 this morning was Court Exhibit 5, just

5    to be clear.  It's a court exhibit as distinguished from a

6    defendant's or plaintiff's exhibit.  This new note, Court

7    Exhibit 6 in evidence is dated today, 12/13/11 at 11:55 a.m.

8    "Your Honor, we would like to request respectfully that we

9    optimize the use of the jury by minimizing the length of the

10   breaks.  Ideally we would like to submit that any business not

11   requiring the presence of the jury be conducted outside the

12   jury's hours so we could maximize the time spent concluding the

13   evidence.  Thank you, Victoria Chin, foreperson of the jury."

14           Okay?

15           MR. DINHOFER:  Dig we must.

16           THE COURT:  Excuse me?

17           MR. DINHOFER:  We'll plow on.  If they want us to go

18   without breaks, we'll go without breaks.

19           THE COURT:  So maybe we'll take a shorter lunch break.

20           MR. DINHOFER:  I don't think that's what they're

21   saying.  They're saying when we're working -- I don't think

22   they understand why you took the break that you just took.

23           MR. HEUBEL:  Judge, if I may, there are going to be

24   certain things that the litigants and the Court are going to

25   have to do during business hours, and I think your Honor

1CDFGIL3                         Giladi - direct

1  should, you know, as you usually do in a nice way let them know

2  that.

3           THE COURT:  Yes, that's a fair point.

4           MR. HEUBEL:  As a matter of fact, today there's going

5  to be some argument and some applications at the close of

6  plaintiff's case, presumably.  That may well take up some time.

7           THE COURT:  Right.  I mean, to the extent we can do

8  things like an application, arguments about jury instructions,

9  etc., I would like to make those in the morning before they

10  come or in the afternoon after they leave to the extent

11  possible.  Sometimes it's possible, sometimes it's not, but

12  it's a fair point and I'll answer their question to the extent

13  I can with that in mind.  Okay?  Shall we bring them back?

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Members of the jury, thank you for your

3     patience again.  I do have your note.  Thank you for your note,

4     and I've shared it with counsel.  We will do our best to be as

5     efficient as we can with your time.  We do try to do that.

6     There are times, for example, this last break was something on

7     a totally different case that I had to deal with, so sometimes

8     it's possible, sometimes it's not.  So sometimes it's my fault.

9     Other times there are legal issues that come up in the middle

10    of testimony or something where we do have to do a sidebar.

11    But bearing that in mind we will try to move as quickly as we

12    can and being as efficient as we can with your time by

13    minimizing your breaks.  We could try to do a 45-minute lunch

14    break if that helps with moving things along.  Does 45 minutes

15    give you enough time?  Well, we will try to get as much of the

16    legal issues resolved during things like lunch breaks as we

17    can.  The problem is a lot of times you have to leave to go get

18    lunch so coming back it makes it hard.  But in any event, I

19    have your note.  I will do my best to move things along and I

20    appreciate your continued attention.

21          Mr. Dinhofer, you may continue.

22          MR. DINHOFER:  Thank you, your Honor.

23    BY MR. DINHOFER:

24    Q.  After you realized that you couldn't have the surgery with

25    Dr. Goodrich, did there come a time when you returned to

1CDFGIL3                        Giladi - direct

1    Israel?

2    A.  Yes.  I think within two months I was in Israel.

3    Q.  Excuse me?

4    A.  Within two months or three months I was back in Israel.

5    Q.  Okay, by the beginning of --

6    A.  January, I believe January.

7    Q.  Of '94?

8    A.  '94, yes.

9    Q.  And for how long did you remain in Israel on that trip?

10   A.  Until August.

11   Q.  When you went back to Israel, what was your reason for

12   going back to Israel?

13   A.  One of the reasons to take care of my elbow.

14   Q.  What was the other reasons?

15   A.  To be in a place where I can be taken care of because I

16   have no income.

17   Q.  So who did you live with when you went back to Israel?

18   A.  In the beginning with my mother.  Then I was with my

19   brother.

20   Q.  And while you were in Israel, did you seek out further

21   consultation with regard to your elbow?

22   A.  I, as I said before, I had my back injury and I was out of,

23   from the doctors in the United States, so I was seeing doctors

24   in Israel also for my back.  I went to this doctor for my back,

25   my carpal tunnel and my elbow, but the treatment was centered

1CDFGIL3                          Giladi - direct

1    only around my back and my carpal tunnel syndromes.

2    Q.  Who is this doctor?

3    A.  Dr. Herness.

4    Q.  I offer in evidence the records of Dr. Herness.

5              MR. HEUBEL:  Judge, can we approach one moment?

6              THE COURT:  Is this the same as the last one?

7              MR. HEUBEL:  And an additional.

8              THE COURT:  Okay, you may approach.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (At the side bar)

2      MR. HEUBEL:  Judge, my objection is really that if

3   counsel is going to keep offering things in front of the jury

4   that have never been offered before with a witness who is not,

5   has nothing to do with records other than being his patient and

6   I object to the records and they don't come in, that's

7   inappropriate, and I don't think that's the proper way to do

8   this or to have done it.  If he was going to put them in or

9   wanted to put them in, he should have told me that ahead of

10  time.  It may be in a pretrial order that's years old, but this

11  is inappropriate to do it this way.

12      THE COURT:  Counsel?

13      MR. DINHOFER:  This comes as no surprise to

14  Mr. Heubel.  I can go back and get my pad with the notes, but

15  if your Honor recalls before the trial we were horse trading

16  exhibits that were going to go into evidence and none of them

17  have any of the authenticity requirements that are required,

18  and Dr. Herness was one of the --

19      MR. HEUBEL:  Can you keep your voice down, please?

20      MR. DINHOFER:  I'm sorry.  Dr. Herness was one of the

21  specific doctors we were discussing in terms of horse trading

22  and counsel knew, in fact, it was defense counsel who wanted

23  Dr. Herness in and he flipped-flopped on me when I said, okay,

24  I'll consent to him coming in, which is the way it actually

25  went down.  The same with Dr. Lester.

1          These are records that counsel proposed at one time

2     that I was tentative about and when I got back to him and said

3     finally okay I'll consent, he said no I changed my mind.

4     That's his prerogative, but to say that he's surprised that I'm

5     offering them if we discussed this --

6          THE COURT:  But if there's no authentication, you're

7     not going to get authentication from this witness.

8          MR. DINHOFER:  I don't know if he changed his mind,

9     your Honor.  That's another reason why I keep offering them,

10    because he did flip-flop, and I don't know where he stands on

11    them.

12         MR. HEUBEL:  The reason he keeps offering them is

13    because he knows what that it looks like I don't want them to

14    come in to the jury.

15         MR. DINHOFER:  It's based on what you said and your

16    flops.  I don't know whether you wanted to put them in or --

17         MR. HEUBEL:  I said I didn't want them in.  How much

18    clearer can I be?

19         MR. DINHOFER:  You flip-flop every day.

20         THE COURT:  This is irrelevant, this back and forth.

21    It is irrelevant, it's not stipulated.  This is not going to

22    come in.  Unless you know they're going to come in or there's

23    authentication for them please don't present them in this

24    manner.  They'll be excluded.

25              (Continued on next page)

 1              (In open court; jury present)

 2   Q.  Although you were primarily seeing Dr. Herness for your

 3   back, you said, did you have occasion to show Dr. Herness any

 4   of the prior EMG's with regard to your left upper extremity?

 5   A.  I do not recall.  But I think he send me to have another

 6   EMG report, EMG testing.

 7   Q.  He sent you for another EMG?

 8   A.  I believe he send me in February of 1994.  To Dr. Spira.

 9              MR. DINHOFER:  We have Dr. Spira's records, your

10   Honor, in evidence as Exhibit 5.

11   Q.  Would the date of February 9, 1994 refresh your

12   recollection?

13   A.  Based on this report the examination was on February 3rd,

14   1994.

15   Q.  Okay.

16   A.  And the report was written on the 9th.

17   Q.  Okay.  And this repeats again, this report again states Dr.

18   Spira's findings with regard to the EMG he performed on you, is

19   that correct?

20   A.  Yes.

21   Q.  Who is Dr. Spira?

22   A.  Dr. Spira is, I do not know if he's a neurologist.  I was

23   being sent by Dr. Herness.  Dr. Herness is one of the doctors

24   who work on the appeals for the Workman's Comp in Israel and I

25   think that Dr. Spira is the one who is doing the EMG for all

1    the people filing appeal for Workman's Comp in Israel.

2    Q.   Where Dr. Spira says with regard to the left ulnar nerve,

3    there was some delays of motor unit conduction activity, the

4    cubital canal with some neurogenic pattern.  There is clear

5    damage to the nerve at the cubital canal with delays in

6    stimulation and partial denigration.  Did Dr. Spira communicate

7    that information to you?

8    A.   This information was being told to me by Dr. Herness.

9    Q.   Okay.  Based on the findings of Dr. Spira?

10   A.   Yes, after receiving the report from him.

11   Q.   Okay.  Did there come a time when you returned to

12   Dr. Rousso?

13   A.   I was seeing Dr. Rousso I think since I came back to

14   Israel.  As I said, Dr. Rousso became to be my primary

15   physician for my elbow.

16   Q.   Why is that?

17   A.   Because he saw me in May, he already have a plan for

18   treatment.  Dr. Herness, he was a doctor to deal with my back.

19   I came with my elbow and I told him about my elbow, but he and

20   me got to the agreement that I come to him only for my carpal

21   tunnel syndrome and my back and with my elbow I continue with

22   Dr. Rousso.

23   Q.   And did Dr. Rousso come up with a plan of treatment for

24   you?

25   A.   Yes.  He told me to, we have such a plan for surgery.

1CDFGIL3                          Giladi – direct

1    Q.  By the way, with all these visits that you had with

2    Dr. Rousso, who paid for them?

3    A.  I did.

4    Q.  And how much did you pay them?

5    A.  For office visit I think around $85.

6    Q.  85 American?

7    A.  Yes.

8    Q.  And did you pay him in cash?

9    A.  Yes.

10   Q.  For the report that he did on the initial occasion, did you

11   pay him for that?

12   A.  Yes, I did.

13   Q.  How much did you pay him?

14   A.  Translated dollar I think around $500, $600.  I do not

15   know.

16   Q.  You paid him in Israeli shekels at that time?

17   A.  Yes.

18   Q.  Did there come a time when you underwent surgery with

19   Dr. Rousso?

20   A.  Yes, on April 11, 1994.

21   Q.  Can you tell us how that occurred?

22   A.  We come to the point where in the surgery I had to do the

23   surgery because I was trying to find out what the problem is

24   and to know, and to receive some help for the pain, and this is

25   the only thing that I was being told it was, may relieve the

1   pain but not guarantee, and I took a chance because I was,

2   already my hand was, I couldn't function anymore, and I want to

3   have help because I was planning to come back to work in August

4   of 1994 and I want to have, to be ready to go back to work.

5   Q.  Okay.  Did you have anesthesia for the surgery with

6   Dr. Rousso?

7   A.  No.  It was local.

8   Q.  It was a local?

9   A.  Yes.

10  Q.  So you were awake during the entire surgery?

11  A.  I heard every word and I know everything what's going on in

12  the surgery.

13  Q.  But you weren't able to feel it?

14  A.  The surgery I do not feel, but I know what's going on.

15  Q.  How did that make you feel knowing what was going on?

16  A.  Depressed.  Cheated.  Deceived.

17  Q.  Why did you feel depressed, cheated and deceived?

18  A.  Depressed because I hurt my kids.  I caused them a lot of

19  emotional problem and they couldn't understand why their father

20  is not willing to play with them, why their father is becoming

21  to be a different person, couldn't relate to the divorce,

22  couldn't relate to my injury.  I had no fault in it, and I was

23  paying the price.  My kids was pushing me away.

24          When I came back, I come now, as of today my second

25  child is barely talking to me.  He's angry with me as of today.

1    It's twenty years later.  He doesn't want to understand.  This

2    shouldn't happen.  If my doctor did what he should do, what

3    Dr. Rousso did, we're not going to be here today.  He could fix

4    it when he realized that the nerve is injured.  I could maybe

5    be in treatment for more than four weeks because of that, but I

6    will be back normal.  This is not the first time that I have

7    nerve injury.  I had in '87.  When the doctor told me that I

8    have nerve injury and I need to go for surgery, within five

9    days I was on the table having my surgery.  As I said on my

10   first time when I was sitting here, I believe in preventive

11   medicine.  I do everything to prevent problem, but I cannot

12   prevent something it was being hidden from me, it was being

13   concealed from me.  How can I prevent it if it's being

14   concealed from me?  And this, the fact that the doctor

15   concealed information from me hurts me, hurts my future, hurts

16   my job, hurt my kid, hurt my life.  I'm not, I never going to

17   be the way I was before the surgery and the way I die, the day

18   I die, I will be having pain.  Doesn't make a difference what

19   Dr. Rousso did.  I will live all my life with pain.

20   Q.   Okay.  Do you recall how long Dr. Rousso's surgery took?

21   A.   More than hour is my recollection.

22   Q.   And after the surgery can you tell us what if anything

23   occurred with regard to your left arm?

24   A.   I was in the hospital until sometime in the afternoon.  In

25   the afternoon I was released and I went home.  I came back

1   after two days.  He did his evaluation.  He told me to come

2   back for the day to remove the stitches.  After removing the

3   stitches he told me to start physical therapy and I have, I

4   went to a friend of mine that he's a physical therapist and he

5   was working on my hand.

6   Q.  You had some physical therapy while you were there in

7   Israel?

8   A.  Not officially, but I was being taken care of.

9   Q.  By a friend?

10  A.  Yes.

11  Q.  And what did that therapy consist of that you had with the

12  friend?

13  A.  Occupational and physical therapy.

14  Q.  What did he have you doing?

15  A.  He had a circle with a mesh inside and I had to do some

16  finger movement.  He did something for strength to, something

17  like a rubber to the wall and I had to pull it to build

18  strength.  I put my hand in a special bath to feel comfort.  He

19  did ultrasound.  He did whatever necessary for, to improve my

20  hand.

21  Q.  And how long did you go for physical therapy in Israel?

22  A.  I think until almost until the time -- maybe for a month,

23  something like that.

24  Q.  And do you know how many sessions he did during that month?

25  A.  No, whenever he had time I went.  I went to him, so I

1CDFGIL3                    Giladi - direct

1    cannot tell you exactly.

2    Q.  Are we talking about something you did once a week, twice a

3    week, something else?

4    A.  At least twice a week.

5    Q.  At least twice a week?

6    A.  Yes.

7    Q.  Did you have to pay Dr. Rousso for the surgery?

8    A.  Yes, I did.

9    Q.  And how much did you pay Dr. Rousso for the surgery?

10   A.  $2,000.

11   Q.  Was that U.S.?

12   A.  Yes.

13   Q.  And did you have to pay the hospital for the surgery?

14   A.  Yes, I think around $500.  This is my recollection.  I'm

15   not --

16   Q.  Postoperatively, did you have to pay Dr. Rousso for any of

17   the office visits?

18   A.  I think for the first or second visit I didn't pay or maybe

19   only the first one I did not pay, but the rest I paid of the

20   visit.

21   Q.  Do you have any idea of how many office visits you actually

22   paid Dr. Rousso for?

23   A.  I believe it's four or five.

24   Q.  Do you feel you had any kind of improvements in your left

25   upper arm symptomology as a result of the surgery performed by

1CDFGIL3                    Giladi - direct

1   Dr. Rousso?

2   A.  I have some relief but not to the extent that I say I can

3   function.

4   Q.  Could you just try and detail for us what kind of relief it

5   is that you did have?

6   A.  I'm not isolating myself any more from people that I knew

7   before Dr. Rousso's surgery.  I still have the pain in my elbow

8   when somebody touch me but not to the extent that was prior to

9   that.  I'm more tolerant but still not really tolerant.  I

10  don't know if that's really understood, but --

11          As I said before, I am trying very hard to function

12  like everybody would like to be functioning, and I'm trying to

13  ignore it.  Before Dr. Rousso surgery, even if I wanted, I

14  couldn't, because the little touch cause me pain for a day or

15  two.  Now it's a little bit different, but still is not

16  comfortable.

17  Q.  It's been roughly sixteen, seventeen years now since

18  Dr. Rousso's surgery, and during that time have you noticed any

19  kinds of improvement in terms of your strength in the fourth

20  and fifth fingers of your left hand?

21  A.  Put it this way, before Dr. Rousso did the surgery I had

22  some clawing of my hand, my hand, my four and fifth finger I

23  had some freeze and I had some problem of clawing or something,

24  I think this is the name he call it, they're calling it.

25  Q.  A contracture of the fingers?

1CDFGIL3                          Giladi - direct

```
 1   A.  Yes.  Even Dr. Spira when I showed him the pictures that
 2   one of my colleagues took from work, when he saw that, he
 3   wanted to take this picture for publication.  This one of the
 4   major things that really got improved from Dr. Rousso's
 5   surgery.
 6   Q.  Okay.  You don't have the clawing as much anymore?
 7   A.  I have some clawing, if you look, I have -- my fifth finger
 8   and fourth finger are constantly touching one another, is not
 9   normal, but this is what I have.  It's better than what I have
10   before.
11   Q.  Okay.  How about the sensation in the fourth and fifth
12   fingers?  Do you have any improvement there?
13   A.  Not really to the extent that I can -- I have improvement,
14   but not major.
15   Q.  Did you have any complaints with regard to a loss of
16   sensation in your fourth and fifth fingers when you first saw
17   Dr. Strauch?
18   A.  I did not have any complaint regarding to the ulnar nerve
19   distributions.
20   Q.  And that includes the elbow as well?
21   A.  Elbow, from the shoulder to the fingers, all this I did not
22   have any.
23   Q.  And how about at the elbow itself?  After he removed the
24   neuroma, was there any improvement at the elbow?
25   A.  For the first, for a while I did not have the pain in
```

1    there, but after this I start to have, for some reason I start

2    to have some pain again there which I did not understand it.

3    So he told me that I may developing some little neuromas around

4    a scar of the cut.  And I asked him what is that and he told me

5    this is, with some people it's normal.  When they already

6    develop the first neuroma, this could happen again.  But I did

7    not have the same thing from the first one, so this could be

8    recurrent because my body already develop the first neuroma.

9    Q.  Do you still have that problem with the scarring today?

10   A.  Yes.

11   Q.  Some of this we've touched on.  I'm going to do it in the

12   phrasing of the questions I'm going to ask you now.  Are there

13   things that you used to do with your left arm that you can't do

14   now as a result of the surgery -- which you attribute to being

15   as a result of the surgery of December 12, 1991 and the injury

16   that you sustained in that surgery?

17   A.  Yes.  I would start with my son.  He's twelve years old

18   now.

19   Q.  This is from your second marriage?

20   A.  Yes.  He wanted to learn martial arts because he know that

21   I used to do martial arts before.  He want me to teach him and

22   to work with him and I refuse.  I said I cannot do it.  He get

23   annoyed, but he get used to it.  He got used to it, but he's

24   still annoyed.  And he also know that he's not allowed to come

25   from my left side.  If he have to do anything with me he have

1    to come from the right side, and my two kids, knowing that my

2    left side is absolutely not near you can come or touch.

3             My adult relationship is very difficult, it's not

4    something the way it was before my injury.  I would put this

5    way.  From the time of the surgery until maybe a year or so

6    after Dr. Rousso I did not have any adult relationship with

7    nobody.  I isolated myself totally with people.  I was totally

8    isolated from my family, isolated from my nieces and nephew, I

9    isolated myself.  When I went overseas I just went to the room

10   and sat down by myself.  I try not to be -- I was not social.

11   That's not me.  I'm a very social person.  I love to be with

12   people.  I love to enjoy the company of people.  It's been

13   taken away from me.

14   Q.  How about activities of daily life, household chores and

15   such not?  Are there things that you used to do that you don't

16   do anymore?

17   A.  I do my best, as I said before, to function like I don't

18   have a problem.  I really work very hard with my kids from my

19   second marriage.  When I was trying to take care of them, most

20   of the stuff I used to do is sitting on the floor because I

21   cannot function with my left hand, so if I need to feed them or

22   something like that, I used to sit on the floor, cross my leg,

23   put the baby on the floor and feed him this way instead of

24   holding them or putting -- I had to modify and find a way to

25   operate and not to excuse my hand from being able to do so.

1CDFGIL3                        Giladi - direct

1   This is why I was working for a year and a half after my

2   surgery.  I was doing my work, I was trying to find a way to do

3   my job, even though my hand do not allow me to do it the way I

4   used to.  Got to the point that my boss got upset and closed my

5   department because from being a profit department I began to be

6   a loser because I was not getting as much jobs as I used to,

7   because nobody liked to work with me anymore, because a job

8   took forever.  It did have effect on my life.

9   Q.  Sitting here now, and I think we covered this, but just

10  quickly, can you tell me what your present complaints are

11  related to the injuries you suffered as a result of the surgery

12  of December 12, 1991?

13  A.  Pain in my elbow.  Sensitive to touch in the area of the

14  elbow, any touch will create pain.  Weakness and loss of

15  sensation.

16          (Continued next page)

17

18

19

20

21

22

23

24

25

1CDZGIL4                    Giladi - direct

1   BY MR. DINHOFER:

2   Q.  And is it your understanding that these complaints will

3   continue for the rest of your life?

4   A.  As I said before, until the day I die.

5           MR. DINHOFER:  Thank you.  That concludes my direct

6   examination, your Honor.

7           THE COURT:  Okay.  Let's take a one minute stretch

8   break.  You want to stand up, you can stretch your legs and

9   back.  I think then we'll go till 1:00, unless somebody needs a

10   break.

11          Okay, cross-examination, Mr. Heubel.

12          MR. HEUBEL:  Judge, I have just one more moment?

13          THE COURT:  Sure.

14   CROSS EXAMINATION

15   BY MR. HEUBEL:

16   Q.  Good afternoon, Mr. Giladi.

17   A.  Good afternoon.

18   Q.  You and I have never met, have we?

19   A.  No.

20   Q.  Never had the occasion during the course of this litigation

21   to meet each other face-to-face prior to this trial, right?

22   A.  That's correct.

23   Q.  Now, Mr. Giladi, isn't it a fact that you knew, long before

24   you saw Dr. Strauch for the first time, in fact three or four

25   years before you saw Dr. Strauch for the first time, that you

1   had ulnar nerve entrapment at your left elbow; isn't that true?

2   A.  Yes.

3   Q.  I'm sorry?

4   A.  Yes.

5   Q.  And you knew that, because you had been going to Dr.

6   Kaplan, as you told us earlier, for many years, correct?

7   A.  Yes, I do.

8            MR. HEUBEL:  And, Judge, may I approach just for a

9   moment?

10           THE COURT:  Yes.

11  Q.  During the time that you had been going to Dr. Kaplan, Mr.

12  Giladi, you had some EMG's done, correct?

13  A.  That's correct.

14  Q.  And, as a matter of fact, you had an EMG done in November

15  of 1987; true?

16  A.  Yeah, this is after the surgery of '87.

17  Q.  That was your wrist surgery, though, right?

18  A.  Correct.

19  Q.  And Dr. Kaplan told you, did he not, that in November of

20  1987, you had entrapments involving the median nerve at both

21  the wrist and ulnar nerves at both elbows, correct?

22  A.  I believe so.

23  Q.  And you knew that an entrapment meant that there was some

24  problem with the way the ulnar nerve was positioned at the

25  elbow; true?

1   A.  No, I did not know that at the time, which I know that

2   issue was not even was not symptom to confirm it.  I was

3   working --

4   Q.  And you told this jury --

5            MR. DINHOFER:  He didn't finish his answer.

6            THE COURT:  Are you finished with the answer?

7            THE WITNESS:  No, I did not.

8            THE COURT:  Okay, you can finish your answer.

9   A.  I was working and I did not have a complaint.

10           The fact that entrapment was being found depends on

11  what stage; if it's mild, minor or moderate degree.  I did not

12  have moderate degree or mild degree, and Dr. Kaplan at the time

13  did not tell me that my condition is that I have a damaged

14  nerve at the place, saying that I have entrapment and just go

15  ahead with this, go ahead and not tell me that anything else.

16  I follow what he told me.  I did not look at this as an issue.

17  Q.  Well, you knew, Mr. Giladi, that an entrapment was not a

18  normal finding; true?

19  A.  Entrapment --

20           MR. DINHOFER:  Objection to the term, your Honor.

21  A.  I'm not a doctor.

22  Q.  Well, when Dr. Kaplan conveyed to you that you had

23  entrapment of the nerve, in the ulnar nerve in the elbow, you

24  didn't think that was a normal finding, did you?

25  A.  If I thought it's normal?

1   Q.  You didn't think it was normal, did you?

2   A.  Entrapment for me mean you have something there.  But what

3   it is, I do not know.  If I do not know, I do not know what is

4   important of it.

5   Q.  Something there -- all I asked you was, you knew that the

6   something that was there was not normal, correct?

7   A.  What is normal for you?  I do not know.

8   Q.  I didn't ask what was normal for me, Mr. Giladi.

9   A.  If you ask me what norm --

10  Q.  I asked you, I asked you if you knew when you were told by

11  Dr. Kaplan that an entrapment of the ulnar nerve at the elbow

12  was not normal?

13          MR. DINHOFER:  Your Honor, this has been asked and

14  answered now four times.  I think my client has answered it

15  sufficiently.

16          MR. HEUBEL:  I don't think I've gotten an answer,

17  Judge.

18          THE COURT:  I'm not sure.  If you have an answer or if

19  you --

20  A.  I said --

21          THE COURT:  -- if you don't understand --

22  A.  I did not understand.  At the time my English was not as

23  good as today.  I was -- entrapment for me that you have

24  something in the elbow, but I did not know the meaning of that

25  today.

1   Q.   When did your English improve?

2   A.   During the years, for the last ten years my English

3   improved dramatically.

4   Q.   So you're telling the jury that your English was not so

5   good back at the time when you were seeing Dr. Strauch?

6   A.   My English was not good to the point that I have it today.

7   My English was good at the time, but not as good as today.

8   Entrapment --

9   Q.   Are you saying that you didn't know what Dr. Strauch and

10  the other doctors were saying to you because your English was

11  not good?

12  A.   No, I -- you talking about '87, we're talking about '91.

13  Between '87 to '91 is four years that I learn a little bit more

14  English, and I also got to learn the language better and to

15  understand it better.  And I, you -- as I said before,

16  entrapment for me was not a big issue.

17  Q.   Mr. Giladi, I didn't ask you if it was a big issue.  I

18  asked you, isn't it correct that you knew it wasn't normal; big

19  issue, small issue, whatever, you knew at the time that it

20  wasn't normal, isn't that correct?

21  A.   Is not -- put it this way, yes.

22  Q.   Thank you.  Now, you told us that a little while ago, that

23  you never had, before seeing Dr. Strauch, any symptoms with

24  your left arm from shoulder through the elbow, correct?

25  A.   No, that's not what I said.

1CDZGIL4                          Giladi - cross

1    Q.  Okay.

2    A.  I, you like --

3    Q.  I'm sorry, I stand corrected.  You said what you didn't

4    have --

5              MR. DINHOFER:  May the witness finish his answer

6    without interruptions, your Honor?

7              THE COURT:  Well --

8              MR. DINHOFER:  The witness was still talking, and he's

9    just talking over him, Mr. Heubel, when he's trying to say

10   something.  Mr. Giladi is soft spoken and I think he's taking

11   advantage of that moment to speak over him.

12             THE COURT:  Well, okay, okay.  He said that's not what

13   I said.

14             MR. DINHOFER:  He was continuing on.

15             THE WITNESS:  Which I said was that I never had a

16   problem on the ulnar nerve distribution of my hand.

17   Q.  And, Mr. Giladi, when you say the ulnar nerve distribution,

18   you're talking about the fourth and the fifth finger, is that

19   right, at least including those two digits, is that correct?

20   A.  Including everything related to the nerve.  I'm talking

21   about the nerve themself.

22   Q.  Correct.  You used the term "ulnar nerve distribution."

23             By the way, did you know what the term ulnar nerve

24   distribution meant?

25   A.  With the --

1    Q.  In 1991 and before then?

2    A.  No.  I know it today.

3    Q.  And when you told the jury that you didn't have any

4    symptoms in the ulnar nerve distribution, you were talking

5    about what?

6    A.  The ulnar nerve was without any injuries.

7    Q.  And you also told this jury earlier that you did not have

8    any problems with the elbow, correct?

9    A.  I never had a problem with the elbow until '91.

10   Q.  Until '91?

11   A.  Meaning -- '91, yeah, December -- December 12th, 1991.

12   Q.  And you also told the jury that you didn't have any

13   problems with the ulnar nerve distribution before December of

14   1991?

15   A.  When I'm talking about the ulnar nerve distribution, I'm

16   talking about injury to the nerve itself.

17   Q.  Doctor, isn't it a fact -- I mean, not Doctor.  Mr. Giladi,

18   isn't it a fact, that as early as 1988, you were having

19   symptoms related to your ulnar nerve at the elbow?

20   A.  It's not exactly correct.

21   Q.  That's not correct?

22   A.  It's not exactly correct, because I can explain myself to

23   you.

24            MR. HEUBEL:  Judge, can I just step up for a moment?

25            THE COURT:  Yes.

1   Q.  Do you remember earlier today telling us that you went to a

2   Dr. Spinner?

3   A.  Yes.  After my surgery of '87, I went to Dr. Spinner

4   because I had hematoma at the biceps here, which caused by

5   anesthesia.  And as a result, my hand was swelling and too much

6   pressure on ulnar nerve there, and I wanted Dr. Spinner to help

7   me with that and --

8   Q.  And you told us you went to Dr. Spinner in February of

9   1988, correct?

10  A.  Because the problem that I had.

11  Q.  My question was, did you go there in 1988?

12  A.  I don't remember.  I do not remember the dates.  If you say

13  so, I did.

14  Q.  Well, let me show you.  Do you see this note from Dr.

15  Spinner in evidence?

16  A.  Yeah, this first visit with him.

17  Q.  As defendant's Exhibit B in evidence, do you see that the

18  date on there?

19  A.  I say it look like the first visit with him.

20  Q.  February 1st, 2008, correct?

21  A.  Yeah.  It's after the surgery in September of '87.

22  Q.  And didn't you tell Dr. Spinner then that when you flex

23  your elbow, you have numbness in your hand?

24          MR. DINHOFER:  Objection.  It's a mischaracterization

25  of what's in evidence.

1           THE COURT:  Okay, could you clarify.

2           MR. HEUBEL:  I'm not reading what's in evidence.  I'm

3  asking the witness a question.

4           MR. DINHOFER:  It's a mischaracterization of what's in

5  evidence.  The evidence speaks for itself.

6           THE COURT:  Didn't you tell Mr. Spinner that when you

7  flex your elbow, you have numbness in your hand?

8           THE WITNESS:  I do not recall.  I do not recall.

9  Q.  Mr. Giladi, I'd like you to take a look at that note by Dr.

10  Spinner that we talked about a moment ago, and specifically I'd

11  like you to look at the last -- second-to-last sentence in the

12  first paragraph.  And you see where it begins, "it should be

13  noted?"

14  A.  Where are you talking about?

15  Q.  First paragraph 2/1/88, second to the last sentence which

16  begins, it should also be noted?

17          THE DEPUTY CLERK:  This is defendant's exhibit B,

18  correct?

19          MR. HEUBEL:  Defendant's exhibit B, yes.

20          THE DEPUTY CLERK:  Thank you.

21  Q.  You see that?

22  A.  I see that.  And he said very clear, that when I flex my

23  elbow I have, I have numbness in my hand.  But he doesn't say

24  which fingers in my hand I have the numbness.

25  Q.  Okay.  Dr. Spinner, most certainly related the flexing of

1   your elbow to the numbness in your hand, did he not?

2   A.  But what finger, I do not know what he's talking about.

3   Q.  In another -- I'm not asking you about fingers.  But you

4   flexed your elbow while you were at Dr. Spinner's office?

5   A.  That's correct.

6   Q.  And you told him that when you did that, you had more

7   numbness in your hand, correct?

8   A.  Based on the notes, he did some examination and I had some

9   numbness.  Which fingers is not talking about, he -- it could

10  be, he told to do something like that too.

11  Q.  Mr. Giladi, are you a doctor?

12  A.  I'm saying I do not --

13  Q.  Are you a doctor?

14  A.  I'm a paramedics.

15          MR. DINHOFER:  Objection, your Honor.

16          THE COURT:  The witness -- the objection is overruled

17  and the witness is instructed to answer the question.

18          MR. DINHOFER:  I got a different objection.  When he's

19  raising his voice, he's starting to run into the witness too.

20          THE COURT:  Overruled.

21  A.  I'm a paramedics.

22  Q.  Mr. Giladi, are you threatened by me?

23          MR. DINHOFER:  Objection.

24          THE COURT:  That's an argumentative question.

25          MR. HEUBEL:  Withdrawn, withdrawn, Judge.

1          MR. DINHOFER:  That's ridiculous.

2          THE COURT:  Sustained.

3  Q.  Mr. Giladi, when you were at Dr. Spinner's office,

4  according to this note, you bent your elbow and you told Dr.

5  Spinner that when you did that, you had more numbness in your

6  hand, correct?

7  A.  Based on the note, yes.

8  Q.  Now, that was approximately three years before you saw Dr.

9  Strauch, true?

10  A.  Give or take, yes.

11  Q.  And, by the way, Mr. Giladi, you had also asked Dr. Kaplan

12  as you did later with Dr. Strauch, for a letter to use to be

13  excused from military duty back in July of 1988, correct?

14  A.  Yeah, because I was having problem with the hematoma, and I

15  was still working on it to fix it to -- I was waiting for the

16  what happened there to reduce.  And I have a responsibility to

17  my soldiers and to the country and to myself and to my family,

18  and I needed something that in case I need it, I should use it.

19  Q.  And Dr. Kaplan gave you that letter, just like Dr. Strauch

20  did, right?

21  A.  That's correct.

22          MR. HEUBEL:  And, Judge, this is plaintiff's Exhibit

23  four in evidence.

24  Q.  The letter, a letter from Dr. Kaplan dated July 26, 1988;

25  can you see that, Mr. Giladi?

1    A.  Yes, I see that.

2    Q.  And do you see that in that letter -- by the way, Dr.

3    Kaplan gave this letter to you to take to Israel or wherever

4    you needed to go to present that in the event that you were

5    asked to do something with respect to your military duty,

6    right?

7    A.  That's correct.

8    Q.  And you read that letter at the time he gave it to you,

9    just like you told the jury you read documents given to you by

10   Dr. Strauch, correct?

11   A.  Yes.

12   Q.  And you see in that letter, Mr. Giladi, that among the

13   things listed by Dr. Kaplan, in about the middle of the letter

14   two-thirds of the way down, it says, "In addition, he has multi

15   focal entrapments of the median ulnar nerves, bilaterally, in

16   the arms occurring at the wrist and elbows respectively?"

17   A.  That's correct.

18   Q.  Do you see that?

19   A.  That's correct.

20   Q.  And does Dr. Kaplan go on to say that Mr. Giladi is in no

21   way a candidate for military duty and would probably represent

22   a hazard in any military situation, correct?

23   A.  That's correct, because --

24   Q.  And was it your understanding, Mr. Giladi, that Dr. Kaplan

25   was telling whoever your superiors might be or whoever you have

1  to give this letter to, that these were the reasons why you

2  might be a hazard in any military situation?

3  A.  No, it's not why.

4  Q.  Now, did he give it to you -- did he give you this letter

5  for some other purpose?

6  A.  He gave me this letter because I was having problem with my

7  biceps and the hematoma, and this creating some of the symptoms

8  that I had.  And, in his opinion, until this issue was not be

9  resolved, I should not be in the military duties.

10 Q.  Now, Mr. Giladi, going back to the notes of Dr. Spinner,

11 the one that we referred to before which was part of

12 defendant's exhibit B, the last sentence in the first

13 paragraph.  You see that?

14 A.  The last sentence of?

15 Q.  Of the first paragraph, after the elbow and the numbness

16 sentence it begins, "It is suggestive of a cubital tunnel

17 syndrome separately; do you see that?

18 A.  I see it now.

19 Q.  Now, you know from all the experience you've had, up to

20 today, including this trial, that the cubital tunnel is the

21 groove that the ulnar nerve passes through at the elbow, right?

22 A.  He's talking about entrapment here.

23 Q.  I'm sorry?

24 A.  He's talking about the entrapment.

25 Q.  Dr. Spinner is saying that when you flex your elbow, you

1CDZGIL4                    Giladi - cross

1    get more numbness in the hand, and that is suggestive of

2    cubital tunnel syndrome separately, correct?

3    A.  As I said.

4    Q.  And what Dr. Spinner -- did Dr. Spinner tell you what his

5    findings were back then in 1988?

6    A.  He spoke with Dr. Kaplan at the time.

7    Q.  No, I asked you if you -- if Dr. Spinner told you what his

8    findings were at that time?

9    A.  Can I answer?

10   Q.  My question, sure.

11   A.  Thank you.  Dr. Kaplan referred me to him.  When I was at

12   his office, if I'm not mistaken, he called Dr. Kaplan.  Dr.

13   Kaplan maybe told him about my entrapment.  And he just -- when

14   he -- I was in his office, he told me besides that, I have the

15   entrapment, and that's it.

16          I never saw this note, this personal note.  He never

17   told me this that I have a syndrome the way it where it it.

18   Here he told me --

19   Q.  Well, the way it's worded here is that the numbness that

20   you feel when you bent your elbow is suggestive of a cubital

21   tunnel syndrome separately; isn't that correct?

22   A.  I do not know.

23   Q.  Okay.

24   A.  I do not know what, but I don't understand your question.

25   Can you repeat the question, please?

1   Q.  My question was, these two sentences, Mr. Giladi, it should

2   also be noted that when he flexes his elbow, he gets more

3   numbness in his hand.  It is suggestive of a cubital tunnel

4   syndrome separately.

5       You understand that to mean that the numbness you felt

6   on bending your elbow suggested to Dr. Spinner that you had a

7   problem in your elbow; true?

8       MR. DINHOFER:  Objection.  At what point in time?

9   Based on the present knowledge he has or at the time back when

10  he saw him with --

11  Q.  Well, start right now.

12      MR. DINHOFER:  If this information was even conveyed

13  to him, which I think he said it wasn't at the time.

14      THE COURT:  I think it's a fair question.

15      You understand, present tense, do you understand that

16  to mean that the numbness he felt on bending your elbow

17  suggested to Dr. Spinner that you had a problem with your

18  elbow; true.

19      THE WITNESS:  My understanding from this statement

20  that Dr. Posner -- Spinner was not sure, is assuming, but you

21  have no evidence that there's some disease going on with the

22  nerve.  He said very clear that possibility.

23  Q.  Well, Mr. Giladi, you don't -- withdrawn.

24      You have no reason to disbelieve Dr. Spinner when he

25  says that when you flexed your elbow, you had more numbness in

1CDZGIL4                         Giladi - cross

1   the hand; you have no reason to disbelieve that, do you?

2   A.  I never doubt doctors.  If I would doubting doctor, I was

3   going to do things with my elbow beforehand.

4       I never doubt doctors.  But doctor told me something

5   that's the first I do what they told me.

6       Second, this note I never saw in my life before,

7   before.  This issue, this is internal issue.  I do not know.  I

8   know what he told me at the time of the examination.  The time

9   of the examination he never mentioned anything about.  He just

10  took notes and he wrote.

11  Q.  Well --

12  A.  What he wrote, I have no knowledge.  So I cannot tell you

13  what you thinking, what thinking.  I know what he told me at

14  the time.

15  Q.  If Dr. Spinner note is correct, then while you were at his

16  office in 1988, you bent your elbow and you had more numbness,

17  and you told him that you had more numbness in your hand,

18  correct?

19      MR. DINHOFER:  I think we've covered this for the last

20  half-hour, your Honor.

21      THE COURT:  I'll allow it.

22  A.  As I said before, whatever the doctor writing, I assume it

23  is correct.

24  Q.  Now, you also saw Dr. Kaplan in January of 1990, correct?

25  A.  Could be.

1CDZGIL4                    Giladi - cross

1    Q.  I'm sorry?

2    A.  Could be.

3    Q.  Okay.  I'm going to show you a portion of Dr. Kaplan's

4    records, which is in evidence as plaintiff's Exhibit four.  Do

5    you see that note as dated 1/9/90?

6    A.  Yes.

7    Q.  Now, Mr. Giladi, when you went to visit Dr. Kaplan on

8    various occasions, at least sometimes he would ask you for a

9    history of what had been going on with you and what your

10   complaints were; true?

11   A.  Not all the time.

12   Q.  Well, I didn't say all the time.  Some of the occasions

13   when you went to Dr. Kaplan, he would ask you for a history as

14   to what was going on with you with respect to what complaints

15   you had?

16   A.  It's a possibility, yes.

17   Q.  I'm sorry?

18   A.  It is a possibility.

19   Q.  Okay.  And if Dr. Kaplan noted in his records that you told

20   him that you continued to have pain in your arms, that would be

21   correct, would it not?

22   A.  Yes.

23   Q.  And if Dr. Kaplan said in his note recorded -- in his note,

24   that you had pain from the left wrist to the elbow to the

25   shoulder, that would be correct as well; true?

1   A.  Yes.

2   Q.  And if Dr. Kaplan said in his note that the pain from your

3   left wrist to the elbow to the shoulder is worse with movement,

4   that would be true as well, correct?

5   A.  Yes.

6   Q.  And if Dr. Kaplan said that this pain in your left wrist to

7   elbow to shoulder was worse while you were holding a telephone,

8   that would be true too, would it not?

9   A.  Yes.

10  Q.  And in order to hold a telephone in your left hand, you

11  have to bend your elbow; true?

12  A.  True.

13  Q.  I'm sorry?

14  A.  Yes.

15  Q.  Now, Mr. Giladi, I'd like you to take a look at the first

16  paragraph of Dr. Kaplan's note dated 1/9/90.  Does that note

17  say that you continue to have pain in your -- in his arms?

18  A.  But it don't say where in his arm I have it.

19  Q.  I'm sorry?

20  A.  It doesn't specify which area of my arm I have pain.

21  Q.  It just says arms, correct?

22  A.  Arms is which part of the arm; upper arm?

23  Q.  All I asked you was, does it say that you continued to have

24  pain in your arm?

25  A.  Yes.  And he's talking about -- he's talking about biceps,

1CDZGIL4                     Giladi - cross

1   because it's the area I was complaining about.

2   Q.  Okay.  His next sentence says, "He has pain from the left

3   wrist to the elbow to the shoulder," does it not?

4   A.  That's correct.

5   Q.  Dr. Kaplan doesn't say he has pain in his bicep, does it?

6   A.  No.

7   Q.  And the bicep, you know the bicep is up here between the

8   elbow and the shoulder; true?

9   A.  That's correct.

10  Q.  And would you agree with me that Dr. Kaplan probably knew

11  what a bicep is?

12  A.  That's correct.

13  Q.  At the time?

14  A.  That's correct.

15  Q.  And do you see in the fourth sentence, "it is worse while

16  holding a telephone," you see that?

17  A.  Yes.  And I know why.  I know what he's talking here is

18  about also --

19  Q.  I didn't ask you what he was talking about.  I asked you if

20  that's what it says in the note?

21  A.  Yes.  He's talking about a shoulder, for the shoulder, this

22  is what is believed at the time that I have.

23  Q.  Now, you were talking to us a moment ago about the term

24  "ulnar nerve distribution," right?

25  A.  That's correct.

1    Q.  Okay.  And I may have asked you this before, but bear with

2    me, I'm going to ask you again.  Included in your terminology

3    of the ulnar nerve distribution are these two fingers, the

4    little finger and the finger next to it?

5    A.  That's correct.

6    Q.  Right?  And we refer to that as the fourth and fifth

7    finger?

8    A.  That's correct.

9    Q.  Okay.  Now --

10           THE COURT:  Counsel, would this be a good time to

11   break for lunch?

12           MR. HEUBEL:  Just one or two more questions.

13           THE COURT:  Okay.

14   Q.  Mr. Giladi, when you met with Dr. Kaplan on January 9th,

15   1990, that was almost a year before you went to see Dr.

16   Strauch, correct?

17   A.  That's correct.

18   Q.  And you told Dr. Kaplan at that time that you had

19   occasional numbness of the fingers, especially the fourth

20   finger; didn't you tell him that?

21   A.  I do not recall.

22   Q.  You don't recall.  If Dr. Kaplan put in his notes that he

23   occasionally has numbness of the fingers, especially the fourth

24   finger, that would be correct, wouldn't it?

25   A.  You talking about this fingers, this finger, ring finger.

1   Q.  Didn't we just say fourth and fifth fingers?

2   A.  No, ring finger goes both direction.

3   Q.  I didn't ask you about direction.  I asked you --

4   A.  You asked me about ulnar nerve distribution.  If we want to

5   be clear and honest to the jury, we have to be honest.  Number

6   four goes, half of it go to the ulnar, and the other half go to

7   different nerve, so.

8   Q.  So the fourth finger is within the ulnar nerve

9   distribution; true?

10  A.  Half of it.

11  Q.  Okay.  The finger, half the finger is in the ulnar nerve

12  distribution, right?

13  A.  I did not specify, but yes.

14  Q.  Now, also at that time Dr. Kaplan in his same note of

15  1/9/90, says the following:  In the second paragraph?

16          MR. DINHOFER:  Is that exhibit in evidence?

17          MR. HEUBEL:  I'm sorry, my mistake.

18  Q.  Exhibit four --

19          MR. HEUBEL:  And this will be my last question, Judge.

20  Q.  You see that, the second paragraph, after examination

21  beginning, he has tenderness; there is a sentence, the third

22  line?

23  A.  Are you talking about normal strength?

24  Q.  No.  He appears to have rather significant slowing of

25  median nerve conduction across the left wrist and ulnar nerve

1CDZGIL4                          Giladi - cross

1  conduction across the left elbow, correct; does it say that?

2  A.   He's talking about entrapment.

3  Q.   That's correct.

4  A.   Okay.

5          MR. HEUBEL:   Judge, this would be an appropriate time

6  to break.

7          THE COURT:   Okay, ladies and gentlemen, we'll take

8  lunch break now.   It's 1:05.   We'll start back at 2:05

9  promptly.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1CDZGIL4                    Giladi - cross

1          (In open court; jury not present)

2          MR. DINHOFER:  Would this be as good a time to revisit

3     the issue of the judicial notice?

4          THE COURT:  Unfortunately, I have an appointment in my

5     chambers that I have to attend, so.

6          MR. DINHOFER:  Before we bring back the jury, can we

7     address it?

8          THE COURT:  Yeah, we'll try to do it quickly before.

9     I'll take a look at the -- the cases are not about that,

10    they're about fraudulent concealment.

11         MR. DINHOFER:  The cases of fraudulent concealment,

12    yes.

13         THE COURT:  So we'll try and address that before the

14    jury comes back.  Okay.

15         By the way, Mr. Heubel, is Dr. Posner, is he available

16    today or not?

17         MR. HEUBEL:  He's not, because I specifically asked

18    him to make sure that he cancelled his appointments all day

19    tomorrow.

20         THE COURT:  Tomorrow morning.

21         MR. HEUBEL:  And then I expect to work fairly

22    efficiently with him, and I will make every effort to do that.

23         THE COURT:  Okay.

24         MR. HEUBEL:  Now, I don't think I'll be much longer, I

25    guess I went about 40 minutes, I don't think I'll be too much

1   more than that as it turns out this afternoon.  So that's 2:05,

2   let's say by three something, I'll probably be finished.  I

3   don't know how much redirect there's going to be.

4              THE COURT:  Okay.  Okay.

5              MR. HEUBEL:  So you want us back here at?

6              THE COURT:  Could you come back about five minutes

7   before 2:00?

8              MR. HEUBEL:  Sure.

9              THE COURT:  Okay.

10             MR. DINHOFER:  Thank you.

11             THE COURT:  Thanks.

12             (Luncheon recess)

13             A F T E R N O O N   S E S S I O N

14             2:05 p.m.

15             (In open court; jury not present)

16             THE DEPUTY CLERK:  Judge entering.

17             THE COURT:  Okay, good afternoon, everyone.  You

18   wanted me to take judicial notice of something?

19             MR. DINHOFER:  Yes, sir.

20             THE COURT:  What was that?

21             MR. DINHOFER:  Okay, there are a bunch of statutes

22   that I cited.

23             THE COURT:  In your jury instructions?

24             MR. DINHOFER:  Right.

25             THE COURT:  What relevance do they have?

1cdzgil4a                    Giladi - cross

1           MR. DINHOFER:  Okay, the statutes are relevant in

2     terms of the biased interest and motive of the defendants to be

3     deceitful, in covering up their own crimes at the time when

4     they did, such that now, of course, they have to stay

5     consistent with those crimes that they covered up back then.

6           I asked them before if they had knowledge of the

7     crime.  I think I just asked it of Dr. Strauch.  And the fact

8     that there is such a crime of filing a false operative report,

9     of filing these for purposes with insurance companies for

10    getting payment, these go to the motives of the defendants in

11    this case, and why they still don't acknowledge the injury that

12    they inflicted upon my client.

13          THE COURT:  Mr. Heubel?

14          MR. HEUBEL:  Judge, I certainly don't think, and this

15    is why I objected when that question was asked of Dr. Strauch,

16    I don't think that there has -- that the elements of any crime

17    have been either pled or made out by evidence in this case.

18    Simply by -- and then counsel wants to advise the jury as to

19    criminal statutes that have no part to play in this case.  It's

20    not a criminal trial.  He's not proving up an underlying crime.

21          And the reason I object also is because the term

22    "filing a false report," what does that mean to anyone?

23          THE COURT:  Yeah, I think it's really attenuated.  I

24    think it's -- I think it's prejudicial.  I think prejudice

25    would substantially outweigh any probative effect, and I just

1cdzgil4a                    Giladi - cross

1    don't think that's what this case is about.  This is a medical

2    malpractice case.  This isn't a criminal case.  To the extent

3    that you want to make motive relevant, it's obvious what the

4    motive would be.  I mean, you don't need some statute about

5    false filings to make clear what the motive would be.  So

6    there's no sort of additional marginal probative value I think

7    that would be, would come close to outweighing the prejudice of

8    having all these statutes read, and it's just not what this

9    case is about, so.

10              MR. DINHOFER:  I think on the fraudulent concealment

11   aspect of the case, it is exactly what the case is about.

12              THE COURT:  Well, I think you should -- let's bring in

13   the jury.

14              MR. DINHOFER:  Okay.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1        THE DEPUTY CLERK:  Jury entering.

2        THE COURT:  Good afternoon, ladies and gentlemen.  You

3   may be seated.  Welcome back.

4        We'll be continuing now with the cross-examination by

5   defendants of the plaintiff.

6        Mr. Heubel.

7        MR. HEUBEL:  Thank you, Judge.

8   Q.  Mr. Giladi, we left off I think following your visit in

9   1990 with Dr. Kaplan; remember that discussion?

10  A.  Yes.

11  Q.  Earlier today?

12  A.  Yeah.

13  Q.  Before lunch?

14  A.  Uh-huh.

15  Q.  And about the beginning of 1991, you went to see Dr.

16  Strauch at his office at Montefiore Hospital, correct?

17  A.  Yeah, February.

18  Q.  I'm sorry?

19  A.  At the end of February, if I'm not mistaken.

20  Q.  And the reason you went to Dr. Strauch is because you were

21  having difficulty after five or six hours of work with pain in

22  your hand, correct?

23  A.  Talking pain of my hand, I'm talking about the wrist, about

24  this area.

25  Q.  Well, did you?

1cdzgil4a                     Giladi - cross

1    A.   The hand.

2    Q.   Did you explain to Dr. Strauch that you had pain in your

3    hand after five or six hours of work, and that that was

4    concerning to you?

5    A.   Yes.

6    Q.   And --

7    A.   And also --

8    Q.   After the first visit with Dr. Strauch, he sent you to have

9    some EMG studies done, correct?

10   A.   That's correct.

11   Q.   To Dr. Berger?

12   A.   Yes.

13   Q.   And you learned from the results of those studies, as you

14   had learned from previous studies by Dr. Kaplan, that you had

15   your left ulnar nerve entrapment at the elbow, true, that was

16   that was continuing to exist, did it not?

17   A.   Incorrect.  I have bilateral, meaning I have left and right

18   equally.

19   Q.   I asked you if you had it in the left, correct?

20   A.   Yes.

21   Q.   And if you had -- if you have it bilaterally, you must have

22   it in the left, correct?

23   A.   Yes.

24   Q.   Now, at your -- you had a visit with Dr. Strauch on

25   July 19th, 1991 after he had sent you for those EMG studies,

1cdzgil4a                    Giladi - cross

1    nerve conduction studies with Dr. Berger, correct?

2    A.  That's correct.

3    Q.  And at that -- and you've had an opportunity, as you sat

4    here during this trial, to see Dr. Strauch's notes for your

5    visits with him, correct?

6    A.  Can you repeat the question, please?

7    Q.  Sure.  During the time that this trial has been ongoing,

8    you were seated at the table and you had access to a computer

9    screen and you saw various piece of evidence, documentary

10   evidence on the screen, right?

11   A.  I saw that.

12   Q.  And among those -- I'm sorry?

13   A.  I saw.

14   Q.  Okay.  And among that, those documents were certain of Dr.

15   Strauch's records, right?

16   A.  It's correct.

17   Q.  And one of those records that you saw involved a visit on

18   July 19th, 1991, correct?

19   A.  That's correct.

20   Q.  And I put that on the screen, and it's part of plaintiff's

21   Exhibit two, Dr. Strauch's typed notes for 7/19/91.

22          Now, Mr. Giladi, do you see there that Dr. Strauch,

23   approximately three full lines from the bottom of that note --

24   A.  I cannot hear you.

25   Q.  I'm sorry?

1cdzgil4a                          Giladi - cross

1    A.  I cannot hear you.

2    Q.  The bottom of that note 7/19/91?

3    A.  Uh-huh.

4    Q.  That paragraph, about three lines up from the bottom, on

5    the right side of the page there are the words as well as.  Do

6    you see that, as well as weakness?

7    A.  I see that.

8    Q.  Okay.  And it says --

9            MR. DINHOFER:  Which line are you on?  Can you point

10   to the line?

11           MR. HEUBEL:  Sure.

12           MR. DINHOFER:  Okay, sorry.  I was on three from the

13   top.

14   Q.  Now, perhaps I'll read from the whole sentence beginning is

15   the -- "his decreased sensibility was present in the hand on

16   all his digits."  Do you see that?

17   A.  Yes.

18   Q.  And then it says "Has positive Tinel and positive Phelan."

19   Do you see that?

20   A.  Yes.

21   Q.  He also says "weakness of his thenar musculature."

22           Now, you know from sitting here that that's this

23   muscle under your thumb, right?

24   A.  Okay.

25   Q.  Yes?

1    A.  If you say so, yeah.

2    Q.  You don't have to take my word for anything.  Do you

3    understand that the thenar musculature is this muscle under the

4    thumb?

5    A.  Okay.  I understand now.

6    Q.  And do you see where it says, following that, "And his long

7    flexors to the little finger."  You see that?  I'll point it

8    out here.

9    A.  Yes, I see that.

10   Q.  Now, Mr. Giladi, the long -- little finger is part of the

11   ulnar distribution, as you understand it, correct?

12   A.  Yes, I do.

13   Q.  And it's not half the ulnar distribution.  The whole finger

14   is in the ulnar distribution; true?

15   A.  Can you repeat, please?  Can you repeat the question,

16   please?

17   Q.  Not just half the little finger, but the whole finger is in

18   the ulnar nerve distribution as you understand it, correct?

19   A.  That's correct.

20   Q.  So that according to this note, Dr. Strauch found that you

21   had weakness in that finger, correct?

22   A.  It's what the note said.

23   Q.  Now, shortly after that in September, September 4th, 1991,

24   you had another visit with Dr. Strauch, correct?

25   A.  That's correct.

1cdzgil4a                    Giladi - cross

1    Q.  And at that time you asked him for a letter?

2    A.  That's correct.

3    Q.  True?

4    A.  As the note said, yes.

5    Q.  The note reflects that you asked him for a letter, right?

6    A.  Yes.

7    Q.  Do you have any reason to doubt that?

8    A.  No.

9    Q.  And, in fact, Dr. Strauch complied with your request and he

10   gave you a letter on July 3rd -- I'm sorry, let me back up a

11   little bit.

12          You saw Dr. Strauch on July 19th, 1991, and on

13   July 30th, 1991 he gave you a letter concerning your service in

14   the military?

15   A.  Yes.

16   Q.  Right?

17   A.  Yes, with regard to the carpal tunnel syndrome.

18   Q.  Similar to the type of letter you got from Dr. Kaplan years

19   before?

20   A.  That's correct.

21   Q.  True?

22   A.  That's correct.

23   Q.  And that letter that Dr. Strauch gave you, and I'll put it

24   up on the Elmo in a second, that letter was something like you

25   had asked of Dr. Kaplan, something that you needed to avoid

1cdzgil4a                    Giladi - cross

 1  being called to military service because of your physical

 2  complaints and your physical condition?

 3             MR. DINHOFER:  He just asked that two questions ago.

 4             THE COURT:  It's okay for clarification.

 5  A.  First of all, this letter was not to avoid military

 6  service.

 7  Q.  I don't think I said avoid, but let me rephrase the

 8  question then.

 9             The letters that you asked for of Dr. Kaplan and Dr.

10  Strauch, those letters were to be turned over by you to

11  military authorities in Israel in the event that you were

12  called upon to provide some military service in and around the

13  time that these letters were written?

14  A.  Yeah.

15  Q.  True?

16  A.  This letter is to give my superior pictures in what kind of

17  duty can be fit with the condition I was at the time.

18  Q.  And Mr. Giladi, if you knew -- withdrawn.  These --

19  withdrawn.

20             This particular letter -- and I'm putting it on the

21  screens now, part of Exhibit two, plaintiff's Exhibit two -- do

22  you see in the second paragraph, which is only a sentence long,

23  the same reference to weakness in the long flexors to the

24  little finger?

25  A.  This is Dr. Strauch's examination.  It's not my complaint.

 1   Q.  Well, did you tell Dr. Strauch, wait a second, I don't have

 2   any problem with my little finger, I can't bring this to the

 3   Israeli army; did you say that?

 4             MR. DINHOFER:  Objection.  That's not at all what the

 5   report says.  He's mischaracterizing the document in evidence.

 6   Doesn't say there is a problem with the little finger.  It says

 7   there is a problem with the long flexor muscle to the little

 8   finger.  That's the name of the muscle, not the finger.

 9             MR. HEUBEL:  I'll withdraw and rephrase.

10             THE COURT:  Rephrase the question.

11   Q.  Mr. Giladi, did you tell anyone in the military that this

12   is incorrect, that you do not have weakness in the little

13   finger?

14             MR. DINHOFER:  Objection.  Again, it's

15   mischaracterizing.  It doesn't say it has weakness in the

16   little finger.  It says weakness to the long flexor of the

17   little finger.

18   Q.  Mr. Giladi, did you read this letter when Dr. Strauch gave

19   it to you?

20   A.  I read his letter.  The letter said, on physical

21   examination.  This is not my word.  This is Doctor impression.

22   And I cannot argue with what the Doctor's writing with regard

23   to his examination.  This is what he's writing his examination.

24             I cannot -- if the doctors in the army got this letter

25   and if he's like to confirm it, he has to, he was to confirm

1    it.  This is the army to decide.  Said very clear, on physical

2    examination.  Did not say that the patient notify me or told

3    me.  So if I did not say it, it's not my word.  It's the doctor

4    examination.  This is what the doctor feel.

5    Q.  So the answer to my question is, no, you didn't tell anyone

6    that there was an error in that letter?

7    A.  I do not know there is error or not.  This is doctor

8    examination.  How can I say that?  The doctor did wrote an

9    examination.

10   Q.  The reason that you didn't object to it is because you knew

11   that you had weakness and numbness in the ulnar distribution

12   even before you went to see the doctor?

13   A.  This is, this is your interpretation, not mine, and I never

14   said that.

15   Q.  Now, Dr. Strauch -- you told us the other day, when you

16   testified initially, that when you had your first postoperative

17   visit to Dr. Strauch's office, that he wouldn't give you a

18   letter documenting that you were sick, not in condition to go

19   to work; do you remember that?

20   A.  Yes.

21   Q.  Now, at the time you saw Dr. Strauch that day, your arm was

22   still in a cast, right?

23   A.  Absolutely.

24   Q.  And you said that you complained to him of pain, right?

25   A.  I complained from the minute I woke up from surgery.

1cdzgil4a                    Giladi - cross

1    Q.  And you asked Dr. Strauch to give you a letter about that,
2    a note?
3    A.  No, I did not say a letter.  I said I need I need a form
4    for my boss that I cannot perform my job, my work duty, and I
5    need to be excused.
6    Q.  Okay.  So you needed documentation from Dr. Strauch about
7    your work and your inability to perform it, right?
8    A.  He's the surgeon, he's the surgeon.  He's the only one can
9    give it to me.
10   Q.  Well, that's what you asked him for, right?
11   A.  Based on my conversation with him, he supposed to have it
12   ready for next Wednesday, because this is what he promise me
13   before surgery.  It was not done.
14   Q.  Now you're saying that you asked for it before surgery?
15   A.  This is routinely -- he's supposed to give it to me on
16   discharge date.  When he discharge me from the hospital, the
17   form of discharge said, not to return to work.  This one was
18   not in the discharge form.
19          The next thing I believe it should be when I come to
20   his office.  This is not then either.  So I had to ask him for
21   the paper.
22   Q.  Well, when Doctor -- when you asked Dr. Strauch for the
23   letter for the military in July, he gave you that, didn't he?
24   A.  When did I ask him how long it took?
25   Q.  I don't know.  He gave it to you, didn't he?

1    A.  He also gave me the disability form when he give it to me.

2    Q.  He also gave you three forms to continue your disability

3    longer at the time?

4    A.  Gave it to me three weeks after the fact.

5    Q.  And he also gave you another letter later on with respect

6    to the military; true?

7    A.  Because he know that I cannot do the service.  He knew

8    exactly that I have a problem with my hand and I can not do the

9    service.

10   Q.  And he willingly gave you a letter for that; true?

11   A.  He gave me a letter, but he also wrote that, that I have a

12   transposition.  Then -- and this is very risky for me to say

13   that I have a transposition.  Because if I will say that I want

14   to do army and they give me a duty that, that I will be in

15   administrative work, not as a combat, but I will be going with

16   the force into the enemy area, and I got injured, and they need

17   to do an IV, then I gone to start work on my left hand or I

18   need to do anything.  In that opinion, my nerve is moved

19   from -- moved.  So this going also to confuse the medical

20   facility in the army, no?  So his letter that he give me was a

21   false letter.

22   Q.  Now, Mr. Giladi, there came a time, you told us earlier

23   this morning, that you took five weeks vacation in Israel?

24   A.  Yes.

25   Q.  As you said, to get some answers with respect to your --

1cdzgil4a                    Giladi - cross

1   A.  With a combination of seeing my family at the time also,

2   but at the time I'm seeing my family, I'm doing investigation

3   about seeing a physician, sure.

4   Q.  And you told us that you took that vacation starting

5   sometime in November?

6   A.  I do not know I said exactly.  I know that I took it and I

7   came back in January.  That's the only thing I remember.

8   Q.  So do you recall telling us this morning, Mr. Giladi, that

9   you took that vacation sometime starting in November or

10  December of 1992?

11  A.  I said I took it either the end of November or beginning of

12  December, and I came back to the United States in January.

13  Q.  Okay.  So we're in agreement then?

14  A.  Absolutely.

15  Q.  You left in November or December.

16          Now, the last visit that you had with Dr. Strauch,

17  before you left on this vacation was in October of 1992,

18  correct?

19  A.  That's correct.

20          (Continued on next page)

21

22

23

24

25

1   Q.  And isn't it a fact, Mr. Giladi, that Dr. Strauch told you

2   that he had not transposed the ulnar nerve before you ever went

3   on that vacation?

4   A.  It is not true.  He implied one time which make me assume

5   that this is the situation.  When I came to him to his office

6   and he told me that I am laying down, laying on my nerve.  This

7   implied that the nerve was not being transposed.  Then three

8   weeks later he was giving me a letter saying that the nerve was

9   being transposed.  So now my question is, the nerve is being

10  transposed or not being transposed.  On the one hand the doctor

11  implying that the nerve was being transposed, tell me that the

12  nerve was not being transposed, on the other hand, he's

13  implying that it is not.  When I asked him clearly --

14  Q.  My question to you --

15          MR. DINHOFER:  Your Honor, he was still answering.  He

16  was interrupted.

17  A.  If the doctor told me clearly, I never transposed the nerve

18  and he will tell me that we had the problem in the OR, the

19  nerve was being niched and we did not transpose the nerve, as I

20  said before we would not be sitting here.  I would go to

21  immediately take care of the problem and take care of the

22  problem.  This was never been done.

23  Q.  And --

24          MR. DINHOFER:  Let him finish.

25          THE COURT:  The question is, isn't it a fact that

1   Dr. Strauch had told you he had not transposed the ulnar nerve
2   before you went on that vacation.
3   A.  By this, word by word, I did not transpose the nerve, he
4   never said it.
5   Q.  And if he had, as you said, we wouldn't be here, right?
6   A.  Because I will be taking care of my body and I'm not going
7   to be in a situation which I have today.
8   Q.  And there would be no basis for this lawsuit, right?
9   A.  No, that's not what I'm -- the lawsuit is not based on
10  transposed or not transposed.  This is not the case.
11  Q.  So that doesn't matter.
12  A.  What?
13  Q.  So it doesn't matter whether it was transposed or not
14  transposed?
15  A.  What's important is that he injured the nerve, concealed
16  the fact and lied to me over two years and told me over two
17  years, a year and a half, two years, that on a regular basis
18  that the nerve was transposed.
19  Q.  Well, let me ask you this.
20  A.  But the point is he never told me the nerve was severanced.
21  He -- if he told me that I will go for surgery immediately to
22  fix it.
23          MR. HEUBEL:  Judge, could he be asked -- I don't care
24  how long it takes to answer the question, as long as we're
25  answering the question.

1          MR. DINHOFER:  But the objection is still an

2     interruption of the finishing of the answer, your Honor.

3          THE COURT:  As long as he's finishing the answer and

4     answering the question.  He shouldn't be answering other

5     questions, nonresponsive questions.

6          MR. DINHOFER:  In good faith, he is answering the

7     question, Judge, to the best of his ability.

8          THE COURT:  You may continue.

9          MR. HEUBEL:  Thank you.

10    Q.  Mr. Giladi, earlier, much earlier, in fact, in June of

11    1995, you gave your first in a series of depositions in this

12    case, is that right?

13    A.  That's correct.

14    Q.  And you were represented by counsel at that deposition,

15    true?

16    A.  Yes.

17    Q.  And you spent some amount of time with your attorney

18    preparing for that deposition, correct?

19    A.  Could be we were talking, but --

20    Q.  What?

21    A.  Could be we were talking, but he did not tell me what to

22    say.

23    Q.  I didn't suggest that he told you what to say.  Did I say

24    that?

25    A.  Repeat your question.

 1   Q.  My question was did you spend some time in preparation for
 2   that deposition with your attorney?
 3   A.  Yes.  We spent some time in preparation, yes.
 4   Q.  And you understood when you gave that deposition that you
 5   were under oath, correct?
 6   A.  Yes.
 7   Q.  And you knew that everything you said was being recorded,
 8   right?
 9   A.  Yes.
10   Q.  Do you remember at page 210 --
11            MR. DINHOFER:  One second.
12   Q.  You were asked this question and giving this answer,
13   beginning at line 20.
14            MR. DINHOFER:  One second, please.  How far are you
15   planning on going?
16            MR. HEUBEL:  Line 20, page 210.
17            MR. DINHOFER:  To where?
18            MR. HEUBEL:  To the top, the end of the question.
19   Q.  So, do you remember, Mr. Giladi, being asked this question:
20   "Q.  Why don't you tell me what happened, then, over the
21   balance of your visits with Dr. Strauch as best you can in
22   chronological order.
23   "A.  Okay.  On one of the visits I asked Dr. Strauch why I have
24   the pain in the back of my elbow when the nerve was being
25   transposed and moved to the front.  And he told me that the

1CDFGIL5                          Giladi - cross

 1    transposition never took place."

 2                MR. DINHOFER:  I have an objection, your Honor.  If

 3    you read this section in its full context in quotation it's

 4    clear that what the question is referring to is the later

 5    conversation in January of '93 that my client testified to and

 6    not the conversation immediately postoperative.

 7                MR. HEUBEL:  Judge, he's free to read whatever he

 8    wants --

 9                MR. DINHOFER:  It's misleading.  As counsel pointed

10    out --

11                THE COURT:  I can't tell from the context.

12                MR. DINHOFER:  Maybe we should have a sidebar, your

13    Honor.

14                MR. HEUBEL:  Your Honor, he just told --

15                THE COURT:  He can clarify it.

16                MR. HEUBEL:  Could I have an answer to my question,

17    Judge?

18                THE COURT:  Yes.

19    A.  Yes, I think today during my testimony I clearly indicated

20    that when I came back from Israel with the EMG report from

21    Dr. Sadeh I asked Dr. Strauch regarding the transposition and

22    he took his notes and he told me that based on his office notes

23    the nerve was not being transposed, but based on the surgical

24    report the nerve was transposed.  And it's not any

25    contradiction to what this note, what happened during my

1    deposition.  He did say, but he never, he never confirmed that

2    he said.  He said on one hand, one record said yes, one record

3    said no.  This why I went to Dr. Spinner and this is why I went

4    to Dr. Rousso and this is why I went to Dr. Beasley.

5    Q.  My question was, Mr. Giladi, were you asked this question:

6    "Why don't you tell me what happened, then, over the balance of

7    the visits with Dr. Strauch as best you can in chronological

8    order.

9    "A.  Okay.  On one of the visits I asked Dr. Strauch why I have

10   pain in the back of my elbow when the nerve was being

11   transposed and moved to the front and he told me that the

12   transposition never took place."

13           Did you say that answer to that question or not?

14   A.  I just said now that on one of the visits --

15   Q.  I'm not asking what you said now.

16   A.  On one of the visits --

17           MR. HEUBEL:  Judge, could I have an answer to my

18   question?

19           MR. DINHOFER:  He keeps interrupting.  He's trying to

20   answer and Mr. Giladi keeps talking over --

21           THE COURT:  Just stop, stop.  You may answer the

22   question.

23   A.  I said it very clear today during the first part of my

24   testimony when my lawyer asked me the questions and I said very

25   clear when I came back from overseas with the EMG report,

1CDFGIL5                          Giladi - cross

```
 1   Dr. Strauch gave me two answers in one breath.  On one hand he
 2   said it was done.  On the other hand he said it was not done.
 3   This why I start to seek for medical opinion of more doctors
 4   like Dr. Spinner, Dr. Beasley, Dr. Rousso.
 5          I never say he did not say it.  He say it but he did
 6   not confirm it.  He never said to me clear your nerve was not
 7   transposed because we had a problem and we injured your nerve.
 8   He never said that.  He never said that the nerve was
 9   transposed or not transposed.  He said the nerve was being
10   transposed on one hand.  The report said transposed, my notes
11   said not transposed.  So yes, he said not transposed, but he
12   also said transposed.  He said both.
13   Q.  Are you finished?
14   A.  But this note saying yes, he did say that, but I did not
15   say here everything that he said like I said it it today.
16   Q.  Now, do you remember being asked this question, Mr. Giladi,
17   at page 212, line 15 to the following page, line 9.
18   "Q.  After this discussion with Dr. Strauch about the
19   transposition, what's the next thing you remember happening?
20   "A.  I believe before December of 1992 I told that to him."
21   A.  As I said, as I said before --
22          MR. DINHOFER:  Excuse me, that was not what the
23   deposition said.  It said not "that is what I told to him" but
24   it said -- you misread it.
25          MR. HEUBEL:  I'll read it again.
```

1CDFGIL5                    Giladi - cross

 1          MR. DINHOFER:  "I told him that."

 2   Q.  "I believe before December of 1992 I told him that."

 3   A.  What did I tell him?

 4          MR. DINHOFER:  There's more to the response.

 5   Q.  I'll continue.  "He said with time things will be better

 6   and it's already almost a year and things are the same.  How

 7   much longer do I have to wait until things will be better

 8   because I am very frustrated and I would like to know what to

 9   do.  He told me that everything is in my head and I have no

10   problem at this time."

11          Do you remember being asked that question and giving

12   those answers?  That answer.

13   A.  Yes, and because he told me that everything is in my head I

14   took the time off.

15   Q.  So the discussion when Dr. Strauch told you that he had not

16   transposed the nerve took place before you went on vacation in

17   November or December of 1992, correct?

18   A.  No.  If you recall, if you recall the question that I was

19   being asked by defense attorney prior to my answer, he asked me

20   what happened to the rest of the time.  I said very clear

21   before --

22          MR. HEUBEL:  Judge, may I ask that the witness --

23          MR. DINHOFER:  He's answering.

24          THE COURT:  Please, stop.

25          MR. DINHOFER:  He keeps interrupting the answer.

1CDFGIL5                    Giladi - cross

1           THE COURT:  Please focus on the question.  So the

2      discussion when Dr. Strauch told you that he had not transposed

3      the nerve took place before you went on vacation between

4      November and December of '92, correct?

5           THE WITNESS:  I still do not understand what he try to

6      get from me.  I am trying to respond to the line of questions

7      that he's asking.  Everything is being taken out of contact.

8      It was all this line of questioning started with the question,

9      when I responded, I was being asked to say what I recall not in

10     a chronological order, and I was just talking best of my memory

11     what's happening at the time.

12          THE COURT:  Okay, but try not to focus on the line of

13     questions.  It's cross-examination and you have to answer a

14     specific question that counsel asked.

15          THE WITNESS:  I will do my best, your Honor.

16     Q.  So my question was, do you remember that the discussion

17     that you testified about at your deposition where Dr. Strauch

18     told you that he had not transposed the nerve happened before

19     December of 1992?  Yes or no?

20     A.  As I said minutes ago, he never told me clear before

21     December, December, as I said before.  Everything that I said

22     there is a mix of my recollections.  I did not put time line

23     there.  I was just talking in general and I was changing gears

24     from one location to another.

25          I took the five weeks vacation because he told me that

1    I am hypochondriac and I said that this morning, too.

2    Q.  Mr. Giladi, you stated in your deposition that Dr. Strauch

3    told you that he had not transposed the nerve, correct?  At

4    some point that's what he told you.

5    A.  Yes, in January --

6    Q.  And you also said in response to this question, line 15 of

7    212, "After this discussion with Dr. Strauch about the

8    transposition, what's the next thing you remember happening?"

9    "A.  I believe before December of 1992 I told him that."

10            So this discussion about the ulnar nerve happened

11   before December of 1992, correct?

12            MR. DINHOFER:  Your Honor, this is now out of

13   context --

14            THE COURT:  Counsel, counsel.  I don't want speaking

15   objections.

16            MR. DINHOFER:  May we approach at the sidebar now,

17   because this is definitely out of context now.  If you read the

18   questions before --

19            THE COURT:  Shh.  Shh.  Shh.

20            MR. HEUBEL:  Judge, I'll be happy to read the entire

21   thing.

22            THE COURT:  Sidebar.

23            (Continued on next page)

24

25

1CDFGIL5                        Giladi - cross

 1            (At the side bar)

 2            THE COURT:  Let me see --

 3            MR. DINHOFER:  If you read the questions before, he's

 4   talking about when he went to work and that's why he's saying

 5   in '92 he told him that.  It's totally out of context.

 6            THE COURT:  Which line were you reading?

 7            MR. HEUBEL:  I started --

 8            MR. DINHOFER:  It was this line here he was reading,

 9   and I was talking about what happened before.  Do you need

10   glasses?

11            MR. HEUBEL:  It was 210, line 20, to 213, line 7.

12            MR. DINHOFER:  Where I made the down arrows, the

13   specific part he was just reading right now, Judge, it's

14   totally out of context.  That's what he read before that I'm

15   going to come back to that's out of context.

16            MR. HEUBEL:  It's clearly one discussion, Judge.

17            MR. DINHOFER:  This transcript, by the way, goes

18   across and then across.  Doesn't go up and down like the other

19   ones.

20            THE COURT:  I don't understand why it's out of

21   context.

22            MR. HEUBEL:  It's clearly one discussion.

23            MR. DINHOFER:  He's saying I told him that in December

24   '92, but first this question here about going back to work and

25   what was going on at work in December of '92 and not about the

1CDFGIL5                        Giladi - cross

1    conversations he had with Dr. Strauch about the ulnar nerve

2    transposition not being done and it's mischaracterizing the

3    testimony in every which way by that.

4              THE COURT:  I disagree.

5              MR. HEUBEL:  Absolutely not.

6              MR. DINHOFER:  It's totally off point in

7    characterizing what that response is in response to.

8              THE COURT:  I don't think so.  You can clarify it on

9    redirect.

10             MR. DINHOFER:  I surely will.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury present)

2    BY MR. HEUBEL:

3    Q.  Mr. Giladi, would you agree with me that if you had this

4    discussion with Dr. Strauch where you say that he had told you

5    that he had not transposed the nerve, that if you had that

6    conversation before you went on vacation in or around November,

7    1992, then you knew when you left for Israel and when you met

8    with Dr. Sadeh and when you met with Dr. Rousso that your ulnar

9    nerve had not been transposed, correct?  And I'd like a yes or

10   no answer to that question.

11          MR. DINHOFER:  Objection, your Honor.

12   Q.  Or you can tell me otherwise if you can't answer it that

13   way.

14          MR. DINHOFER:  Thank you.

15   A.  At first I may used a wrong word during my deposition and

16   what I've been trying to say that he implied --

17          MR. HEUBEL:  Judge, if I may interrupt --

18          MR. DINHOFER:  Excuse me.

19          MR. HEUBEL:  It's a simple question.  If the

20   discussion was had before you went on vacation, then he knew

21   before he spoke to Rousso and before he spoke to, rather,

22   before -- right, and before he spoke to Sadeh that his ulnar

23   nerve had been transposed.

24          THE COURT:  Can the witness answer the question?

25          MR. DINHOFER:  He was answering.  This is a chronic

1CDFGIL5                    Giladi - cross

1    thing.  He keeps objecting in the middle of the witness' answer

2    as a pretext.

3            THE COURT:  And you keep speaking when you shouldn't.

4            MR. DINHOFER:  Because it's frustrating to hear him do

5    this and not let the witness answer.

6            THE COURT:  There you go again.

7            Can the witness answer the question?

8            THE WITNESS:  Yes, your Honor.

9            THE COURT:  Okay.

10   A.  I know that the nerve was not being transposed not by

11   Dr. Strauch, by Dr. Goodrich, who implied that it is a

12   possibility that that nerve has not been transposed and the

13   nerve has been injured.

14   Q.  And you saw Dr. Goodrich before you went on vacation,

15   right?

16   A.  That's correct.

17   Q.  Thank you.

18           Now, Mr. Giladi, when you eventually met with, at some

19   point you told us, and we saw some notes of Dr. Goodrich to

20   this effect, that you had scheduled a surgery with respect to

21   your ulnar nerve in November, I think November 11 of 2011 --

22   1992, correct?

23   A.  1993.

24   Q.  1993?  I'm sorry.

25           MR. HEUBEL:  Excuse me just a moment, Judge.

1       (Pause)

2  Q.  Now, Mr. Giladi, after you had the -- by the way, between

3  Dr. Strauch's surgery and the surgery by Dr. Rousso in April of

4  1994, you treated the pain in your elbow that you told us about

5  with over the counter pain medication, true?

6  A.  Mostly, yes.

7  Q.  Tylenol, Motrin, things like that, correct?

8  A.  Yeah, without --

9  Q.  Once you got out of the hospital, is that correct?

10 A.  Maybe once or twice I got prescription, but not on a

11 regular basis.

12 Q.  So over the course of that time from December of 2001, once

13 you were discharged from the hospital until April of 2004, you

14 treated yourself with a couple of exceptions solely with over

15 the counter pain medications like Tylenol and Motrin, right?

16 A.  What my physician provide me with, that's what I had to do.

17 Q.  And that was true of your physician Dr. Strauch or any of

18 the other physicians you went to with the possible exception of

19 a couple of times, right?

20 A.  Yes.

21 Q.  And after Dr. Rousso performed the surgery and since that

22 time you remarried, correct?

23 A.  Yes.

24 Q.  You met your wife, socialized, you met her?

25 A.  I'm not saying I socialized.  I just got -- I got married.

1    I said very clear I'm not socialized the way I used to.

2    Q.  I'm not asking you if it was the way you used to, but it

3    was enough to meet someone and get married, correct?

4    A.  Yes.

5    Q.  And from that marriage, you since that time have had two

6    children, correct?

7    A.  Yes.

8    Q.  Now, you told us that your relationship with your children

9    from the prior marriage is somewhat strained?  Some problems

10   there, that you attribute to your elbow pain?  Is that correct?

11   A.  Put it this way:  In every divorce you have a problem.

12   Sometime parents try to work very hard to resolve this problem.

13   When they have one party looking for some issues to create

14   problem, you try to avoid it.  In my situation, I couldn't

15   avoid it if my ex-wife tried to alienate the kids from me and

16   she have a good reason, your father's not coming, your father

17   said he would be here at 6:00, at 10:00, he can't make it, he's

18   not coming.  Because I called and said I cannot drive, I cannot

19   come because of my pain, and this is creating, giving

20   ammunition against me to the kids, who as of today are blaming

21   me for that time because I did not want to come.

22   Q.  Mr. Giladi there was a time and you told us earlier that

23   you came to understand that your wife had stabbed you, correct?

24   Did you tell us that?

25   A.  Yes, it was in '87.

1   Q.  And that she had some hostility towards you, correct?

2   A.  I'm not denying it.

3   Q.  I'm sure you're not, because you told us about that.

4   A.  I'm not denying it.

5   Q.  And subsequent to that, according to Dr. Strauch's

6   records -- excuse me, I'll get to it in a second.

7           Was there a time, Mr. Giladi, when you told

8   Dr. Strauch that your wife had traumatized your left upper

9   extremity, your left arm?

10  A.  It's not exactly what I told him.

11  Q.  Did you tell him something in sum and substance like that?

12  A.  I told him that she was trying to hurt my hand because she

13  know this hand is very sensitive.  She grabbed me in my hand

14  and when I said my hand, usually I talk about this area, and I

15  was able, and I was just moved away from her and this is what

16  happened.  And I told him that I need to know what's going on

17  and I need to have help, because people, she's using it against

18  me.  This is what I told him.  I just give him another issue to

19  raise to him that my condition is not a proper condition and I

20  have, I'm not functioning normal and I cannot deal with on a

21  daily basis with things that are happening and people are using

22  this against me.

23  Q.  Mr. Giladi, eventually you were involved in a divorce

24  action with your wife, correct?

25  A.  This is before that.

1CDFGIL5                         Giladi - cross

1    Q.  This was before that?

2    A.  My divorce was over before my surgery.

3    Q.  Your divorce ended in 1990, right?

4    A.  That's correct.

5    Q.  And there was also a custody battle as part of that, true?

6    A.  Yes, and we have joint custody.

7    Q.  And do you think that perhaps your children suffered

8    because of that and that some of your relationship with them is

9    affected by those times?

10   A.  Before my surgery I had a relationship with my kids.  I

11   used to go with him to the swimming pool.  He endured some

12   issues, but today when I speak with my older son he constantly

13   remind me of the period where I used to call and not to show

14   up, after my surgery.  Today as a physician he understand, this

15   is why I get along with him very well.  The youngest maybe in a

16   few years he will understand, but in the meantime he doesn't

17   want to understand it.

18   Q.  Since you mention it, Mr. Giladi, you can drive, right?

19   A.  Not in a big -- not in the beginning and every time -- and

20   I did my driving limited to the point only when necessary and

21   mandatory.  I used to go to work by train and buses.  I used to

22   use the car only when I had a location shoot when I had to rent

23   equipment, take it to work and return it.  For many years I did

24   not even own the car because I do not drive.  Whenever I need

25   to have a car I used to borrow from a friend or rent.

1CDFGIL5                    Giladi - cross

1  Q.  Mr. Giladi, you can drive today, right?

2  A.  I drive with some limitation.  I need to have a wide car.

3  I cannot drive with small cars.  I need to have space for my

4  elbow.

5  Q.  But you can drive, that's my question.

6  A.  What?

7  Q.  You can drive, can you not?

8  A.  A person with impotent hand can drive too.

9  Q.  In fact, in July of this year you drove from your home in

10  New Jersey to a physical examination in Manhattan by

11  Dr. Posner, correct?

12  A.  No, I did not drive.

13  Q.  And you drove back --

14  A.  Yes, I drove, you're right.

15  Q.  Of course I'm right.

16          MR. DINHOFER:  Objection.

17  Q.  And you drove back, too?

18          THE COURT:  Sustained.

19  Q.  You drove back too, right?

20  A.  20 minutes ride and I have a wide car and comfortable car

21  and I spend extra money because of my medical condition.  I

22  have kids.  I have kids to take care of and somebody have to

23  take care of them and I need the car.

24  Q.  By the way --

25  A.  And I said earlier, I try to live my life as somebody who

1   have no disability.  I do my best to take care of myself, to

2   take care of my family.

3   Q.  And at the present time, Mr. Giladi, you still continue to

4   use only over the counter medications to treat whatever pain

5   you have in your elbow, true?

6   A.  Not always.

7   Q.  True?  Most of the time?

8   A.  I'm not seeing a physician on a regular basis.

9   Q.  So you can't, so you haven't gotten prescriptions for pain

10   medication other than -- you haven't gotten prescriptions for

11   pain medications because you're not seeing physicians

12   currently, right?

13   A.  I'm not taking medication for a reason that, my condition

14   is a chronic pain at the moment, which used to -- what I had in

15   the beginning, it was a pain due to injury.  After six years,

16   seven years and Dr. Rousso said it very clear, my condition

17   began to be a chronic.  Chronic pain is something that will

18   stay with you forever.  I --

19   Q.  My question only was, Judge, whether he's taking other than

20   over the counter pain medication at the present time.

21         THE COURT:  That is the question.

22   Q.  Isn't that correct, that you're taking only over the

23   counter pain medication at the present time?

24   A.  Yes.

25   Q.  And, Mr. Giladi, you've done a lot of traveling by airplane

1    from outside the country and within the United States since you

2    had your surgery by Dr. Rousso, correct?

3    A.  Yes.

4    Q.  You go back to Israel frequently, is that right?

5    A.  When you say frequently, can you specify what it is

6    frequently for you.

7    Q.  Ten times a year?

8    A.  Absolutely not.

9    Q.  Five times a year?

10   A.  How many?

11   Q.  Five?

12   A.  Absolutely not.

13   Q.  Have you traveled to Las Vegas?

14   A.  Give a period.

15   Q.  In 2000?

16   A.  Hmm?

17   Q.  2000, 2003, 2004, 2005.  In the period from 2000 to 2010,

18   you've done a fair amount of traveling outside the country and

19   within the country by airline, correct?

20   A.  Just to let you know, since the beginning of this year I

21   did not travel to Israel at all.

22        THE COURT:  That doesn't answer the question.

23   A.  I don't have a list of how many times I travel.  My

24   traveling is limited in some way and sometime I went more,

25   sometimes I went less, but every time I travel with an

1   airplane, I took medication.

2   Q.  But you managed to travel, true?  Sometimes for vacation,

3   sometimes to visit family, right?

4   A.  I'm not denying that I'm trying to function as a human

5   being.

6   Q.  And I think you told us on the first day that you're the

7   primary caregiver at home?

8   A.  Yes, I do.

9   Q.  And does that mean that you get to spend a lot of time with

10  your kids?

11  A.  A lot of time between schools and sleep.  A few hours a

12  day, yes.

13          MR. HEUBEL:  Nothing further, Judge.  Thank you.

14          MR. DINHOFER:  I'm not going to be long, Judge.

15          THE COURT:  Okay.  Redirect.

16          MR. HEUBEL:  I'll leave the exhibits up there.

17          MR. DINHOFER:  Thank you.

18  REDIRECT EXAMINATION

19  BY MR. DINHOFER:

20  Q.  Mr. Giladi, when you travel by air, do you take any special

21  precaution in terms of the seating that you have on the

22  airlines?

23  A.  Yes.  I make sure that my seat will be to the window, I

24  make sure to the window that I sit will be to my left -- that

25  no people will be to my left side.

1   Q.   Why is that?

2   A.   To protect my elbow because any touch of my elbow will

3   create pain and electric shock to the fingers.

4   Q.   Now, Mr. Heubel started questioning you you with references

5   to Dr. Spinner.  Do you remember that questioning?

6   A.   Mm-hmm.

7   Q.   And he was questioning you about complaints that you had.

8   Did you offer any complaints to your little finger?

9   A.   No.

10  Q.   Were you offering complaints to any other part of your

11  hand?

12  A.   If I complain anything, I complained about finger one, two

13  and three, maybe, but again, most of my complain about the

14  biceps.

15  Q.   Okay.  You were complaining about the biceps from the

16  anesthesia problem you had?

17  A.   Yes.

18  Q.   When it said in I think Dr. Kaplan's records that you were

19  having a problem from the elbow to shoulder, is that what he's

20  referring to?

21  A.   Yes.

22  Q.   At any time did Dr. Spinner give you any kind of treatment

23  for your elbow?

24  A.   No.

25  Q.   Did Dr. Kaplan give you any treatment for your elbow?

1    A.  No.

2    Q.  Now, when you went to see Dr. Strauch, counsel made a big

3    point about the long flexor of the little finger.  Did you say

4    to Dr. Strauch I have a problem with my long flexor of my

5    little finger?

6    A.  No.

7    Q.  Is it only through this litigation that you came to

8    understand that there is such a muscle called long flexor of

9    the little finger?

10   A.  Yes.

11   Q.  I'm sorry?

12   A.  Yes.

13   Q.  In fact, can we agree that when you went to Dr. Strauch you

14   never complained initially about any problem with your little

15   finger?

16   A.  No, I complained -- my complaint was only about finger one,

17   two and three, after prolong time of work and up through the

18   wrist.  That was it.

19   Q.  And when you were complaining about weakness in your hand,

20   where was the weakness that you were complaining about when you

21   first went to Dr. Strauch in your hand?

22   A.   I complain about the weakness in my hand, about the three

23   fingers when I'm trying to work, and Dr. Strauch told me that

24   the weakness is because of the pain, I don't have any weakness,

25   he doesn't find any weakness in my hand.  This is what I

1    remember.  I'm not sure.

2    Q.  Okay.  And there were no complaints at that time related to

3    fingers three and four -- four and five, right?

4    A.  No.  I did not complain about pain in my elbow or any

5    problem in my elbow or problem with these fingers until I woke

6    up from surgery.

7    Q.  Now, an issue was made with regard to when you asked

8    Dr. Strauch for the letters for the military.  Could you tell

9    us how long from the time when you first asked Dr. Strauch for

10   a letter to the military was it until you first received that

11   actual letter for the military?

12   A.  I don't have the date in front of me, but it was not -- I

13   don't remember exactly the time, but --

14   Q.  He didn't, when you first asked him, he didn't run right

15   away to a typewriter and type out a letter for you so that you

16   could have it right away, did he?

17   A.  No, no.  I had to come back later, after a while.

18   Q.  Did it take a while until you got that letter?

19   A.  Yes.

20   Q.  Just like you asked him for the disability forms, it didn't

21   come right away, you had to --

22            THE COURT:  Counsel, try not to ask any leading

23   questions.

24   Q.  Was it the same thing with regard to the disability forms?

25   A.  Disability forms I said before, I came on the 18th, I asked

1    him for the paper.  He told me to go back to my boss, I talked

2    to him, I think it was sometime in January that I received the

3    first disability form.

4    Q.  Mr. Heubel tried cross examining you with some portions of

5    your deposition transcript, and he read to you this part where

6    you answered that before December of '92 you told him that.

7    Can I read to you the questions preceding and see if that gives

8    context to what you were talking about in December of '92 when

9    you said "I told him that" to Dr. Strauch?  Starting at page

10   211, line 20.

11   "Q.  How were you doing on your job?

12   "A.  Horrible.

13   "Q.  In what way?

14   "A.  Difficult to concentrate when you have a lot of pain and

15   you have to do creative work.

16   "Q.  Anything else?

17   "A.  Functioning with my hand.  I couldn't function with my

18   hand.  I could not operate with my hand.

19   "Q.  That's your left hand?

20   "A.  Yes.  My left hand.  I cannot operate with that.

21   "Q.  Did you mention anything else about how you were doing at

22   work?

23   "A.  This is my best recollection is what I told you.  That's

24   all I can remember."

25            And this gets to the question you were asked.

1    "Q.  After your discussion with Dr. Strauch about the

2    transposition, what's the next thing you remember happening?

3    "A.  I believe before December of 1992 I told him that."

4          Having heard the full context of the question and

5    answer that led to that response, do you recall what you meant

6    when you said I told him about that?

7    A.  I was talking about functioning at work.

8    Q.  You weren't talking about the fact that there was any kind

9    of transposition in the questions leading up to that, were you?

10   A.  No.

11         MR. DINHOFER:  I have nothing further, your Honor.

12         THE COURT:  Okay.  That's all for this witness?

13         MR. DINHOFER:  That's it.

14         THE COURT:  Mr. Giladi, you may step down.

15         (Witness excused)

16         THE COURT:  Shall we take a five-minute break?  Okay,

17   let's take a five-minute break.

18         (Jury excused)

19         (Continued on next page)

20

21

22

23

24

25

 1                (In open court; jury not present)

 2                THE COURT:  Is that it for plaintiff's case?

 3                MR. DINHOFER:  Let me talk with my client and see if

 4     there's anything else we need to cover.  I'm drawing a blank at

 5     this second.  Can I fall over when I say I rest?  Literally?

 6                THE COURT:  Mr. Heubel -- am I saying your name right?

 7     I've always said Heubel, is it Heubel?

 8                MR. HEUBEL:  I stopped directing people because it

 9     gets worse than that.  But it's Heubel.  I think you started

10     out correctly.

11                MR. DINHOFER:  I say Gerry.

12                THE COURT:  I'm not going to say Gerry, I'll say

13     Heubel.  Mr. Heubel, on the assumption that plaintiff rests,

14     you said you had a couple of applications.

15                MR. HEUBEL:  Yes.

16                THE COURT:  Do you want to preview those?

17                MR. HEUBEL:  Yes.  I'm going to move to dismiss as to

18     Dr. Sterman.  I'm going to renew my application to deny

19     punitive damages in the case, as well as with respect to the

20     physician defendants and the hospital defendant and that's

21     about it.

22                THE COURT:  Okay.

23                MR. HEUBEL:  And generally to dismiss the failure to

24     make a prima facie case.

25                THE COURT:  So a directed verdict essentially, or

1CDFGIL5                          Giladi - redirect

```
 1   dismissal.  Dismissal.

 2              MR. HEUBEL:  For the whole case and specifically as to

 3   Dr. Sterman and the hospital and then the punitive damages

 4   aspect of the case again.  I think that -- well, I won't argue

 5   again.

 6              THE COURT:  One question, this is sort of out of the

 7   blue, but one question I have is did Dr. Sterman live in New

 8   Jersey when this case was filed?  In 1994.

 9              MR. HEUBEL:  Yes.

10              THE COURT:  And --

11              MR. DINHOFER:  Plaintiff was living in Israel when the

12   case was filed.

13              THE COURT:  Was the plaintiff living in Israel or

14   visiting Israel with his brother and mother?

15              MR. DINHOFER:  His testimony was he lost everything

16   here and he couldn't afford to live here so he was living there

17   with his brother and mother, and he lived there until August at

18   which point he had the surgery with Dr. Rousso at which point

19   he came back to the United States to try it again.

20              THE COURT:  So when the case was filed he was living

21   in Israel with the intent to stay there?

22              MR. DINHOFER:  That's correct.

23              THE COURT:  Because if he was a resident of New Jersey

24   and defendant was a resident of New Jersey, there ain't no

25   diversity jurisdiction.
```

1              MR. DINHOFER:  I understand that, and he was very

2      clear that he was living with the intent to remain in Israel at

3      the time.  That's exactly -- he was treating, he had his

4      surgery, he was staying there, he was treating, doing his

5      therapy and living his life there.

6              THE COURT:  Okay.  And I wanted to ask Mr. Heubel, on

7      a motion for mistrial relating to punitive damages, not getting

8      to the merits of punitive damages --

9              MR. DINHOFER:  Not a mistrial?

10             THE COURT:  You previously moved for a mistrial,

11     right?

12             MR. HEUBEL:  I previously moved based on the fact the

13     doctors didn't have sufficient notice to retain counsel to

14     represent their uninsured interests in the case.

15             THE COURT:  Why would they need separate counsel?

16             MR. HEUBEL:  Because as counsel for the insureds, I'm

17     retained to represent them as to their insured interests.

18             THE COURT:  But there's no divergence of interest as

19     to punitive damages, is there?

20             THE COURT:  Well, there is enough that the defendants

21     were notified by their insurance company that they -- I don't

22     know the wording of the letter directly, but concerning

23     retaining separate counsel for their uninsured interests.  And

24     that generally is what happens.

25             THE COURT:  Yes, I've seen that.

1            MR. DINHOFER:  That's actually a matter of the

2    client's bad faith action against the defense counsel who

3    failed to advise them that ten years ago we were claiming

4    punitive damages, that if there was some damage that accrued to

5    Dr. Strauch or Dr. Sterman because they weren't advised, then

6    they may have a claim against Parker O'Donald who was

7    representing them at the time or attorneys who filed the claim

8    at that time and they failed to act on that.  Once they had the

9    notice that I gave them in the pretrial orders that we did and

10   the drafts that we did back in early 2000 or 2001, at that

11   point that information should have been communicated by those

12   attorneys and that's all that relates to is that possible bad

13   faith claim that they may have should a verdict come in for

14   punitive damages as against their former attorneys.

15           THE COURT:  When you say notice ten years ago, you

16   mean the proposed jury instructions on punitive damages to

17   which the defendants objected?

18           MR. DINHOFER:  But they still had notice nonetheless

19   that I was claiming it as part of this case and the law is

20   clear that I do not have to plead it.

21           THE COURT:  It's true you don't have to plead it.  You

22   have to plead sufficient facts in the complaint giving notice

23   to a factual basis for punitive damages.  You don't have to use

24   the words "punitive damages" as a cause of action.

25           In any event, I wanted a little clarification of that.

1   If plaintiff rests now, would it be possible to proceed with

2   your remaining witnesses and then we can take up the motions

3   after letting the jury go?  In other words, holding the motions

4   or applications in abeyance for an hour, a little more than an

5   hour?

6           MR. DINHOFER:  Given the jury's express desires, that

7   would be smart.

8           MR. HEUBEL:  I understand why the Court wants to do

9   that, but I feel compelled to ask the Court to address those

10  rulings before I proceed with my case in chief.

11          THE COURT:  I appreciate that you feel you have to

12  request that, but I don't really see the prejudice in

13  proceeding.  There's no -- I don't think there's any prejudice

14  with having you do those additional witnesses and I'll consider

15  the applications in an hour and twenty minutes.

16          MR. DINHOFER:  Judge --

17          MR. HEUBEL:  If your Honor were to resolve the

18  punitive damages question in favor of the defendants, that

19  might make a difference as to my case in chief.

20          MR. DINHOFER:  Most Courts that I've appeared before

21  usually reserve decision on those motions that are made midway

22  through until after the jury renders its verdict in any event

23  because of the fact it avoids the necessity of a retrial in the

24  event there were error in the decision one way or the other.

25          THE COURT:  Well, that's one of the options.

1CDFGIL5                          Giladi - redirect

1           MR. HEUBEL:  I understand that you have that option,

2     Judge.  However, I think that it's clear enough having heard

3     plaintiff's case that this isn't a case for punitive damages

4     and that continuing the case with the specter of punitive

5     damages is not necessary and complicates the defense

6     unnecessarily.

7           MR. DINHOFER:  Well, the jury knows nothing about

8     punitive damages, so I don't see how it complicates the

9     presentation to the jury.

10          MR. HEUBEL:  In terms of what I ask, who I put on the

11    stand and those types of decisions may differ depending upon

12    whether there's punitive damages left in the case or not.  And

13    I think there comes a point, Judge, and when plaintiff has had

14    his opportunity to put in all his proof, where the Court can

15    decide that issue at this juncture.

16          THE COURT:  I could, but I'm inclined to deny these

17    applications without prejudice and complete the evidence and

18    then reconsider them at the end of the evidence or possibly

19    until after a verdict, because I think it does put the record

20    in a better position for any future proceedings.

21          Let me ask you with respect to the punitive damages

22    issue.  There was testimony from Dr. Rousso, in some ways it

23    might have been confusing because there was a lot of different

24    testimony and sometimes it wasn't sort of neatly in the form of

25    an expert report, but there arguably was testimony relating to

1    the perception of a laceration and also these issues about

2    whether a transposition was done or was not done.  What's your

3    response to plaintiff's argument that the failure to inform, if

4    in fact the circumstantial evidence shows that that happened,

5    that this sort of mistake happened and informing the patient

6    about that sooner would have had a positive result and in fact

7    there was some quote-unquote fraudulent concealment of that,

8    why isn't that enough to support an instruction for punitive

9    damages?

10           MR. HEUBEL:  Judge, I think that you first have to go

11   to the standard of proof, which for punitive damages is clear

12   and convincing, unequivocal evidence.  And there's no way that

13   what we've heard up to this point in the trial through the

14   completion of plaintiff's case that there's anything that's

15   clear and convincing and unequivocal.  And I think that then

16   the danger, and the Courts have said that, because what you're

17   actually asking the jury to do is punish somebody for really a

18   public wrong and that it comes close to criminality.  So

19   because of that, the standard of proof is especially high and I

20   don't see how the plaintiff can meet that standard.  I have

21   some case law with respect to that that I'd be happy to pass up

22   to the Court.  The Court may be well aware of that.

23           THE COURT:  The case law does -- there is a high

24   standard, it is gross recklessness, wanton or willful or

25   intentional conduct that warrants punishment.

1          MR. HEUBEL:  But it has to be established not by a

2     preponderance of the evidence, but by clear and convincing

3     proof.

4          THE COURT:  I'll need to check that.  I wasn't certain

5     about that.

6          MR. DINHOFER:  Even that would still be a jury issue

7     as to whether or not that threshold were met, and one could

8     very well say that Dr. Rousso's testimony that I went in there

9     and I saw this, is clear and convincing; that I took a

10     photograph of it and I'm pointing it to you in a photograph is

11     clear and convincing, and that's up to the jury to make that

12     decision ultimately as to whether that standard was met just

13     like in every other burden of proof question.

14          THE COURT:  What about the application with respect to

15     Dr. Sterman?  What's your basis for that?

16          MR. HEUBEL:  Judge, the basis for that, my motion to

17     dismiss the case as to Dr. Sterman is I think that there's

18     ample evidence in the record so far and in terms of plaintiff

19     making his prima facie case, that in fact plaintiff hasn't.

20     The testimony has been that Dr. Strauch's custom and practice

21     is not to allow residents to cut tissue.  Dr. Iriizarry

22     testified to that, Dr. Strauch testified to that, Dr. Sterman

23     testified to that.  Additionally, residents in the State of New

24     York operate under the direct supervision of the attending, and

25     according to the case law in New York, as long as they're

1   operating under the direct supervision of the attending and

2   doing only what he tells them to do or allows them to do,

3   they're not liable, and the reason for that is it really puts a

4   pall on the ability of big teaching institutions to train

5   doctors.

6          So for all of those reasons, and certainly there's no

7   evidence despite a couple of comments by counsel that

8   Dr. Strauch was not in the operating room supervising this

9   surgery, the evidence is clear that he was doing the surgery

10  and Dr. Sterman was there in his assisting capacity, not

11  involved in neurolysis or decompression of the nerve.

12          THE COURT:  Mr. Dinhofer, it is true that all the

13  testimony was that Dr. Sterman did no cutting.

14          MR. DINHOFER:  That is not correct, your Honor.

15          THE COURT:  What testimony contradicts that?

16          MR. DINHOFER:  There was testimony that I read from

17  Dr. Strauch's deposition where he said the operative report

18  indicates what Dr. Sterman did, number one, and there were

19  twice readings to Dr. Sterman from his deposition where he said

20  this is what I did.

21          THE COURT:  But he clarified what he meant.

22          MR. HEUBEL:  Those were all --

23          MR. DINHOFER:  It's up to the jury as to whether or

24  not they're going to accept his clarifications or not.  You're

25  talking about dismissing a cause of action whether or not I've

1   adduced sufficient evidence to get the case to a jury.  Those

2   statements, the three statements combined are sufficient.  Plus

3   Dr. Irizarry, contrary to what counsel says, when I read to her

4   from her deposition, readily acknowledged that residents did do

5   cutting.  I read that portion to her and she acknowledged that.

6               MR. HEUBEL:  We acknowledge they did cutting and so

7   did they, but it's cutting of sutures, not of tissue.

8               THE COURT:  She did clarify that.

9               MR. DINHOFER:  That's qualification, but that's not

10  what she said at deposition.  And the question becomes one of

11  what the jury wants to believe.

12              MR. HEUBEL:  Judge --

13              MR. DINHOFER:  And it's not Dr. Strauch who is

14  responsible, it's the hospital who is actually responsible,

15  that's the respondeat superior theory against the hospital.

16              THE COURT:  Okay, Mr.  --

17              MR. HEUBEL:  But that's not --

18              MR. DINHOFER:  That's not up to the resident and it's

19  up to the jury to decide who did the actual cutting and I

20  believe it's a question of fact as to whether or not

21  Dr. Strauch was even in the OR, and I think the facts are what

22  went on.  Dr. Rousso said a senior surgeon would never have

23  done this, if in fact it had to happen, that there was a cut, a

24  senior surgeon should have been gotten to come back or to come

25  in.  There's enough in there to get the jury on the question of

1    whether or not Dr. Strauch was even in the OR.

2              MR. HEUBEL:  Judge, there's no evidence in this case

3    that Dr. Strauch was not in the OR.  I think, your Honor, you

4    can at some point say there is not enough evidence for the jury

5    to decide that Dr. Sterman was involved in any way cutting

6    tissues on this patient.  But again, even if he was, he was

7    under the direction, the supervision of Dr. Strauch, and under

8    that situation he's not individually responsible for that.

9              MR. DINHOFER:  But they deny it.  They deny that he

10   did it.  They can't say he did it under the supervision if they

11   deny that he did it.

12             MR. HEUBEL:  No, I'm saying --

13             THE COURT:  One at a time.

14             MR. DINHOFER:  The question is where does the lie

15   start and with whom?  Dr. Strauch clearly said the operative

16   report indicates what Dr. Sterman did.  That's enough to raise

17   the triable issue of fact as to whether or not Dr. Sterman did

18   the surgery.

19             MR. HEUBEL:  Aside from the fact I disagree with that,

20   the law is that if he did it, whatever he did, under the

21   supervision of the attending at the surgery, he is not

22   individually responsible.

23             THE COURT:  I believe that is essentially the law.

24             MR. DINHOFER:  But if the lie is that Dr. Strauch was

25   there and Dr. Strauch did the cutting and the jury disregards

1    that and accepts the testimony of Dr. Strauch that the

2    operative report indicates what the jury did, that under the

3    doctrine of falsus in unum, which I requested be charged to the

4    jury, then the jury can disregard the entirety and disbelieve

5    the fact that Dr. Strauch was even there at the time.  That's

6    their prerogative, your Honor.  That's what the inferences

7    permit.

8            THE COURT:  Not when there's so much evidence contrary

9    to that.

10           MR. DINHOFER:  I'm sorry, if it's false, it's false.

11   That's exclusively within the doctrine of the jury.  That's the

12   doctrine of falsus in unum.

13           THE COURT:  I think I'm going to take the applications

14   under advisement and proceed.

15           MR. HEUBEL:  Has plaintiff rested, by the way?

16           THE COURT:  Not yet in front of the jury.

17           MR. DINHOFER:  I want to hit the men's room before we

18   start and I said I wanted to have a moment to confer with my

19   client.

20           THE COURT:  So we'll take two minutes.

21           MR. HEUBEL:  Judge, can I ask with counsel's

22   permission to speak to the Court separately?

23           MR. DINHOFER:  I don't understand how that's possible.

24           MR. HEUBEL:  Well --

25           MR. DINHOFER:  I mean, if you want to try to discuss

 1   settlement, if that's your intent or something like that, sure.

 2   If it's on the issue of settlement, sure, I'm always in favor

 3   of that.  But if it's about the conduct of the trial, that's

 4   not appropriate.

 5          MR. HEUBEL:  I want some assurance that you have

 6   rested, you are resting.

 7          MR. DINHOFER:  We haven't gotten there yet.  The judge

 8   asked me before.  I want a moment to talk to my client to see

 9   if I haven't forgotten something, and I wanted to go to the

10   bathroom.  Once I do those two things, I'll give you my answer.

11   I said that very clearly.  You might have been talking to your

12   clients when the judge asked me that question.

13          MR. HEUBEL:  Judge, I understand your concern for the

14   jury, but I think this might be appropriate, once he has given

15   the assurance that they're going to rest that I have a

16   conversation with you, if it's agreeable to him.

17          MR. DINHOFER:  Ex parte?  I can't, unless it's for the

18   purposes of settlement.

19          THE COURT:  Why don't you discuss between

20   yourselves --

21          MR. DINHOFER:  You have to tell me what it's about.

22          THE COURT:  Off the record.

23          (Discussion off the record)

24          (Recess)

25

1CDZGIL6

```
 1              (In open court; jury not present)
 2              THE DEPUTY CLERK:  Judge entering.
 3              Jury entering.
 4              3:43 p.m.
 5              THE COURT:  Good afternoon, ladies and gentlemen.
 6              THE JURY:  Good afternoon.
 7              THE COURT:  You may be seated.
 8              Okay, Mr. Dinhofer.
 9              MR. DINHOFER:  Yes, your Honor.  Much to everyone's
10    relief, at this time plaintiff rests.
11              THE COURT:  Okay, plaintiff has rested.  That means
12    that's the end of the plaintiff's case.
13              We took a little longer, because we are working.  We
14    do have legal issues that come up, as I've told you, and now we
15    have some other legal issues to deal with, so I'm going to let
16    you go early today.  But please plan to come in at 9:30
17    tomorrow morning, as you did this morning, and we'll continue
18    from there, and hope to be -- hope to be done with the evidence
19    tomorrow, which would mean you'd hopefully begin deliberating
20    tomorrow afternoon.
21              Thank you again for your patience and time and
22    concentration on the case.
23              (Jury exits)
24              (In open court; jury not present)
25              THE COURT:  Okay, you gentlemen may step out.
```

1CDZGIL6

1          MR. DINHOFER:  Thank you.

2          (Recess)

3          4:30 p.m.

4          THE COURT:  Okay, we're back on the record.  I

5     understand the parties have something to tell me.

6          MR. DINHOFER:  Yes, your Honor.  The parties have

7     agreed to settle this action in the net payable sum of

8     $600,000.  With that, plaintiff will be providing the defendant

9     with a general release.

10          MR. HEUBEL:  With a joint tortfeasor clause.

11          MR. DINHOFER:  A stipulation of discontinuance.

12          MR. HEUBEL:  Separately as to Dr. Sterman, and a

13     separate stipulation of discontinuance with prejudice as to

14     Montefiore and Dr. Strauch.

15          MR. DINHOFER:  And they also request that a hold

16     harmless letter with regard to any liens, of which there are

17     none.

18          MR. HEUBEL:  There is a --

19          MR. DINHOFER:  A subrogation interest held by the

20     1199, and I have to debate with them whether or not they're

21     entitled to that under the 355 of the general obligation law

22     that was passed a year ago, last October.

23          MR. HEUBEL:  And the understanding is that the

24     plaintiff will be responsible for any and all liens that there

25     are, attributable to the --

1CDZGIL6

1          MR. DINHOFER:  There are no liens.  It's just that one

2     subrogation interest by the insurance carrier, it's a

3     contractual right of action, it's not a lien under the law.

4          MR. HEUBEL:  We also have an agreement that the

5     proceeds of settlement will not be paid for up to 90 days, and

6     the hold harmless agreement you talked about is in a particular

7     FOJP form, which I will send to you.

8          MR. DINHOFER:  Okay.

9          MR. HEUBEL:  Which includes an agreement not to

10    publicize.

11         MR. DINHOFER:  Okay.  Just so you're aware, some of

12    those hold harmless agreements require me as attorney to sign.

13    A city bar ethics opinion said that's inappropriate, that's

14    called Champerty, and as an attorney we're not allowed to sign

15    those interests, because we don't have those rights and

16    interests.

17         MR. HEUBEL:  There are parts of the hold harmless lien

18    that you're not aware of any liens and you won't publicize, and

19    we'll arrange that you can agree to hold --

20         MR. DINHOFER:  That's in the form of a settlement

21    agreement, that I understand.

22         THE COURT:  You mentioned a --

23         MR. DINHOFER:  I'm talking about the fiscal, I'm not

24    allowed --

25         THE COURT:  You mentioned an 1199 issue, that's

1CDZGIL6

1    something that --

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1CDFGIL7

1          MR. DINHOFER:  1199 is his union.

2          THE COURT:  Okay.

3          MR. DINHOFER:  Okay, and they have a small claim of

4     less than $6,000, that is to say for the medical bills for

5     Dr. Strauch's procedures that they believe they're entitled to

6     reimbursement from.  It is the law in malpractice cases, of

7     course, that in the instance of a favorable verdict the

8     defendant is not allowed to keep the proceeds of the procedure

9     that he did inappropriately, so therefore the insurance company

10    believes to be a subrogation which is a contractual remedy that

11    they're entitled to it.  However, the passage of GOL355 last

12    year specifically states that unless it was a qualified ERISA

13    plan, which the 1199 is not, then they are not entitled to it.

14    However, I may have given them a letter of representation many

15    years ago that may, and I don't know if it's been decided in

16    the courts, how that affects a subsequent enactment.

17         THE COURT:  Okay.

18         MR. DINHOFER:  That's just an issue for debate with

19    1199 that I will use in reducing their lien.

20         THE COURT:  In any event, however, that's resolved,

21    that's all on you.  It doesn't affect the settlement.

22         MR. DINHOFER:  Yes.

23         MR. HEUBEL:  It's my understanding that the plaintiff

24    has never been a recipient of Medicare or Medicaid?

25         MR. DINHOFER:  That's correct.

1CDFGIL7

1          THE COURT:  And you said up to 90 days for payment?

2     One payment?

3          MR. HEUBEL:  Up to 90 days from receipt of these

4     documents properly executed.

5          MR. DINHOFER:  I would hope we'll have those documents

6     done within the week, before the end of the week.

7          MR. HEUBEL:  I'll have them to you tomorrow.

8          MR. DINHOFER:  Good.

9          THE COURT:  And I assume the insurance company is

10    fully on board with this and there's no need for separate

11    representation by them.

12         MR. HEUBEL:  That's correct.

13         THE COURT:  Okay.  That seems adequate in terms of

14    documenting the settlement.  Is there agreement in terms of

15    confidentiality, advertisement, that sort of thing?

16         MR. DINHOFER:  That's in the documents and I have no

17    problem with that.

18         MR. HEUBEL:  Counsel has agreed.

19         MR. DINHOFER:  My client has no problem with that

20    either.

21         MR. HEUBEL:  Counsel and his client I believe are in

22    agreement not to publicize the terms of the settlement.

23         MR. DINHOFER:  Correct.  He may tell his wife and

24    accountants for whatever purposes need be, but beyond that it

25    will go no further.  And I generally tell my clients not to

1CDFGIL7

```
 1   make any mention of it, too, because when the world finds out
 2   you have money they feel they're entitled to a part of it, as
 3   you know from all the lottery people.
 4              THE COURT:  Okay.
 5              MR. HEUBEL:  Thank you, Judge, for all your --
 6              MR. DINHOFER:  It was your first trial, I understand?
 7              THE COURT:  My first trial.
 8              MR. DINHOFER:  I hope it's a memorable one.
 9              MR. HEUBEL:  Judge, it was my first trial in federal
10   court, too.  I couldn't have had a better time.  The first time
11   I stepped into this case was the first time I ever stepped into
12   a federal courthouse and believe me there are things that are
13   fabulous about it, but there are lots of rules that we state
14   lawyers don't deal with on a routine -- are you taking this
15   down?
16              MR. DINHOFER:  I think we're done with the record.  I
17   think we can go off the record.
18              (Discussion off the record)
19              (Adjourned)
20
21
22
23
24
25
```

```
 1                      INDEX OF EXAMINATION
 2  Examination of:                         Page
 3  RONI GILADI
 4  Direct By Mr. Dinhofer . . . . . . . . . . . 835
 5  Cross By Mr. Heubel  . . . . . . . . . . . . 912
 6  Redirect By Mr. Dinhofer . . . . . . . . . . 971
 7                      PLAINTIFF EXHIBITS
 8  Exhibit No.                             Received
 9   16    . . . . . . . . . . . . . . . . . . 888
10                      DEFENDANT EXHIBITS
11  Exhibit No.                             Received
12   B   . . . . . . . . . . . . . . . . . . . 859
13
14
15
16
17
18
19
20
21
22
23
24
25
```